UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

United States of America,     )
                              )
                Plaintiff,    )
                              )
        vs.                   )        File No. 1:20-cr-107
                              )
Dawson M. Rouse,              )
                              )
                Defendant.    )

TRANSCRIPT OF DIGITAL RECORDING
DETENTION HEARING

Taken at
United States Courthouse
Bismarck, North Dakota
July 16, 2020

BEFORE THE HONORABLE CLARE R. HOCHHALTER
-- UNITED STATES DISTRICT COURT MAGISTRATE JUDGE --

<u>APPEARANCES</u>

MR. GARY LEE DELORME
U.S. Attorney's Office
220 E. Rosser Ave.
P. O. Box 699
Bismarck, North Dakota 58502-0699

FOR THE UNITED STATES

- - - - - - - - - -

MR. MICHAEL R. HOFFMAN
Attorney at Law
120 North Third Street, Suite 100
P. O. Box 1056
Bismarck, North Dakota 58502-1056

FOR THE DEFENDANT

- - - - - - - - - -

GOVERNMENT WITNESSES

Page No.

Brandon Rask
   Direct Examination by Mr. Delorme          5
   Cross-Examination by Mr. Hoffman          30
   Redirect Examination by Mr. Delorme       35
   Recross-Examination by Mr. Hoffman        39

Patrick Jensen
   Direct Examination by Mr. Delorme         40
   Cross-Examination by Mr. Hoffman          43


- - - - - - - - -



DEFENSE WITNESS

Bobby Wiseman
   Direct Examination by Mr. Hoffman         44
   Cross-Examination by Mr. Delorme          47
   Redirect Examination by Mr. Hoffman       50


- - - - - - - - -


Certificate of Court Reporter - Page 68


- - - - - - - - -

1              (The above-entitled matter came before the Court, The

2    Honorable Clare R. Hochhalter, United States District Court

3    Magistrate Judge, presiding, commencing at 1:30 p.m., Thursday,

4    July 16, 2020, in the United States Courthouse, Bismarck, North

5    Dakota.  The following proceedings were had and made of record

6    by digital recording in open court.)

7              - - - - - - - - - - -

8              THE COURT:  We're on the record in *United States of*

9    *America versus Dawson M. Rouse*, Criminal Case 1:20-cr-107.

10   Counsel, if you would please note your appearances for the

11   record.

12             MR. DELORME:  Gary Delorme on behalf of the United

13   States, Your Honor.

14             MR. HOFFMAN:  Michael Hoffman on behalf of the

15   defendant, Mr. Rouse.

16             THE COURT:  All right.  And, Mr. Hoffman, I have this

17   scheduled today for a detention hearing, planning to proceed by

18   videoconference today.  Is defendant prepared to go forward?

19             MR. HOFFMAN:  Yes, Your Honor.

20             THE COURT:  And, Mr. Delorme, is the United States

21   prepared?

22             MR. DELORME:  Yes, Your Honor.

23             THE COURT:  Testimony anticipated today?

24             MR. DELORME:  Yes, Your Honor.  I have two witnesses

25   to present today.

1          THE COURT:  All right.  And, Mr. Hoffman, any

2    testimony anticipated today?

3          MR. HOFFMAN:  Mr. Delorme asked me that before the

4    hearing, and I said no, but I think I may call Ms. Wiseman

5    briefly.

6          THE COURT:  Okay.  All right.  Go ahead, Mr. Delorme.

7          MR. DELORME:  Thank you, Your Honor.  The United

8    States would call Detective Brandon Rask to the stand.

9                          BRANDON RASK,

10   having been first duly sworn, was examined and testified as

11   follows:

12                     DIRECT EXAMINATION

13   BY MR. DELORME:

14   **Q.**   All right.  Detective Rask, can you please state and spell

15   your name for the record?

16   A.   First name, Brandon, B-r-a-n-d-o-n; last name, Rask,

17   R-a-s-k.

18   **Q.**   And you are a detective with the Bismarck Police

19   Department, correct?

20   A.   That is correct.

21   **Q.**   How long have you been a detective with the Bismarck

22   Police Department?

23   A.   I've been a detective for approximately 7 years.

24   **Q.**   Okay.  And what are your assigned duties as a detective of

25   the -- with the police department?

1    A.    Typically as a detective we're assigned police reports

2    that are fielded by patrol originally that are beyond the scope

3    of a patrol officer's abilities, and we conduct further and

4    oftentimes complex investigations as a result of those reports.

5    **Q.**   And are you one of the assigned investigating individuals

6    or detectives for this particular matter?

7    A.    Yes.

8    **Q.**   How did this matter first come to your attention?

9    A.    It first come to my attention when I received a phone call

10   from Officer Brett Naill, who is a patrolman with the Bismarck

11   Police Department.  He made me aware of a circumstance in which

12   two young teenage girls had left the residence without

13   permission from their parents.  Essentially the initial report

14   was a curfew violation.

15           THE COURT:  Hang on once, counsel.  Detective, if you

16   maybe lean back a little further from the mike but make sure

17   it's in front of you so you're directing your testimony at the

18   microphone, that'll help, and then we'll get some of that

19   interference maybe --

20           THE WITNESS:  Sure.

21           THE COURT:  Mr. Delorme.

22   **Q.**   (MR. DELORME CONTINUING)  Detective Rask, was that a

23   matter then referred to you for investigation at that point?

24   A.    Yes, it was.

25   **Q.**   And what did you do once you received it?

6

1    A.   I received -- I actually arrived at work, and before I had

2    received the report -- the following day I received another

3    call from Officer Brett Naill, who had indicated to me that

4    additional information had come forward.  As a result of that

5    additional information, I had arranged interviews with the

6    first two alleged victims.

7    **Q.**   Okay.  And from there did you, I guess, roll this

8    investigation into a larger investigation at some point,

9    culminating in the Indictment that is now before the Court?

10   A.   Yes.

11   **Q.**   And it's a 27-count Indictment currently, correct?

12   A.   That is correct.

13   **Q.**   In that Indictment -- can you just tell the Court how many

14   victims you identified that are reflected within the body of

15   the Indictment?

16   A.   Within the Indictment itself, there's 15 victims.

17   **Q.**   Okay.  And the counts that are now before the Court are

18   charges of production of child pornography, attempted

19   production of child pornography, coercion and enticement,

20   attempted coercion and enticement, and transfer of obscene

21   materials, correct?

22   A.   Correct.

23   **Q.**   So a variation of all those counts in those 27?

24   A.   Yes.

25   **Q.**   Is this investigation, you know, deemed closed at this

1    point in time or completed, or is it an ongoing investigation?

2    A.   It's ongoing.

3    **Q.**   In fact, can you indicate to the Court what you -- I guess

4    developments you've had in the last few days involved with this

5    particular matter?

6    A.   As of this previous Saturday I was able to locate and

7    interview an additional victim, that the disclosure of whom

8    would result in two additional violations of the United States

9    Code.

10   **Q.**   And at this point in time are you continuing to work to --

11   investigating leads that you've developed in this particular

12   matter?

13   A.   Yes.

14   **Q.**   And how many leads possibly are you looking at at this

15   particular time?

16   A.   It's difficult to put an exact number on it, but I would

17   approximate that I still need to interview between two and four

18   dozen young women.

19   **Q.**   And that's just with the information you have at this

20   point, correct?

21   A.   Yes, that's based solely on information -- mostly word of

22   mouth and information that I found during phone examination.

23   **Q.**   Okay.  Are you expecting additional information as part of

24   your investigation via search warrants that you expect will

25   result in additional developments?

1    A.    I am.  In fact, I completed affidavits of probable cause

2    and successfully obtained search warrants for iCloud data in

3    relation to Dawson's account, as well as multiple Snapchat

4    accounts.  And I have received back production of Verizon data,

5    as well as Sideline application data that I have not yet looked

6    at.

7    **Q.**    Okay.  And just reflecting back to the 27 counts we have

8    now, can you tell the Court what the general age range is that

9    -- that you've discovered were involved in these particular

10   allegations?

11   A.    Within the victims listed in the Indictment, the age range

12   was 13 years of age to 17 years of age, but most of those

13   reside within the age range of 13 to 15 years of age.

14   **Q.**    Okay.  And today Mr. Rouse is 21 years of age, correct?

15   A.    That's correct.

16   **Q.**    Okay.  Is there any commonality as to how -- timeframes

17   when Mr. Rouse would communicate with these individuals or try

18   to meet with them?

19   A.    His pattern of conduct appeared that he would communicate

20   with them oftentimes throughout the day, into the evening and

21   early morning hours.  But if there were to be a closing-in on a

22   physical meeting, oftentimes those were arranged to occur in

23   the late evening and very early morning hours.  I would say

24   between the hours of 9:00 p.m. and 5:00 a.m. oftentimes.

25   **Q.**    Okay.  And the mode of communication was primarily what?

1    A.    The mode of -- excuse me?

2    Q.    Communication.

3    A.    Primarily Snapchat.

4    Q.    Okay.  And were there additional means of communications

5    such as texting and telephone?

6    A.    There were, depending on the victim.  I was informed that

7    communications occurred over Snapchat; SMS, which is

8    short-message service, text messaging; in addition to FaceTime

9    on occasions and also phone calls.

10    Q.    Okay.  So the current Indictment, the individuals or

11    (inaudible) the counts that are alleged where there was conduct

12    resulting in contact between the defendant and the victim,

13    those mostly took place during the hours of 9:00 and 5:00 a.m.,

14    correct?

15    A.    Correct.

16    Q.    Was there at least one occasion where there was a daytime

17    attempt to meet with somebody by the initials K.B.?

18    A.    Yes, there was.

19    Q.    And tell us just a little bit about that.

20    A.    This resulted in -- there were communications that

21    resulted in an attempted meeting.  I believe this occurred in

22    April or May of 2019.  According to the communications I

23    located, the victim that you referred to as K.B. was on a

24    family camping trip at Cross Ranch State Park.  At the same

25    time Dawson Rouse happen to be at Cross Ranch State Park, from

10

1    what appeared to be in communications, for a event that was

2    associated with the Boy Scouts of America.

3    **Q.**   Okay.  Did that meeting ever result in any interaction

4    between Mr. Rouse and that particular individual?

5    A.   Of all of the attempts were made, it didn't appear that

6    that meeting materialized.

7    **Q.**   I'm just going to have you back up just a tiny bit again

8    because you're starting to get a little close to --

9    A.   Sorry.

10   **Q.**   -- the microphone.  It's okay.  How about in those counts

11   alleged in the Indictment, were there any meetings that took

12   place away from the Fargo (sic) area -- or where any

13   individuals were transported away from the Bismarck area?

14   A.   There was.  You have numerous victims away from Bismarck.

15   Some of those include Center, Garrison, and one in particular

16   he arranged to meet in Bismarck and pick up and take to the

17   Fargo area, where it was reported that he took her to a rural

18   area in Cass County and engaged in sexual acts.

19   **Q.**   And that did take place in Cass County?

20   A.   Yes.

21   **Q.**   Now, I know one of the things that's going to come up

22   today is -- you know, what we're presenting to the Court is

23   evidence of a threat to the community and/or a threat to not

24   appear.  One of the things that I know will be raised because

25   of the bail report is that he has a home or a residence that he

1    can -- he can go to, which is his parents' residence.  This

2    conduct that you're talking about, can you tell us where

3    primarily the communications were -- were conducted from?

4    A.    Where the communications were conducted from?

5    **Q.**   Yes.

6    A.    It's believed that they were conducted from his residence.

7    **Q.**   Okay.  And is that the residence that he would have shared

8    with his parents?

9    A.    Yes.

10   **Q.**   And did he reside at his parents' residence throughout the

11   time period of your investigation, going back to -- I believe

12   in the Indictment there's at least one count that goes back to

13   2017, all the way through April 21st.

14   A.    That's my understanding, yes.

15   **Q.**   Are you aware of any incidents that were taking place with

16   Mr. Rouse while at the family residence or on family property?

17   A.    I do.

18   **Q.**   Can you tell us a little bit about that?

19   A.    There were multiple instances where Mr. Rouse was alleged

20   to have engaged in sexual intercourse with minor females at a

21   detached garage at the family residence.  These multiple

22   incidents involved two minor females.

23   **Q.**   Okay.  And what were the age of these females?

24   A.    One of them was age 13.  One of them was age 14.

25   **Q.**   Now, aside from the concern probably raised to you by the

1    communications and the conduct between Mr. Rouse and these

2    individuals from age 13 to 17, were you -- or did you become

3    aware of any other information through your investigation that

4    raises additional concern as far as Mr. Rouse's conduct with

5    some of these victims?

6    A.   Yeah.  On a variety of occasions he disclosed that he's

7    much younger than he actually was.  In some instances he

8    actually provided a photograph of an altered identification

9    card that made him perceive to be three years younger than he

10   actually was.

11   **Q.**   Okay.  And were you able to identify or corroborate any of

12   this information or find evidence that he presented a false

13   card?

14   A.   I actually found a photograph on his phone of the

15   identification card that had an altered date of birth.  His

16   actual date of birth is November 25th of 1998.  The

17   identification card in question reflects his date of birth as

18   November 25th, 2001.

19   **Q.**   Okay.  So shed three years off of his age?

20   A.   That's correct.

21   **Q.**   And these communications, did Mr. Rouse identify himself

22   personally throughout, or were there additional personas that

23   he used?

24   A.   Oftentimes he would provide his real name, but there were

25   other additional accounts that he would provide an alternative

1  name.

2  **Q.**   Okay.  Focusing in a little bit on, you know, the conduct

3  with some of the victims that he had actual -- met face to

4  face, was there any concern as to what kind of conduct he was

5  engaging in with them?

6  A.   There was.

7  **Q.**   What was that?

8  A.   He had a strong interest in BDSM type of sexual behavior,

9  which is an overlapping acronym that stands for three different

10  types of sexual interactions, the first being bondage

11  discipline; the second being dominance submissive; and the

12  third being sadism and masochism, all of which are types of

13  sexual behavior that are associated with types of violence,

14  such as slapping, choking, hair-pulling, scratching, restraint

15  use and things of that nature.

16  **Q.**   Okay.  And did you discover any evidence of him carrying

17  on with conduct with -- with some of these minor individuals?

18  A.   Yeah, during the interviews with these females, they

19  disclosed much of the behavior that I just mentioned.

20  Specifically, they brought up scratching, hair-pulling, choking

21  and slapping.

22  **Q.**   Okay.  And when you -- correct me if I'm wrong.  One of

23  the individuals that provided you some of that information was

24  14 at the time that this conduct took place, correct?

25  A.   That's correct.

1  **Q.**   Were you able to identify any evidence that corroborated,

2  you know, this kind of abusive conduct towards victims?

3  A.   I did.  I found photographers of some of the victims on

4  the phone.  One in particular depicted a 14-year-old girl's

5  back who had endured significant -- significant scratching, to

6  the point where many of the scratches had drawn blood.

7  **Q.**   And as far as the BDSM, I guess the type of conduct that

8  he was directing towards his victims, were there anything else

9  that you found that was of particular interest when you -- when

10  you searched his devices?

11  A.   I did.  I found a video, during which it depicts a

12  completed sexual consent contract with a 14-year-old female.

13  The verbiage in that contract outlines what can and cannot be

14  done during sexual encounters, to include some of the BDSM

15  contact -- or some of the BDSM events that I'd mentioned

16  before.

17  **Q.**   Okay.  Were you also able to discover and obtain a

18  contract on Mr. Rouse's cellular phone?

19  A.   I did.  I found a Google search history for BDSM contract.

20  And in addition to that, I found a Word document saved in his

21  OneDrive that was titled "CF," which is believed to be consent

22  form.

23  **Q.**   Okay.  Now, the victims that you did identify in your

24  interview, did you, working with them, identify them -- or did

25  any of them personally identify Mr. Rouse as the person that

15

1    would've engaged in the communications and/or communicated with

2    them and had a contract with them?

3    A.    Yeah, they did identify him by a photograph in a photo

4    lineup.  Some of them did, yes.

5    **Q.**    So numerous of the victims would have identified him via

6    (inaudible)?

7    A.    Multiple, yes.

8    **Q.**    Now, some didn't identify him, correct?

9    A.    That is correct.

10    **Q.**    And what's the reason?  I guess what's the rationale for

11    that?

12    A.    We found that some of the girls that were unable to

13    identify him, through their interviews they indicated that they

14    had not received any photographs from him through Snapchat and

15    had not met with him either, and so that would be a normal

16    reason of why they wouldn't know what he looked like.

17    **Q.**    Okay.  Now, relative to the Indictment, I know some of the

18    -- and some of the counts have a completed sexual exploitation;

19    some of them have attempted.  Insofar as the completed sexual

20    exploitation, were you able to discover actual images at any

21    time that depicted the sexual exploitation of minors?

22    A.    I did.  He had installed on his iPhone an application that

23    was designed specifically to hide photos and videos, and within

24    that application I found numerous files of nude, what I believe

25    to be at the time minor females.

16

1          Through further investigation into those images, I

2    was able to meet with numerous females who identified

3    themselves as being the subjects in the photos, and in addition

4    to that, there are additional photos that I have yet to

5    identify.  At this point I've found six victims that are

6    definitely depicted within that material in that application,

7    and there are others that I still need to identify.

8    Q.   And these individuals, when they, I guess, were

9    interviewed by you, indicated that these images were taken by

10   them and in response to a request -- a specific request from

11   Mr. Rouse?

12   A.   That's correct.

13   Q.   And you confirmed at the time of interviewing them that

14   when the images were taken, they were under the age of 18?

15   A.   Yes.

16   Q.   Did you -- and you said there's more images that you are

17   still working on as part of your leads, correct?

18   A.   That's correct.

19   Q.   Were there any, I guess, images or videos where you could

20   identify specifically Mr. Rouse engaging in any -- in any type

21   of conduct?

22   A.   There was.

23   Q.   Could you explain that for us, please?

24   A.   On -- in the same application that I had mentioned before,

25   I found a video of a male and a female engaged in

1   vaginal-penial intercourse.  It was simply a recording of their
2   torsos, and so no faces were shown, so that took extensive
3   investigation to determine who was depicted in that video.
4           As far as with respect to the female, she was wearing
5   pink-laced panties, and that was an item that could've been
6   used for identification and was used for identification.  I
7   suspected who the female may have been, at which time I went
8   and interviewed that female and asked her if she was the
9   individual in the video recording.  She not only stated that
10  she was, but she's also able to provide to me the pink panties
11  that were depicted in the video.
12  **Q.**   Okay.  And how about Mr. Rouse?  Were you able to identify
13  him in that video?
14  A.   I was.  During the sexual intercourse, the male removed
15  his penis from the female's vagina, at which point there is a
16  unique characteristic on the male's penis that led to me being
17  able to identify the male in that video as being Mr. Rouse.
18  **Q.**   And how were you able to do that?
19  A.   The unique characteristic in the video shows -- on the rim
20  of the penis, where the head connects to the shaft, slightly
21  right of center there appear to be a unique characteristic that
22  appeared to be an eighth-inch circular concave type of anomaly.
23          In speaking with the physician, I learned that this
24  was a very unique characteristic and used that to obtain
25  probable cause to obtain a search warrant to photograph

1    Mr. Rouse's penis.  In doing that and comparing those

2    photographs to the male penis seen in the video, they appear to

3    be the same.

4    **Q.**   Okay.  And when you presented Mr. Rouse with this search

5    warrant that you obtained, was he cooperative?

6    A.   He appeared cooperative other than that it appeared to me

7    at the time the photographs were taken -- he seemed to me --

8    this is my interpretation -- that he was manipulating his penis

9    in a way to hide that anomaly so that it couldn't be

10   photographed, until I directed him specifically how to hold his

11   penis so that it could be photographed.

12   **Q.**   Okay.  So including the newest victim that you talked

13   about that you discovered just within the past few days, all

14   this conduct occurred from roughly beginning the summer of

15   2017 -- 2017 to and through the date in which you conducted a

16   search warrant at Mr. Rouse's detached garage or shop area in

17   April, correct?

18   A.   Correct.

19   **Q.**   Now, you talked about you got ahold of his phone.  You --

20   you did a forensic examination of that or had a (inaudible)

21   looking through the phone.  I ask you to just give me some more

22   indication of things that would be of concern for you as far as

23   (inaudible) that you were seeing on the phone.  Can you tell me

24   some of those things that you were -- you were discovering as

25   you went through his phone?

19

1  A.  Yeah.  There was some concern in Internet browsing

2  history, in addition to some corroborative browsing history as

3  far as the BDSM activity.  Specifically in relation to the

4  browsing history, there were searches for rape.  There were

5  searches for rape fantasy.  There was BDSM search.  There was

6  BDSM contract search.  There was a search -- a Google search

7  specifically that read, quote, what does a mutilated female

8  genitalia look like, end quote.

9        Outside of that browsing history -- excuse me.

10  Within that browsing history there was also some video viewing

11  history that showed what types of videos he had been watching.

12  Some of those titles include, quote, three teen slaves

13  (inaudible) and humiliated by the BDSM master; quote, BDSM

14  rough sex with petite Latina teen, and another was cute teen

15  girls, BDSM punishment porn video.

16  Q.  Okay.  And just to kind of switch our focus a little bit,

17  Detective Rask, again, you know, what is often offered to the

18  Court in these detention hearings is that, you know, the

19  individual has a stable home to go to or a place where it can

20  be monitored by (inaudible).  So focusing in on that, I asked

21  you to kind of go through the -- your investigative file, what

22  you were seeing through phone call monitoring, other things,

23  texts that you were finding on the phone to tell me a little

24  bit about the stability of the home, correct?

25  A.  Yes.

1   **Q.**   And what -- just generally, before we get into any

2   specifics or timelines, what generally were you finding as you

3   went through and -- and conducted that research for me?

4   **A.**   There appears to be a significant historical and ongoing

5   issue with alcohol abuse.

6   **Q.**   Okay.  And by "historical," just going back in time, can

7   you tell us a little bit about an incident that occurred in

8   November of 2012?

9   **A.**   Sure.  I referenced a Burleigh County Sheriff's Department

10  law enforcement report and learned in November 2012 there was a

11  deputy response, as well as an ambulance response to the Rouse

12  residence for an unknown head injury to Daniel.  At that time

13  the deputy noted in his report that Daniel had been consuming

14  alcohol, and it was determined that he had fallen headfirst

15  into a grandfather clock that had resulted in a cut on the

16  bridge of his nose.

17  **Q.**   Okay.  And before going further, when you say "Daniel,"

18  are you referring to Daniel Rouse, the -- the father of the

19  defendant?

20  **A.**   Yes.

21  **Q.**   There's also an incident in 2013, correct?

22  **A.**   Correct.

23  **Q.**   Tell us a little bit about that, please.

24  **A.**   In 2013, apparently Daniel was reported, some suspicious

25  driving on the Capitol grounds, which resulted in later contact

21

1    at his residence, which resulted in a DUI investigation and his

2    arrest.  A blood test was done during that arrest, which

3    yielded a blood-alcohol concentration of .342, which is more

4    than four times the legal driving limit.

5    **Q.**   Okay.  And then going on a little bit further in time

6    then, in 2016 I think there was some additional issues that you

7    found or discovered?

8    A.   There was.  Upon doing an open source -- or, excuse me, an

9    open records request to Daniel's employer, I learned that there

10   was a pre-action notice given to him in May of 2016, and this

11   was the result of Daniel being found in the employer's parking

12   lot in his vehicle and intoxicated during business hours.

13             THE COURT:  What year was that?

14             THE WITNESS:  May of 2016.

15   **Q.**   (MR. DELORME CONTINUING)  And I think later in 2016 there

16   was another incident, correct?

17   A.   There was stemming from a Bismarck Police Department

18   contact with Daniel, which resulted in another DUI or -- or APC

19   investigation, during which Daniel was again issued a citation

20   for DUI and again blood-tested.  The results of that blood test

21   were a .393, which is nearly five times the legal driving

22   limit.

23   **Q.**   And that was in September of 2016, correct?

24   A.   That's correct.

25   **Q.**   Now, since that point in time are you aware of some

22

1    ongoing and continuing, I guess, conduct involving alcohol

2    abuse in that -- in that family household?

3    A.    I am.  Those -- those incidents that I mentioned obviously

4    are as recent as 2016, but after Dawson's incarceration and

5    during review of some phone calls, both audio and video, it's

6    evident that Lisa Rouse, Daniel's -- or, excuse me, Dawson's

7    mother, and Daniel Rouse, Dawson's father, are frequently seen

8    in what I interpret to be a state of intoxication.

9    Q.    Okay.  And just, I guess, for the basis of the Court

10   having an ability to understand your experience in making that

11   assessment, what kind of experience do you have as a law

12   enforcement officer prior to being a detective?

13   A.    I've been in law enforcement for nearly 18 years.  When I

14   began, I spent 8 years as a patrol officer, during which I

15   received training for DUI detection and impairment detection.

16   And so my judgment is based off of that training and all the

17   experience I had from patrol and into today with dealing with

18   individuals that are impaired due to substance abuse.

19   Q.    Okay.  And did you also discover some text messaging that

20   indicates that there was ongoing -- I mean, the family kind of

21   knew that there was this alcohol abuse issue, and they were --

22   they were trying to, I guess, deal with it on their own?

23   A.    I did.  In fact, as recent as April of this year I located

24   on Dawson's phone, text messages between Dawson and Lisa that

25   involved instances where they communicated about finding hidden

1  booze bottles throughout the house, sometimes under the sink,

2  sometimes in the workbench, and it appeared that they were

3  making a coordinated effort to find these booze bottles and

4  dump them out to prevent further consumption by Daniel.

5  **Q.**  And were there any (inaudible) communications or anything

6  that related to the (inaudible) booze or these -- or this

7  alcohol abuse issue or addiction issue?

8  A.  There was.  One moment.  In the same device, that being

9  Dawson's phone, there were text messages between him and

10  Daniel, one of which occurred on June 6 of 2019 at 9:16 in the

11  evening during which Daniel asks where his bottle of wine is

12  and states, quote, if you don't give it back to me, I promise I

13  will make destructive decisions now, end quote.  He followed

14  that up with a secondary message that says, and if you tell me

15  you don't know where, I'm done.

16  **Q.**  And how about through the rest of -- the remainder of the

17  monitoring that you did?  Were you able to determine or

18  ascertain any other aggressive behaviors that -- that raised a

19  concern for you?

20  A.  I missed the first part of your question.  I'm sorry.

21  **Q.**  As part of your monitoring and further investigation, were

22  you able to ascertain any other information as towards

23  aggressive behavior associated with the alcohol issues?

24  A.  Yeah, during the review of audio and video calls, Daniel

25  and Lisa appear to talk fairly aggressively to one other on

1    occasion in the form of argument.

2              One case in particular elevated from a verbal

3    altercation to a physical altercation on July 11th at 9:00,

4    10:00 p.m., where it appears in the video call that there's a

5    brief altercation over the possession of a cellular phone,

6    during which Daniel -- he ultimately comes away with possession

7    of the phone and pans across the backyard, and Lisa can be seen

8    slumped over in the video grabbing her midsection.

9    **Q.**   Okay.  And was that matter referred over to law

10   enforcement authorities for further investigation?

11   A.   Yes, it was.  Because of the jurisdiction, it was referred

12   to the Burleigh County Sheriff's Department.

13   **Q.**   Now, throughout this -- I guess the monitoring that you've

14   seen and videos, the intoxication of both Daniel Rouse and Lisa

15   Rouse, did that occur primarily in the evening hours, or was

16   that throughout, you know, the day during that time period?

17   A.   That's primarily in the afternoon and evening, but on

18   occasion it has been seen during daytime hours.

19   **Q.**   Okay.  Now, just finally a couple little things I want to

20   tidy up or go back -- or go on with just relative to some other

21   issues, Detective Rask, insofar as -- there's some indication

22   that perhaps Mr. Rouse has the ability to potentially on

23   release go to school or attend school at the University of

24   Mary.  Are you aware of any information that, you know, that

25   may not be an open avenue for him at this point in time?

25

1    A.    Well, during the review of the same aforementioned

2    audio-video calls, the family discusses how there's an active

3    investigation at the University of Mary as a result of Dawson's

4    most recent conduct that could result in the potential

5    expulsion or suspension of him from the school.

6    Q.    Okay.  And then I just want to go back a little bit to

7    this incident that took place in Cass County over the female

8    minor that was transported from Burleigh to Cass.  Did that

9    result in any kind of law enforcement investigation not related

10   to your investigation at this time?

11   A.    There was a Fargo Police Department investigation back in

12   April of 2019 regarding that conduct.  At that time the Fargo

13   investigator had reached out to the Bismarck Police Department

14   to request assistance in contacting Dawson and investigating

15   him -- or, excuse me, interviewing him for that behavior.  That

16   investigator was not me, but from what I read in the reports,

17   the investigator who was involved made numerous contacts to

18   talk to Dawson, albeit phone call, none of which were returned

19   or answered.

20   Q.    Okay.  And that would have taken place in December of

21   2019?

22   A.    That was April of 2019.

23   Q.    Okay.  The conduct took place in 2019, but --

24   A.    The conduct occurred in April of 2019.  I think you're

25   referring to different conduct in --

26

1    **Q.**   Okay.

2    **A.**   -- December of 2019.

3    **Q.**   So the April communications between the detective here in

4    Bismarck with Mr. Rouse, it didn't actually result in any

5    direct communication between the two.

6    **A.**   No.

7    **Q.**   But there were attempted phone calls and voice messages

8    left?

9    **A.**   Yes.

10   **Q.**   And to the best of your knowledge, the phone that you

11   seized from Mr. Rouse during your April search warrant, was

12   that the same -- did that use the same phone number as the

13   detective would have used when he was attempting to contact

14   Mr. Rouse relative to that Cass County issue?

15   **A.**   It is.  And, in fact, I found some text messages from the

16   investigator at that time still on the device.

17   **Q.**   Okay.  And Mr. Rouse ignored the communications -- or

18   apparently ignored the communications and did not contact the

19   detective, correct?

20   **A.**   For the most part, yes.

21   **Q.**   And did a lot of this conduct that's alleged to have

22   occurred in Indictment Counts 1 through 27, did a lot of that

23   conduct occur after this attempted communication with Mr. Rouse

24   in 2019?

25   **A.**   Much of it did, yes.

1   **Q.**   Are you aware of any other, I guess, instances where

2   Mr. Rouse would have been, I guess, approached relative to some

3   of this concerning conduct, whether it be via law enforcement

4   or other people in discussions (inaudible)?

5   A.   I am.  There was an instance in December of 2018 where a

6   15-year-old female disclosed having a conversation with Dawson

7   over Snapchat.  During that conversation Dawson asked if she

8   was a single pringle, quote, unquote.  After she said that she

9   was, he essentially asked her out on a date to the movies.  The

10   15-year-old female found that to be concerning and disclosed

11   this information to her mother, who then confronted Dawson via

12   text message about that interaction.

13   **Q.**   Okay.  And in this confrontation between the mother and

14   Mr. Rouse, was there indication that -- that he wouldn't do

15   anything like this any -- any further, or --

16   A.   Actually, he first justified it and made excuses for why

17   he -- the content of the communications weren't as they

18   appeared, but ultimately he ended up pleading and begging for

19   the mother not to make this content aware to his parents.

20   **Q.**   Okay.  And she did not then make it aware that she --

21   A.   She did not notify the parents.

22   **Q.**   And, again, a lot of the conduct that is alleged in

23   Counts 1 through 27 occurred after this contact with this

24   mother.

25   A.   Most, if not all of it occurred after December of 2018.

1    **Q.**   Detective Rask, do -- you have training in doing forensic

2    examinations yourself, correct?

3    A.   I do.

4    **Q.**   And when you do search warrants, I mean, everything in a

5    person's house seems to be connected to the Wi-Fi now, correct?

6    A.   We are in the age of (inaudible) of things, and there are

7    multiple smart devices within the households now, yes.

8    **Q.**   TVs can connect to the Internet?

9    A.   Correct.

10   **Q.**   Game consoles?

11   A.   Correct.

12   **Q.**   Obviously phones are connected, whether it's through Wi-Fi

13   or through cellular service, correct?

14   A.   Yes.

15   **Q.**   And these things can be prevented -- you know, a person

16   can be prevented from having access to these things, but are

17   there ever other avenues that a person can obtain access to the

18   Internet?

19   A.   Sure.

20   **Q.**   Have you ever heard of burner phones?

21   A.   Yes.

22   **Q.**   What is a "burner phone"?

23   A.   A burner phone is typically a slang term for a low-end,

24   low cost-producted (sic) phone that you can buy at a big box --

25   a big box store like Walmart.

1   **Q.**   Okay.  And these are generally rechargeable, right, so

2   they're (inaudible)?  You buy minutes?

3   A.   Yeah.  Typically you don't have to have any personal

4   identifying information associated with them.  You simply buy

5   the phone, which is very cheap, and then you buy minutes that

6   you can load onto the phone.

7   **Q.**   Okay.  And are you aware of any communications in your

8   investigation that -- that the use of the term "burner phones"

9   was mentioned by either Mr. Rouse or anyone in his family?

10   A.   Yeah.  Most recently there was a phone communication

11   between Daniel and Dawson where Dawson informed Daniel that his

12   cellular phone number was provided to some investigator, after

13   which Daniel made mention that he was upset about that and that

14   he would now potentially need to go and get burner phones for

15   the family.

16              MR. DELORME:  I have nothing further, Your Honor.

17              THE COURT:  Mr. Hoffman?

18              MR. HOFFMAN:  Thank you, Judge.

19                      CROSS-EXAMINATION

20   BY MR. HOFFMAN:

21   **Q.**   You mentioned in your testimony that this conduct occurred

22   from 2017 until the search warrant was executed at the Rouse

23   residence or garage in, what, April?  What date was that?

24   A.   I believe the search warrant was executed April 24th,

25   2020.

1   **Q.**  April 24th?

2   A.  Correct.

3   **Q.**  Were you present during that?

4   A.  Yes, I was.

5   **Q.**  And during the execution of that search warrant, you

6   encountered Dawson Rouse, correct?

7   A.  Correct.

8   **Q.**  Was he cooperative?

9   A.  For the most part, yes.

10   **Q.**  For the most part.  How was he not cooperative?

11   A.  I can't think of an instance that he was uncooperative.

12   **Q.**  And did anyone prevent you from executing your search

13   warrant at that garage?

14   A.  No, the family in its entirety was very accommodating

15   despite the circumstances.

16   **Q.**  Yeah.  And isn't it true that someone from law enforcement

17   -- maybe it was you.  I'm not sure -- left some of your own

18   property in the garage after the search warrant, and the Rouses

19   retrieved it for you, did they not?

20   A.  They did not retrieve it for me.  However, they did check

21   to see if it was on premises still.

22   **Q.**  And they found it?

23   A.  They did.

24   **Q.**  And they informed you?

25   A.  Correct.

1    **Q.**   And then it was retrieved by law enforcement?

2    **A.**   Retrieved by myself, yes.

3    **Q.**   And it was not corrupted in any fashion?

4    **A.**   There was nothing to corrupt.  It was simply a binder.

5    **Q.**   Okay.  Well, they didn't do anything to it.

6    **A.**   Not to my knowledge, no, it didn't appear to be.

7    **Q.**   Are you confident that in that search warrant you would've

8    retrieved all the electronic devices that you believed were

9    necessary for this investigation and prosecution?

10   **A.**   One can never know that to be fact.  The state of the

11   detached garage was in significant disarray.  The amount of

12   property in there, to be honest, one could spend a week trying

13   to thoroughly search that detached garage.

14           And the investigation is ongoing, and I can't

15   definitively say that the device that I have is the only device

16   that he communicated from.  In fact, I have reason to believe

17   that there is an additional device because there are

18   photographs on his phone that I have of another phone that has

19   pictures of what I believe to be nude minor females on it.

20   **Q.**   Have you attempted to get another search warrant?

21   **A.**   I haven't attempted to get another search warrant for that

22   yet.  We did seize an additional phone that day that I have in

23   my possession.  I haven't compared yet that phone to the phone

24   seen in the aforementioned photographs.

25   **Q.**   So Mr. Rouse was taken into custody on April 24 of 2020,

1    and he made bond at some point in time.  Do you remember the

2    date of that?

3    A.   I do not.

4    **Q.**   Okay.  But he did make bond, and then he was -- a second

5    set of charges was brought.  Do you remember the date that

6    those were -- when he was re-arrested?  When was that?

7    A.   I don't recall the date.  I wasn't involved in his second

8    arrest.

9    **Q.**   But he was out for a period of time.

10   A.   That's my understanding, yes.

11   **Q.**   So the first charges in the state court in Burleigh County

12   were all prior to the search warrant on April 24th of 2020,

13   correct?

14   A.   Yes.

15   **Q.**   And then the second set of charges that came in May

16   of 2020 against Mr. Rouse, those were also before the search

17   warrant on April 24th of 2020, correct?

18   A.   I believe so, yes.

19   **Q.**   Are you aware of any conduct by Mr. Rouse after he was

20   released on bond the first time where he would have violated

21   any bond or made any attempt to commit any of these alleged

22   crimes?

23   A.   I'm aware of no such conduct.

24   **Q.**   And you are aware that during the time that he was on

25   bond, he was living at home in this residence with his parents,

1  correct?

2  A.  That's what I've been told.

3  Q.  In your experience does -- have you -- I'll ask you as an

4  individual police officer.  Have you ever worked with the

5  pretrial services -- federal pretrial services in cases?

6  A.  Have I worked with them in cases?

7  Q.  Yes.  The federal pretrial services, say that they're

8  monitoring an individual.  Do you ever work with that, the

9  monitoring of that individual?

10  A.  I don't think that I've ever directly worked with them.

11  However, there have been instances where, in my position as a

12  certified forensic computer examiner, a pretrial services

13  officer has brought me a device to examine.

14  Q.  All right.  Because you have the expertise of dealing with

15  that in a forensic analysis.

16  A.  Correct.

17  Q.  When you have a person like Mr. Rouse charged and sitting

18  here in this courtroom and you've given this testimony and

19  you -- and you're focusing on that person, do you have the

20  ability to monitor -- let's say if he was allowed to go home,

21  do you have ability to monitor any cell phone or Internet usage

22  as a law enforcement tactic from that home of that person?

23  A.  I mean, the capabilities exist.  However, in this

24  particular instance, I don't think at this stage in the

25  investigation there would be anything that would allow me to

34

1    monitor his Internet and telephone activity.

2    **Q.**   Do you have any knowledge of anything that Mr. Daniel

3    Rouse is a person untrustworthy of belief?

4    A.   I have very limited interactions with Mr. Daniel Rouse

5    other than the documentation that I've shared today and a very

6    brief interaction with him during the day of the search warrant

7    execution, during which he was polite to me.  Outside of those,

8    I don't really have an opinion of his trustworthiness.

9    **Q.**   Do you know who the person was that actually found the

10   binder that was left behind by law enforcement?

11   A.   I don't recall.

12   **Q.**   Do you have any knowledge or information that Lisa Rouse

13   is a person that's untrustworthy and not worthy of belief?

14   A.   Similar to my interactions with Daniel, I have very

15   limited interactions with Lisa to make a determination on that.

16          MR. HOFFMAN:  I don't have any other questions,

17   Judge.

18          THE COURT:  Mr. Delorme?

19          MR. DELORME:  A couple follow-ups, Your Honor.

20                    REDIRECT EXAMINATION

21   BY MR. DELORME:

22   **Q.**   Detective Rask, I know Mr. Hoffman asked you about your

23   knowledge of Mr. Rouse's trustworthiness.  I know your personal

24   interaction, you don't have any opinion.  But your

25   investigation, you discovered false pages were presented to

35

1   victims, false personas were used for him in his association

2   with his victims.  Would you find that to be something that

3   would bring into question his trustworthiness?

4   A.   I guess that I may have misinterpreted the question

5   before.  I thought that was a question of Daniel's

6   trustworthiness.

7          MR. HOFFMAN:  It was.

8          THE WITNESS:  But to answer your question, certainly

9   that was -- those are instances where somebody's

10  trustworthiness could be called into question.

11  **Q.**  (MR. DELORME CONTINUING)  Okay.  And the -- I know you

12  indicated earlier in your testimony on direct that Mr. Rouse

13  was primarily using Snapchat, correct?

14  A.   Correct.

15  **Q.**  Can you tell us, I mean, just briefly, I mean, what -- in

16  the use of Snapchat, how could a person who's doing what

17  Mr. Rouse is alleged to have been doing over that period of

18  time use Snapchat to benefit himself in finding new

19  individuals?

20  A.   Snapchat is a social media application, and it is designed

21  to expand your social media contacts.  Two ways that it does

22  that in particular is -- one of which is it suggests to you

23  Snapchat friends based on not only your friends, but your

24  friends' friends.  Similar to Facebook, you are constantly

25  given suggestions for friends, and Snapchat is (inaudible)

1    where it simply displays for you a series of names that it

2    feels that you should maybe become friends with, and a lot of

3    those are added that way.

4           Another thing on Snapchat is Snap users are given the

5    option to put things on their story.  These stories are

6    essentially video captures or photograph captures of real-life

7    events in their life that is shared amongst all other Snapchat

8    friends and sometimes Snapchat users outside their friend

9    group.  Within these stories you can mention other Snapchat

10   users by user name.  When you see a story that has a mentioned

11   Snapchat user in it, you're able to then communicate with that

12   mentioned individual or request friendship with that mentioned

13   individual.

14          So, you see, the Snapchat -- the Snapchat application

15   is designed in a way to not allow you to be satisfied

16   essentially with your finite friend group.  It's -- it's

17   somewhat designed to expand significantly your friend group.

18          And with those two means of expanding friend group,

19   he would use those to friend these minor girls.  And then by

20   the means I just explained, that friend group in that age

21   demographic would expand tremendously over a very small period

22   of time.

23   **Q.**   Okay.  So by finding simply one person in that 13-to-15

24   age group who's willing to friend him or accept a friend,

25   linking -- linking them together, that would expand his then

1   menu of persons he could then friend thereafter.

2   A.   Correct.

3   **Q.**   Now, with the use of the hidden apps that you found on his

4   phone and the other items that you found on his phone, would

5   you, I guess, identify Mr. Rouse as somebody who's rather tech

6   savvy?

7   A.   Yes.

8   **Q.**   And as far as Mr. Hoffman's question to you about

9   monitoring or being able to monitor somebody like Mr. Rouse,

10   there's no real way to monitor somebody if they're using a

11   device connected one way or another to the Internet, absent

12   finding them in possession of the device, correct?

13   A.   Absent finding them in position -- in possession and using

14   the device.

15   **Q.**   Unless they've had approved device that you had some sort

16   of parental control on or some sort of, you know, app yourself,

17   correct?

18   A.   Correct.

19   **Q.**   Now, as far as Mr. Rouse's initial state charges, he was

20   initially charged with just a few counts, correct?

21   A.   That's correct.

22   **Q.**   And thereafter, when he -- he was released on bail, and

23   through your investigation you discovered that there was a far

24   broader matter here involving many more victims, correct?

25   A.   Yes.

1    **Q.**   New charges were presented?

2    A.   Yes.

3    **Q.**   Mr. Rouse was then re-arrested?

4    A.   Yes.

5    **Q.**   And at that time he was provided either no bail, or a bail

6    that was pretty much cost-probative took place post, correct?

7    A.   Cost-probative, I believe.

8            MR. DELORME:  Okay.  That's all the question I have,

9    Your Honor.

10           THE COURT:  Mr. Hoffman, anything else?

11                        RECROSS-EXAMINATION

12   BY MR. HOFFMAN:

13   **Q.**   Were you involved in his re-arrest?

14   A.   I was not.

15   **Q.**   Did you have any word from other officers whether he was

16   cooperative or not?

17   A.   I did not.

18   **Q.**   Do you have any reason to believe that he was not

19   cooperative?

20   A.   I have no information to comment on the matter at all.

21           MR. HOFFMAN:  That's all.

22           THE COURT:  Thank you.  You're excused.

23           THE WITNESS:  Thank you.

24           THE COURT:  Other witnesses, Mr. Delorme?

25           MR. DELORME:  Yes, Your Honor.  I have one more

1    witness.  I would call to the stand Patrick Jensen.

2                              <u>PATRICK JENSEN</u>,

3    having been first duly sworn, was examined and testified as

4    follows:

5                           <u>DIRECT EXAMINATION</u>

6    <u>BY MR. DELORME</u>:

7    **Q.**   Now, Mr. Jensen, can you please state and spell your name

8    for the record?

9    A.   Patrick, P-a-t-r-i-c-k; Jensen, J-e-n-s-e-n.

10   **Q.**   And just so we can give a basis for why you're here today,

11   you're the parent of one of the individuals identified in the

12   Indictment, correct?

13   A.   Yes, sir, I am.

14   **Q.**   And you reached out to our office indicating that you

15   wanted to provide a statement to the Court today?

16   A.   Yes, sir.

17   **Q.**   Do you want to go ahead and provide your statement to the

18   Court?  And I may ask you a few follow-up questions afterwards,

19   okay?

20   A.   Yes, sir.  I understand people may not typically speak at

21   these, but I think it's important today to advocate for each of

22   the girls that have been affected by the actions of this

23   person.  I don't want to call him a man because a man doesn't

24   do that to a child.

25              I'm the father of one of the victims, and I'm here

1    today to ask you to detain Dawson Rouse until trial.  The

2    physical and psychological impact this person has already

3    caused my youngest daughter, who's just 13 at the time, can

4    never be taken back or (inaudible).  We live in a household

5    with three daughters and one son all under the age of 16.

6    Because of what he has done -- what he has done, they each

7    worry and ask what is going on with the trial and where he

8    currently is.

9           His actions has (inaudible) continue to affect our

10   young children and my entire family daily.  They fear that he's

11   going to get out, and he knows where we live.  It would be an

12   incredible injustice if he'd be released at this time, I

13   believe.

14          This is a serious case that involves many underaged

15   individuals, and given the severity of the charges, the

16   overwhelming amount of information against him, prison time he

17   may face if convicted, there's no monetary amount to be given

18   or forfeited that he would not show up for trial.  I can't even

19   imagine a reason for him to want to show up or stick around if

20   he would be released.

21          I'm asking that you consider keeping Mr. Rouse behind

22   bars until his trial so my daughters can sleep better at night,

23   so that the other victims will feel a little bit safer, and to

24   guarantee that he's at the trial.

25   **Q.**   And, Mr. Jensen, I know when I talked to you yesterday, I

41

1    asked you a few questions about your statement, and -- and one

2    of the things you'd indicated to me is that when Mr. Rouse was

3    released briefly by the State on bail, your child was greatly

4    fearful for herself at that time, correct?

5    A.   Yes.

6    **Q.**   And she has some friends that were connected to this in a

7    --- the way of, as the detective indicated, Snapchat friends.

8    They've communicated.  They were also fearful for themselves?

9    A.   Yes, that's correct.  In speaking with one of the parents,

10   those individuals were having trouble sleeping at night because

11   they were afraid that he would come.

12   **Q.**   Okay.

13   A.   I can -- I would also like to speak about the hiding of

14   information, as Detective Rask was talking about.  I know for a

15   fact in speaking with my daughter, that he taught her ways to

16   hide her communications which he thought would (inaudible) of

17   communication in ways that we would not be able to see it, so

18   that she could hide her identity and not be found with what was

19   going on.

20   **Q.**   Okay.  Is part of your fear then that if he were released,

21   he might communicate with her or threaten her or cause her to

22   not want to cooperate with law enforcement?

23   A.   That, and that he could also do that himself with other

24   people.

25            MR. DELORME:  Thank you for your statement,

1    Mr. Jensen.  You might want to just stand by just in case

2    Mr. Hoffman has a question.

3              THE COURT:  Mr. Hoffman?

4              MR. HOFFMAN:  Just briefly, Judge.

5                        CROSS-EXAMINATION

6    BY MR. HOFFMAN:

7    **Q.**  I'm sorry.  How old is your daughter?

8    A.   She's 14 now.

9    **Q.**  Fourteen?

10   A.   Yes, sir.

11   **Q.**  Snapchat seems like a really -- something that parents

12   should be fearful of, correct?

13   A.   Absolutely.

14   **Q.**  And Detective Rask kind of painted a picture of how it

15   kind of spreads out even -- it's designed -- I don't know how

16   it works, but it's designed to gather more friends even if you

17   don't know those people.

18   A.   Yes, sir.

19   **Q.**  Do you have some familiarity with that?

20   A.   Yes, I do.  He reached out to my other daughters through

21   my daughter.

22   **Q.**  So my question to you is, sir, has anything like that

23   happened since April 24th of 2020?

24   A.   No.  I actually couldn't even -- I wouldn't know because

25   she no longer has the application on her phone.

1   **Q.**   Oh, I understand that, but you're not aware of any

2   information or nothing has been brought to your concern that

3   something like that has happened since April 24 of 2020.

4   A.   No, sir.

5            MR. HOFFMAN:  Thank you, sir.

6            THE COURT:  Mr. Delorme?

7            MR. DELORME:  No further questions.

8            THE COURT:  You're excused.  Thank you.

9            THE WITNESS:  Thank you.

10           MR. DELORME:  I have no further witnesses, Your

11   Honor.

12           THE COURT:  All right.  Mr. Hoffman, testimony?

13           MR. HOFFMAN:  We will call Bobby Wiseman, please.

14                         BOBBY WISEMAN,

15   having been first duly sworn, was examined and testified as

16   follows:

17                   DIRECT EXAMINATION

18   BY MR. HOFFMAN:

19   **Q.**   Ms. Wiseman, does the federal pretrial services office use

20   ankle bracelets for pretrial detention?

21   A.   We do.

22   **Q.**   And my understanding is now with the satellites and the

23   geolocation, you can put a person into a zone, and that if they

24   leave the zone, that ankle bracelet would alert to your office

25   that there's been a breach of that?

1   A.   That's correct.

2   **Q.**   And it's my understanding that these zones are very kind

3   of sensitive too.  For example, you could -- if someone was

4   confined to their home, you could allow them maybe to walk to

5   the mailbox to get the mail and back, and that would not be a

6   breach.  Is it that sensitive?

7   A.   It's approximately 150 feet from the point that you set.

8   **Q.**   Okay.  Let's say that the person is confined in their home

9   and they wanted to go visit their lawyer.  They could call your

10   office for permission to make that trip to the lawyer's office,

11   correct?

12   A.   Correct.

13   **Q.**   Is there any reason why an ankle bracelet cannot be used

14   in this case?

15   A.   I have my reservation.  I feel that detention is most

16   appropriate for this defendant, as outlined in my pretrial

17   report.

18   **Q.**   No, I understand that.  I'm talking just from a practical

19   standpoint or a whatever standpoint.  Is there any reason why

20   an ankle bracelet could not be used in this case if he was

21   confined to his home?

22   A.   If the Court ordered an ankle monitoring device, we would

23   monitor it.

24   **Q.**   All right.  Now, as far as your supervision, you -- you

25   have the authority to go to the residence and make contact with

45

1    Mr. Rouse there in his home if he was there and also his

2    family, his parents, correct?

3    A.   Correct.

4    **Q.**   And in the course of that, do you have the ability to

5    search the home if you wish?

6    A.   If the Court orders a search condition, we would have the

7    ability to search the home if a violation is apparent.

8    **Q.**   Okay.  In preparation for your report and this hearing

9    today, you actually spoke with Mr. Rouse's parents, did you

10   not?

11   A.   I did.

12   **Q.**   And they were opposed to having Dawson Rouse have any

13   phone, even a flip phone, correct?

14   A.   Correct.

15   **Q.**   And they offered their services to make sure that any

16   devices -- electronic devices in the home would be

17   password-protected so Dawson could not use any of those

18   devices, correct?

19   A.   That is what they indicated, yes.

20   **Q.**   Do you know Mr. Daniel Rouse to be a lawyer that works in

21   the North Dakota State Tax Department?

22   A.   Yes, that's what he told me today.

23   **Q.**   Okay.  And the mother, Lisa Rouse, is a person, I believe,

24   that works at -- part-time anyway at the Cathedral school.  Is

25   that your understanding?

1   A.   That's my understanding.

2   **Q.**   And they both were onboard with your office that Dawson

3   Rouse should be confined to the home and be prevented from

4   using any type of electronic devices, is that right?

5   A.   That's right.

6   **Q.**   Do you have any knowledge that Dawson Rouse violated any

7   conditions of his bond when he was released on the first state

8   charges?

9   A.   I do not.

10   **Q.**   And I believe you reference two active protection orders

11   against him naming 11 juveniles.  That's from the state court,

12   is that right?

13   A.   Correct.

14   **Q.**   And today we heard that there's, I believe, 15, so you're

15   familiar that the orders of this Court could be that there be

16   no contact with any of those people, right?

17   A.   Right.

18            MR. HOFFMAN:  Okay.  That's all I have, Judge.

19            THE COURT:  Mr. Delorme?

20            MR. DELORME:  I have a few questions, Your Honor.

21                         CROSS-EXAMINATION

22   BY MR. DELORME:

23   **Q.**   Ms. Wiseman, how long have you been working for pretrial

24   services?

25   A.   It'll be six years in November.

1  **Q.**   Okay.  And I know you primarily do bail reports, but you

2  do some supervision at times, correct?

3  A.   Correct.

4  **Q.**   So in a situation like this, even if the Court ordered

5  everything Adam Walsh required, being electronic monitoring, if

6  a person like Mr. Rouse were able -- were able to get his hand

7  on electronic device even without knowledge of his parents --

8  let's just say a friend picks him up a burner phone -- absent

9  finding it on his person, you wouldn't know the existence of

10  this device, correct?

11  A.   Correct.

12  **Q.**   And, in fact, even if he had a device on his person and he

13  was using it and then erasing it or setting it back -- back for

14  reset in between sessions, you wouldn't know if he used it for

15  anything (inaudible), correct?

16  A.   Correct.

17  **Q.**   So a tech. savvy person could do that and prevent you from

18  having -- having any knowledge of any illegal use of an

19  electronic device.

20  A.   That's correct.

21  **Q.**   Okay.  Similarly, with all the devices that you have, if

22  the minor were convinced by Mr. Rouse to appear at the family

23  residence or the detached garage in the middle of the evening

24  or in the early morning hours, 2 o'clock in the morning,

25  3 o'clock in the morning, you wouldn't be able to have

1    knowledge of that yourself, correct?

2    A.    Correct.

3    **Q.**    And any electronic devices that he would have would only

4    be in his position, and he could stay within the compound of

5    the family residence or property and victimize additional

6    victims without your knowledge.

7    A.    Correct.

8    **Q.**    And the fact that -- the evidence you've heard today as

9    far as instability in the home and the alcohol abuse, would

10   that further raise concern for you that -- that you would not

11   be able to control the situation with Mr. Rouse given the

12   parents could be sleeping rather heavily as a -- as a result of

13   intoxication?

14   A.    It certainly brings further concerns to the stability of

15   the home, yes.

16   **Q.**    And just going right to that, the matter that we discussed

17   or the issue we discussed with Detective Rask, that

18   instability, does that increase your recommendation or the -- I

19   guess the weight of your recommendation that you would provide

20   to the Court as far as detention as opposed to any kind of

21   release conditions?

22   A.    Yes, it further validates my recommendation for detention.

23             MR. DELORME:  No further questions, Your Honor.

24             THE COURT:  Mr. Hoffman?

25        ///

1          <u>REDIRECT EXAMINATION</u>

2   <u>BY MR. HOFFMAN</u>:

3   **Q.**   Did you meet with Mr. and Mrs. Rouse in person or just on

4   the phone?

5   A.   On the phone.

6   **Q.**   Have you ever met them in person?

7   A.   I have not.

8          MR. HOFFMAN:  That's all.

9          THE COURT:  All right.  You're excused.  Thank you.

10         Anything else, Mr. Hoffman?

11         MR. HOFFMAN:  We rest.

12         THE COURT:  All right.  Ready for argument?  And,

13   counsel, just to remind you, as you already likely know, I have

14   the benefit of testimony today, as well as the files and

15   records, the report of U.S. Probation and Pretrial Services, as

16   well as any additional proffered evidence during argument that

17   counsel may wish to offer.  Go ahead, Mr. Delorme.

18         MR. DELORME:  Thank you, Your Honor.  I actually, you

19   know, am going with the recommendation of the pretrial

20   services.  I'm asking the Court to order the defendant be

21   detained pending trial in this particular matter.

22         THE COURT:  Is this a situation, Mr. Delorme, where

23   the presumption applies as well under 3142(e)(3)?

24         MR. DELORME:  That is correct, Your Honor, the

25   rebuttal presumption does apply in this particular matter.

1            Let me start first with the threat of nonappearance.

2    It's -- it's not one that I can present to the Court with a lot

3    of red flags.  The only which way I can present to the Court

4    that if released, I would have to assume that even by this time

5    Mr. Hoffman, with his experience, has sat down with the

6    defendant and explained to him that given the counts of the

7    Indictment, the 27 counts, given the guidelines should he be

8    convicted of each and every count, the result would be

9    something in the -- in the 43 to 53 range in the guidelines,

10   with Criminal History Category I, essentially making him

11   360 months to a life of a guideline range if convicted of each

12   count -- each and every count at trial.

13           While it's not, you know, the biggest red flag for

14   nonappearance, it still even does provide some motivation when

15   a person is looking at a case if they understand that the

16   evidence is quite weighty.  And in this case, I think even from

17   the brief testimony of the -- Detective Rask in this matter,

18   the evidence is quite weighty in this case in that it does

19   provide a motivation for a defendant to -- to abscond if he

20   felt that he could get away with absconding and getting out of

21   this country.

22           THE COURT:  Mr. Delorme, do you know whether there's

23   been any evaluation -- I don't recall from the report of

24   pretrial services anyway -- as far as mental health issues of

25   the defendant or others in the household or substance abuse

1    issues?

2           MR. DELORME:  I don't think there have been, Your

3    Honor.

4           THE COURT:  So it's an unknown at this time.

5           MR. DELORME:  That would be unknown.  This is

6    speculative.  It'd be two DUIs the father had.  There had to

7    have been some sort of associative, you know, at least

8    treatment type of counseling to see if he needed ongoing

9    treatment.  That would've been required in the state system, I

10   believe, from my experience in the state system.

11          Going on to the threat of -- to the community and to

12   the victims in this particular matter, Your Honor, here's where

13   I think the meat of our argument is, and it's -- it's quite a

14   lot.

15          When you look at the defendant, you know, tech. savvy

16   individual, one who had two brushes that could have changed the

17   trajectory of what he was doing -- and by that I mean he had

18   the 2019 interaction with law enforcement involving the female

19   that he brought to Cass County.  That apparently had no effect

20   on him.  I mean, he continued.

21          And not only that, you know, the detective indicated

22   that most of the stuff that we identified now occurred after

23   that point, when he could have and should have known that he

24   was being investigated with the messages that were being left

25   on his phone, messages that were discovered on his phone by

52

1   Detective Rask.

2          Then again you had the earlier 2018 interaction with

3   the concerned mother who focused him and also confronts him

4   about this kind of conduct and how inappropriate it is.  He

5   baits her basically not to tell his parents, but then continues

6   this conduct.  In fact, what lately happened was -- that

7   interaction with both instances probably helped him, I guess,

8   develop his predatory conduct and morph in -- in nature that

9   was better suited for him and to reduce his risk of being

10  discovered.

11         In this particular matter -- the only way he was

12  actually discovered in this particular matter was that two

13  girls were out past curfew and a parent of those individuals

14  reported to law enforcement, and it just happened to end up on

15  the desk of a -- of a detective who had the ability to look at

16  electronic devices and saw something there that a lot of people

17  probably wouldn't have seen and continued the investigation.

18         Again, the rebuttal presumption does apply in this

19  particular matter.  I don't think just offering potentially

20  that he has a stable home to go to, when, in fact, we know it's

21  not as stable as what it may appear from what Mr. Hoffman was

22  likely to argue, is a rebuttable presumption or not.  I just

23  don't see that being there, Your Honor.

24         There's a lot of individuals that still need to be

25  interviewed in this particular matter.  There's a lot of

1    individuals that may be victims that Mr. Rouse knows of that we

2    don't yet.  And having that knowledge, that could be used

3    potentially to tamper with witnesses in a manner to prevent

4    them from having discussions with law enforcement.

5              When I look at the 18 USC, 3142(b), Your Honor, and

6    3142(g), you know, there it tells the Court to take a look at

7    things such as, you know, the clear probable cause and the

8    weight of the matter in this particular case.  You know, is

9    every count, you know, heavily weighted in favor of, you know,

10   probable cause in -- and evidence that we have stacked?

11   Probably not as much as one to the other.

12             But we still have enough evidence that we presented

13   to the Court that in this particular matter -- with respect to

14   one video that was discussed by the detective, the one where he

15   identifies not only the victim, but then identifies the anomaly

16   on Mr. Rouse's person and is able to later corroborate that,

17   confirm it through a search warrant, there is a lot of evidence

18   here and it weighs in favor of -- of probable cause in this

19   matter.  It's weighted towards -- potentially against Mr. --

20   Mr. Rouse.

21             You're looking at the factors, nature of the alleged

22   crimes and crimes of violence.  Here again, we got 15

23   individuals that are included in the Indictment.  We have the

24   additional one in there.  We have witnesses that are -- victims

25   that testified -- not testified, but provided statements

1    indicating that they engaged in rough sex with Mr. --

2    Mr. Rouse.  He has all the searches on his phone for BDSM,

3    various other types of rough sex searches on his phone.

4           We have the picture that the detective told you

5    about, the one of a young lady who was confirmed to be a victim

6    that's included in the Indictment or the original 27 counts

7    that stand as is right now that has multiple, multiple

8    scratches on her back, scratches to the point of bleeding.

9           I think the crimes and the kinds of violence in this

10   particular matter, Your Honor, weigh in favor of detention.

11   The weight of the evidence, again, when I look over at the

12   evidence, it's quite weighty in this particular matter.

13          And while on the surface, Mr. Rouse's character may

14   appear to be a nice guy.  He's -- I know from looking at some

15   of the documents the agents were able to pull up, that, you

16   know, he's a Boy Scout and that he volunteered.  He did a lot

17   of other stuff.  He's -- you know, seeks out counseling from

18   his -- his clergyman often, but we're not here because of that

19   character.

20          We're here because of the other side of him that

21   resulted in his charging.  We're here because, you know, just

22   the -- the tip of this investigation has shown us 16

23   individuals between the ages of 13 and 17, with a primary age

24   preference of -- 13 to 15 being his -- his preference.

25          What he did to them, that's why we're here.  That's

1    the part of the character that weighs against him, and that's

2    why -- and that's what the Court should be considering in

3    whether or not to detain him or release him in this particular

4    matter.

5           I believe he does pose a threat, Your Honor, to the

6    victims in this particular case, that -- the ones that are

7    known to us, the ones that are unknown to us, and I couldn't

8    think but there's a possibility yet, given the two different

9    contexts he's had where he could've stopped his conduct, and

10   the fact that he carried on.  If he believes he can carry on

11   and can conduct that kind of conduct without getting caught, I

12   think he would.  His character seems to show that that's the

13   route that he would go in this particular matter.

14          If he had the opportunity to have a phone that he

15   could hide from pretrial services, communicate with others and

16   any victim in his -- in his grasp, I think he would take the

17   opportunity, especially if you consider that he may not have

18   the opportunity for a very long period of time.

19          One thing I would proffer to the Court in addition to

20   what Detective Rask testified to, there was one communication

21   that Detective Rask found on the phone.  It was with an

22   18-year-old, and -- or an adult.  I don't believe that she was

23   18, but one of the things he was bragging about to this adult

24   female was that he was angry that he could not find women over

25   the age of 18 that wanted to BDSI (sic).

56

1          And when I look at that communication, it appears to

2     me that because his anger that he couldn't find somebody closer

3     to his own age to engage in that kind of, you know, conduct

4     consensually, however he wants to, he then redirected his --

5     his focus to individuals who were not sexually experienced,

6     that were not real worldly and did not know that rough sex was

7     not a normal thing.  That's part of what -- what I would

8     present to a Court at jury trial -- or to a jury at trial, that

9     there was that focus because he was angry he couldn't find

10    somebody closer to his own age, so he went to 13- to

11    15-years-olds.

12          All of that together, Your Honor, I'm asking the

13    Court to detain Mr. Rouse pending -- pending trial in this

14    particular matter.

15          THE COURT:  Mr. Hoffman?

16          MR. HOFFMAN:  Your Honor, this case is one where he

17    does have a residence to go to, his mother and father's

18    residence.  It's in northern Bismarck in a -- which was

19    probably originally a rural home development, so it's a number

20    of homes out -- more out in the country than necessarily your

21    typical Bismarck streets, but it's a place where I believe with

22    a -- with an ankle bracelet, there could be a zone that keeps

23    him within his home, that he can only leave with permission

24    that would exist.

25          I believe that the parents have communicated with

1    pretrial services.  They would do everything that they could,

2    that he would not have access to electronic devices.  The last

3    I understood is that that's the job of pretrial services, to

4    monitor that and to make sure that that's not happening.  So

5    there can be visits to the home.  There can be contact with the

6    parents.  There can be contact with Mr. Rouse to make sure that

7    he remains law-abiding while he's in that home confinement.

8           He's already proved that he can do that.  He was

9    arrested on April 24th.  My notes from my calendar is that he

10   made bond on April 29th, so he was out of jail from April 29th

11   to when he was re-arrested on May 18th.  That's three weeks at

12   least, maybe a bit more, where he was law-abiding.  There was

13   no allegations here today of any improper conduct during that

14   period of time, so why not allow him to do that now, while his

15   case is pending?  If there is any sniff of him doing something

16   improper by pretrial services or law enforcement, then he would

17   be back here before you, arrested on a violation of bond

18   conditions.

19          I guess I have my own selfish reason for this, is

20   that it's next to impossible to have an attorney-client

21   relationship in this Covid situation, where access to lawyers,

22   to visitation has been cut back.

23          I actually have a client -- another client who's out

24   at the pen awaiting state charges.  I can't even go visit him.

25   I'm not allowed to go visit him.  And everything that's done

1    with lawyers, if you can't visit or if your visit -- visitation

2    is cut back has to be by telephone that's monitored.  There's

3    no confidentiality between lawyers and their clients when

4    they're in jail, none.

5           There used to be.  For example, the Burleigh-Morton

6    -- or the Burleigh jail anyway had an attorney phone line.

7    They don't have an attorney phone line anymore, so all

8    conversations that I have with Mr. Rouse, I'm sure the

9    government has possession of it, just like they told you about

10   the video chat between the Rouses and Dawson today.

11          So I would ask, Your Honor, to give it a chance.  I

12   believe that that can be done.  It's not a situation where he

13   doesn't have any place to go or he has a place to go where he

14   doesn't have some type of supervision.  He's got parents.

15          Danny Rouse is a lawyer with the State Tax

16   Department, and I'm sure he has worked hard to get where he is

17   today.  To paint this picture of him today as some kind of

18   monster is almost reprehensible to me.  We're all human.  We

19   all have some failings.  We all have some shortcomings, but

20   that doesn't make us incompetent human beings.  That doesn't

21   make us untrustworthy.

22          For Mr. Rouse to tell the pretrial services, yes, I

23   will make sure and do everything that I can that he doesn't

24   have any electronic devices, that the electronic devices in our

25   home be password-protected, that if I find some violation by my

1    son, I will report it to you, it doesn't have -- everything you

2    heard today has nothing to do with his ability to do that, that

3    he won't do that, and same with his mother.

4              I don't see any reason why he can't go to his home

5    under a house arrest situation, where the electronics that we

6    have, the sophistication, would tell the authorities that he's

7    violated by leaving that residence.

8              Yes, some of these things occurred while he was a

9    resident of his home, but his parents weren't alerted.  Let's

10   assume the truth of all of this.  His parents weren't alerted

11   to any of that.  There's nothing to show they had any knowledge

12   -- pre-knowledge of any of it, but now that they're alerted to

13   the charges and the case and the situation and they -- they're

14   smart people, and they can -- they can help.

15             They want their son to be in their home.  They said

16   that to the pretrial services officer.  I guess I'm repeating

17   myself.  I want him in the home so I have a client that I have

18   a relationship in that fashion.  I ask you to give it a chance

19   before you simply say no.

20             THE COURT:  Mr. Delorme?

21             MR. DELORME:  Briefly in rebuttal, Your Honor, first

22   and foremost, I'm not aware of any facility in the state that

23   actually records and provides communications between attorneys

24   and clients.  It simply does not happen.

25             I've seen the system.  I receive updated information

60

1    from my agents often.  There, you know, are no calls that are

2    generated or reported between attorneys.  When they're listed

3    as an attorney, you can see only that a certain number was

4    called.  You don't get any recordings or anything of that

5    fashion.

6         THE COURT:  A quick question, Mr. Delorme, which is

7    related to what Mr. Hoffman brought up.  In a situation like

8    this where you're dealing with contraband images and multiple,

9    perhaps, removable media and the like, are there opportunities

10   for a defendant to meet with counsel and go over that evidence

11   once it's disclosed in discovery?

12        MR. DELORME:  I believe a lot of the jail

13   (inaudible), Your Honor.  They are making video capabilities

14   available.  I think Rugby is doing that a little bit more and

15   more.  I know that the attorneys do prefer to stop in and visit

16   personally because I think a lot of them have the same concern

17   that Mr. Hoffman has, that they may be recorded.  And I think

18   the cameras are on, but that's for safety of individuals.

19        THE COURT:  Have you had any situations where there

20   has been a temporary release of a defendant in order to meet

21   with counsel, which I think is the way that maybe 3142 speaks

22   of it happening?  Has that occurred as a result of this Covid

23   crisis, where a defendant, in order to have full access to

24   counsel, has sought what we sometimes call a furlough in

25   federal court?

1          MR. DELORME:  No, Your Honor, I'm not aware of any of

2     those situations.  The only thing I'm aware of right now is

3     that Rugby is allowing visitation with -- with attorneys by

4     appointment.  I think Washburn is allowing visitation.  I think

5     Burleigh-Morton is allowing some visitation.  I don't know if

6     it's in-person contact or if there's some separation by glass.

7     I also believe Stutsman County provides visitation as well.  It

8     might not be as much time as they used to have because of the

9     Covid and other people trying to get in.

10          But going back to my rebuttal, Your Honor, I

11     understand where Mr. Hoffman is coming to with regards to our

12     information we provided about stability of the home, but this

13     is a very serious matter.  This is a very serious matter, and

14     if the offer to the Court is that this home is where this

15     person should be, then everything that makes that home

16     ineligible as far as a placement is fair game in the courtroom.

17          In this particular matter we know and (inaudible)

18     told you -- or the detective told you that all of -- all of

19     this conduct occurred while the defendant was residing at that

20     residence.  Now, perhaps the alcohol prevented them from --

21     from acknowledging or seeing any signs of this kind of conduct

22     taking place.  Maybe it didn't.  Maybe they just weren't that

23     attentive.

24          But what we do know is with the current situation and

25     the seriousness of the alcohol addiction issues, can't possibly

1    believe that the -- that the parents can monitor the defendant,

2    not at all hours of the -- of the evening.  He had typically a

3    little bit of a night owl thing going on from that 9:00 to 5:00

4    a.m. type of situation.

5          The effects of alcohol, if anybody has had experience

6    with alcohol, you not only have the intoxication that prohibits

7    or prevents you from being very aware of situations, but then

8    you have the after-effects, which are usually sleepy, the

9    headaches, the after-effects of just having the hangovers that

10   prevent a lot of stuff from being -- you being more aware of

11   situational awareness around you, so from that perspective,

12   Your Honor, that's fair game.

13         Well, you know, this is a serious situation.  We have

14   16 victims now.  We have dozens of further leads that we have

15   to follow up on, plus there's, you know, additional leads that

16   may be developed from personal information that is still coming

17   in at this point in time.

18         Now, one of the things I asked Probation Officer

19   Wiseman is, could she tell if somebody had a hidden device in

20   the residence and was using it.  No, she couldn't.  Nobody can

21   do that.  If Mr. Rouse had a hidden device in the residence and

22   he used it, their attempts of finding it on his person or in

23   the general vicinity and -- and seizing it and determining that

24   there's something on it -- you could not tell if he's using a

25   device in a facility, in his residence or on the family

1   property.

2          Similarly, none of the technology that pretrial

3   services has today is going to tell (inaudible) if Mr. Rouse

4   has convinced yet another person under the age to travel to the

5   residence.  He can't leave because of electronic device

6   monitoring.  Perhaps somebody travels there.  They can't tell

7   that.

8          There's nobody that sits on the residence 24 hours a

9   day.  Nobody is going to show up at 9 o'clock at night and stay

10  there until 5 o'clock in the morning, hoping that nobody shows

11  up and that the parents will be of sound mind in the next day

12  to monitor the happenings around the house, so there's --

13  there's nothing, Your Honor, that'd prevent Mr. Rouse from

14  continuing his conduct if he so chose to do it.

15         And given the fact that he had two prior instances

16  that should have, I guess, somehow redirected him and did not,

17  actually, you know, put him on stronger, that is some

18  indication to the Court that there's no conditions that the

19  Court can impose in this particular matter that would prevent

20  Mr. Rouse from continuing his conduct or safeguard the

21  community, so I'd ask the Court detain Mr. Rouse pending trial

22  in this matter.

23         THE COURT:  All right.  Thank you.  Under federal law

24  there's typically a preference for release, and if release

25  alone is not enough, to release with conditions.

1                    However, in a case such as this, where there is a

2          federal Indictment returned by a federal grand jury having

3          found probable cause to support the charges contained in the

4          Indictment, some 27 counts, thereabouts, of offenses that fall

5          within 3142(e)(3)'s presumption of detention, albeit a

6          rebuttable presumption as to issues of flight risk and danger

7          to the community, which is the first step in the process as far

8          as the Court is concerned in determining whether a defendant

9          should be released.

10                   And one of those components, of course, is flight,

11         and I believe the defense as to the issue of flight has

12         proposed potentially effective conditions that would rebut that

13         -- that part of that presumption.  However, that -- the inquiry

14         doesn't end there.

15                   There is still the danger to the community issue to

16         be addressed, and as part of that, obstruction of justice,

17         obstruction of witnesses potential in this case, and that's the

18         more problematic portion of the inquiry.  And I do not believe

19         the record here rebuts the presumption as to -- as far as a

20         danger to the community, including the defendant, were he

21         released into it.

22                   I believe that the proffered alternative of placement

23         at a residence in custody -- the third-party custody of parents

24         here is not an effective alternative to detention.  There

25         are -- there is evidence that both parents have employment.  It

1    appears that at least part of that may be outside the home.

2         It appears that it's the same residence that the

3    defendant has been living at and has availed himself of

4    opportunities over time.  Whether his parents were informed or

5    not or suspicious or not, he was able to communicate, and, in

6    fact, if you can believe the allegations in the Indictment,

7    commit a number of offenses against minor victims, so I just

8    don't believe on this record that that's an effective

9    alternative.

10        We also have a situation where if the Adam Walsh

11   requirements were in place and there were an ankle bracelet, as

12   to the flight risk aspect, I can -- you know, I can -- I can

13   see defense counsel's point.  He's not going to get far, if he

14   gets anywhere at all, but none of that will negatively affect

15   defendant's ability to communicate with potential witnesses,

16   with potential new victims.

17        The defendant has shown a willingness to not comply

18   with conditions of release notwithstanding his relatively --

19   you know, his history of being, at least as far as we know,

20   relatively law-abiding apart from these offenses.

21        So I can appreciate all of what Mr. Hoffman has said

22   in many respects, but I do not believe that as far as a danger

23   to the community and the danger of obstruction -- of witness

24   tampering, that there is evidence to rebut that aspect, and so

25   I'm going to order that the defendant be held in custody of the

66

1    Attorney General pending further proceedings.

2                    Anything else from the United States, Mr. Delorme?

3                    MR. DELORME:  Yes, Your Honor.  As the Court probably

4    is aware, there are a number of electronic means of

5    communication that are allowed now in the -- in the jail

6    systems.  Because of that, I would ask the Court to include in

7    its order that defendant not have any contact with victims in

8    this matter, both known and unknown to the -- to the United

9    States, while -- while he's incarcerated pending trial.

10                    THE COURT:  Except as through counsel or counsel --

11   defense counsel's investigator as part of his defense, I'll

12   order that.

13                    MR. DELORME:  Thank you, Your Honor.

14                    THE COURT:  Anything else, Mr. Delorme?

15                    MR. DELORME:  No, Your Honor.

16                    THE COURT:  Mr. Hoffman?

17                    MR. HOFFMAN:  No, Your Honor.  Thank you.

18                    THE COURT:  Court is adjourned.

19                    (Proceedings concluded at 3:10 p.m., the same day.)

20                            - - - - - - - - - -

21

22

23

24

25

<u>CERTIFICATE</u>

State of North Dakota  )

                       ) ss

County of Burleigh     )


     I, Sandra E. Ehrmantraut, do hereby certify that the foregoing and attached typewritten pages contain an accurate transcription, to the best of my ability, of said digital recording made at the time and place herein indicated.

     Dated:  August 17, 2020


           /s/ Sandra E. Ehrmantraut