UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA


United States of America,      )
                               )
              Plaintiff,       )
                               )
         vs.                   )      File No. 1:20-cr-107
                               )
Dawson M. Rouse,               )
                               )
              Defendant.       )


TRANSCRIPT OF CHANGE OF PLEA


Taken at
United States Courthouse
Bismarck, North Dakota
February 14, 2022


BEFORE THE HONORABLE DANIEL L. HOVLAND
-- UNITED STATES DISTRICT COURT JUDGE --

<u>APPEARANCES</u>

MR. GARY LEE DELORME
U.S. Attorney's Office
220 E. Rosser Ave.
P. O. Box 699
Bismarck, North Dakota 58502-0699

FOR THE UNITED STATES

- - - - - - - - -

MR. MICHAEL R. HOFFMAN
Attorney at Law
120 North Third Street, Suite 100
P. O. Box 1056
Bismarck, North Dakota 58502-1056

FOR THE DEFENDANT

- - - - - - - - -

Certificate of Court Reporter - Page 57

- - - - - - - - -

1             (The above-entitled matter came before the Court, The

2    Honorable Daniel L. Hovland, United States District Court

3    Judge, presiding, commencing at 8:29 a.m., Monday, February 14,

4    2002, in the United States Courthouse, Bismarck, North Dakota.

5    The following proceedings were had and made of record in open

6    court with the defendant present.)

7                    - - - - - - - - - - -

8             THE COURT:  We will open the record in the case of

9    *United States of America versus Dawson Rouse*.  Here on behalf

10   of the federal government is Assistant U.S. Attorney Gary

11   Delorme.  Representing the defendant here is Attorney Mike

12   Hoffmann from Bismarck.  Mr. Rouse, how are you?

13            THE DEFENDANT:  I'm okay, Your Honor.  Yourself?

14            THE COURT:  Good.  This is scheduled as a change of

15   plea hearing on 21 separate counts set forth in an Information.

16   The parties filed a Plea Agreement on December 3rd of this year

17   (sic), along with a Plea Agreement Supplement.  I've gone

18   through the Plea Agreement.  Mr. Delorme, maybe you can

19   summarize here on the record what the parties have agreed upon

20   here.

21            MR. DELORME:  Yes, Your Honor.  Mister -- per the

22   agreement, Mr. Rouse will plead guilty to each of the 21 counts

23   in the Information today, and those are counts of coercion or

24   attempted coercion or enticement of a minor and receipt of

25   child pornography or attempted receipt of child pornography.

3

1    The counts that are coercion or attempted coercion are 1, 3, 4,
2    5, 6, 8, 9, 10, 11, 14, 15, 16, 17, 18 and 20.  The receipt or
3    attempted receipt are Counts 2, 7, 12, 13, 19 and 21.
4            The guidelines range in this particular matter, Your
5    Honor, is going to be quite high, probably likely a range the
6    Court is not used to seeing.  There's a 28 base offense level,
7    and then there's six additional enhancements.  And then there's
8    a 21-level enhancement for multiple victims and -- per
9    Chapter 4, so we anticipate that the PSR will reflect a total
10   offense level of 57.  Minus three brings it down to a 54.  And
11   in that range, Your Honor, it would be a life range for the
12   counts of the coercion or attempted coercion and up to 20 years
13   max for the receipt or attempted receipt.
14           The United States can offer the Court any
15   recommendation within the guideline range or below.
16   Mr. Hoffmann will also be allowed to give any recommendation to
17   the Court down to the mandatory minimums if he feels the need
18   to.
19           THE COURT:  Very well.  Mr. Hoffmann, anything you
20   want to add to that summary?
21           MR. HOFFMAN:  No, Your Honor.
22           THE COURT:  All right.  So, Mr. Rouse, I need to
23   visit with you on the record about this case and your intent to
24   plead guilty to these 21 separate counts.  I'll go through the
25   Plea Agreement with you.  I am not going to cover every

1   paragraph of the Plea Agreement, but I'll cover the paragraphs

2   that I'm required to make sure that you understand.

3            I'll need to ask you some questions about what was

4   going on here, as well as some questions about your background.

5   I don't know anything about you.  What I have in my file in

6   front of me is simply the charge and the Plea Agreement.

7   That's what I know about the case.

8            If you have any questions as we go through the Plea

9   Agreement, don't hesitate to speak up.  You're free to ask

10  questions here as a part of this hearing, and there's no such

11  thing as a foolish question.

12           And in terms of wearing the mask, I'll leave that to

13  your discretion.  You don't have to wear it when you're talking

14  if you don't want to, but if you're more comfortable wearing a

15  mask, then please feel free to do so.

16           But you are how old today, sir?

17           THE DEFENDANT:  Twenty-three, Your Honor.

18           THE COURT:  All right.  And are you married, have any

19  children?

20           THE DEFENDANT:  No, Your Honor.

21           THE COURT:  And how far have you gone in your

22  schooling?

23           THE DEFENDANT:  I just completed my junior year at

24  the University of Mary right prior to my arrest.

25           THE COURT:  And what were you pursuing there?

5

1           THE DEFENDANT:  I was majoring in biology, with a

2  minor in chemistry in the predental program, looking to become

3  a periodontal oral surgeon.

4           THE COURT:  Okay.  And what kind of grades were you

5  pulling down?

6           THE DEFENDANT:  Usually Bs and -- As and Bs.

7           THE COURT:  All right.  And went to school here in

8  Bismarck?

9           THE DEFENDANT:  Yes, sir, St. Mary's Central High

10  School.

11           THE COURT:  Okay.  Ever been in trouble with the law

12  before?

13           THE DEFENDANT:  Only traffic tickets, Your Honor.

14           THE COURT:  Okay.  And do you -- your parents live in

15  town?

16           THE DEFENDANT:  Yes, Your Honor.

17           THE COURT:  And you have any brothers and sisters?

18           THE DEFENDANT:  Yes, Your Honor.  I have one younger

19  brother, 16, who attends St. Mary's.

20           THE COURT:  Okay.  And are your parents here today?

21           THE DEFENDANT:  Yes, Your Honor, they are.

22           THE COURT:  And where are they seated?  Okay.

23           Do you feel that you've had adequate time to review

24  this case with your attorney, Mr. Hoffmann?

25           THE DEFENDANT:  Yes, Your Honor.

6

1          THE COURT:  Have you been given an opportunity to

2    review the discovery or the evidence that the government

3    would've been required to turn over to your attorney?

4          THE DEFENDANT:  The vast majority of it, yes, Your

5    Honor.

6          THE COURT:  All right.  And with respect to the Plea

7    Agreement, do you feel you've had adequate time to review that

8    document with your attorney?

9          THE DEFENDANT:  I do, Your Honor.

10          THE COURT:  Did you read the Plea Agreement before

11    you signed it?

12          THE DEFENDANT:  Yes, Your Honor, I did.

13          THE COURT:  Did Mr. Hoffmann give you an opportunity

14    to ask questions about the Plea Agreement and what it all means

15    for you?

16          THE DEFENDANT:  Yes, sir, he did.

17          THE COURT:  All right.  Have you ever struggled with

18    any issues in your life related to the abuse, misuse of alcohol

19    or street drugs?

20          THE DEFENDANT:  No, Your Honor.

21          THE COURT:  Have you ever been treated for any mental

22    health issues at any time throughout your life?

23          THE DEFENDANT:  No, sir, I have not.

24          THE COURT:  And you're in good physical health today?

25          THE DEFENDANT:  Yes, sir.

1          THE COURT:  And in terms of your overall mental

2     health, your mind is clear today?

3          THE DEFENDANT:  Yes, sir.

4          THE COURT:  So where have you been housed, and how

5     long have you been housed in a correctional facility?

6          THE DEFENDANT:  So I was re-arrested on the 18th of

7     May, 2020.  I spent approximately six months in Burleigh-Morton

8     Detention Center.  Was then moved to the Heart of America

9     Correctional and Treatment Center in Rugby, North Dakota, for

10    one day short of six months.  And then I was housed in

11    Washington County Justice Center in Akron, Colorado, for

12    seven months.  And I'm now being housed at the Stutsman County

13    Correctional Center in Jamestown, and I've been there since the

14    beginning of January.

15         THE COURT:  All right.  So have you been treated in a

16    respectful manner in those facilities?

17         THE DEFENDANT:  Yes, Your Honor.

18         THE COURT:  Good.  So do you have a copy of the Plea

19    Agreement there in front of you?

20         THE DEFENDANT:  I do, Your Honor.

21         THE COURT:  First of all, turning to the last page of

22    the Plea Agreement, is that your signature on page 18?

23         THE DEFENDANT:  Yes, Your Honor.

24         THE COURT:  And this charge is -- arises out of an

25    Information now, correct?

8

1            MR. DELORME:  Yes, Your Honor.

2            THE COURT:  Has there been a Waiver of Indictment

3  signed, Mr. Hoffmann, or --

4            MR. DELORME:  I don't believe we have one yet, Your

5  Honor.

6            THE COURT:  All right.

7            MR. DELORME:  I'll have to run up -- go up and get

8  one.

9            THE COURT:  Very well.

10            MR. DELORME:  May I have a couple minutes just to

11  run -- grab one, Your Honor, or do you want us to do it after

12  the hearing?

13            THE COURT:  We can do it after the hearing.  There's

14  a waiver provision in the Plea Agreement, I see, but --

15            MR. DELORME:  Yes, Your Honor.

16            THE COURT:  So, first of all, if you could turn to

17  paragraph 6 of the Plea Agreement, Mr. Rouse -- and is that how

18  you correctly pronounce your last name?

19            THE DEFENDANT:  No, Your Honor, it's Rouse.

20            THE COURT:  Rouse.  Okay.

21            THE DEFENDANT:  Yes, sir.

22            THE COURT:  Sorry.  Paragraph 6 is a very lengthy

23  paragraph.  It starts on page 2, and it runs all the way to the

24  top of page 10 of the Plea Agreement.  The purpose of paragraph

25  6 is to provide a brief factual summary of what was going on

1  here.  It explains why you were charged with these crimes in
2  the federal district court of North Dakota.

3          I can't just accept a plea of guilty from somebody
4  unless I know that there are sufficient facts that have been
5  outlined in the Plea Agreement or agreed upon by the parties in
6  some document that supports finding you guilty of these
7  offenses, so almost every Plea Agreement contains a summary of
8  the underlying facts that resulted in the federal charges being
9  brought against that particular defendant.  You've reviewed
10  paragraph 6 with Mr. Hoffmann, correct?

11          THE DEFENDANT:  Yes, Your Honor.

12          THE COURT:  Is the factual information contained in
13  paragraph 6 of the Plea Agreement as it relates to you true and
14  accurate information?

15          THE DEFENDANT:  Yes, sir, it is.

16          THE COURT:  And when was it that you were arrested,
17  and where were you arrested on these charges?

18          THE DEFENDANT:  Originally I was arrested down the
19  street from my house on April, I believe, 24th of 2020, on
20  state charges.  I was housed in Burleigh-Morton for several
21  days.  Bond was set.  I posted bond.  I was out on bond for --
22  I believe it was 18 days, and then re-arrested on more charges
23  stemming from the initial investigation.  And bond was set at
24  $250,000, cash only, and that was obviously not something that
25  we could afford.  And shortly thereafter I was served with a

1   federal arrest warrant and indicted.

2         THE COURT:  So you're obviously a smart guy.  Why --

3   or how'd you get caught up in this scheme?

4         THE DEFENDANT:  Honestly, Your Honor, that's

5   something I've been asking myself the last 20, almost 21 months

6   here.  I'm really not sure.  I guess over the course of my life

7   I've made mistakes, I've struggled with certain things, and

8   this was the result of that.

9         THE COURT:  So were the communications that went on

10  in this case all on Facebook, Twitter, Snapchat?  Where did

11  most of the communications occur?

12        THE DEFENDANT:  The majority of the communications

13  occurred on either Snapchat or text messages.

14        THE COURT:  Okay.  And the young ladies that you were

15  having communications with, were most of them from the

16  Bismarck-Mandan area?

17        THE DEFENDANT:  To the best of my knowledge, yes,

18  Your Honor.

19        THE COURT:  And the age range was what?

20        THE DEFENDANT:  Twelve to seventeen, Your Honor.

21        THE COURT:  All right.  So you don't know what

22  triggered all this.

23        THE DEFENDANT:  No, Your Honor.

24        THE COURT:  And what -- I guess I'm curious as to

25  whether you had had communications with young women that are

1  18 years of age and over, or --

2          THE DEFENDANT:  Yes, Your Honor.

3          THE COURT:  -- were all your communications to

4  minors?

5          THE DEFENDANT:  Sorry.  Can you repeat the question,

6  Your Honor?

7          THE COURT:  Did you have similar communications via

8  Snapchat where you hooked up with 18-plus-year-old women, or

9  were --

10          THE DEFENDANT:  Yes, Your Honor, I did.

11          THE COURT:  -- all of your communications with

12  minors?

13          THE DEFENDANT:  I had with 18-plus as well, Your

14  Honor.  In fact, in the discovery there is an instance where

15  the investigators went and tried to meet somebody that I had

16  made contact with that was over the age of 18 because she

17  shared a name with one of the people on my Indictment.

18          THE COURT:  So did it ever cross your mind that

19  there's a problem having sexual contact with females under the

20  age of 18 or 16 or --

21          THE DEFENDANT:  Yes, Your Honor.

22          THE COURT:  So how did -- or what were the

23  circumstances surrounding your arrest?  Were you arrested at

24  your home?

25          THE DEFENDANT:  Directly down the road from my house.

1    It was mid-afternoon on a Friday.  I had -- I was on my way

2    over to my grandmother's condo to pick up our lawnmower for the

3    spring and summer season, and there was a vehicle in front of

4    me.  It stopped.

5             Two officers exited the vehicle and approached me,

6    asked me to step out of the vehicle.  I complied, was

7    handcuffed, was then placed in the back of a marked Bismarck

8    Police Department squad car, which was driven up the road to my

9    house.  They executed a search warrant on the shop at my house,

10   and then I was taken to Burleigh-Morton Detention Center.

11            THE COURT:  What do you mean "the shop" on your -- in

12   your house?

13            THE DEFENDANT:  We have a detached garage, shop at

14   our house, and there was a search warrant executed there.

15            THE COURT:  And is that where the computer or

16   computers were located that most of the conversations took

17   place on, or was it all cell phone communication?

18            THE DEFENDANT:  No, sir, the cell phone that the

19   communications occurred on was on my person when they arrested

20   me and asked me to remove myself from the vehicle.

21            THE COURT:  So did you have more than one cell phone

22   that was seized and searched?

23            THE DEFENDANT:  Yes, Your Honor, I did.

24            THE COURT:  How many?

25            THE DEFENDANT:  Two of them, an iPhone XS and one

13

1    iPhone 6S.  The iPhone 6S was not an active phone, though.  It

2    was not connected to any number or any subscription service.

3            THE COURT:  And was there more than one computer,

4    laptop, iPad, whatever it may be in the shop in your house?

5            THE DEFENDANT:  No, Your Honor, just -- the iPhone 6S

6    was the only device that was recovered from there.

7            THE COURT:  So where were most of the images seized

8    from, what computer device?

9            THE DEFENDANT:  On the iPhone XS that was in my

10   vehicle when I was arrested, which was my main, daily-use cell

11   phone.

12           THE COURT:  So from your review of the discovery and

13   discussions with your attorney, how was this -- these matters

14   first brought to the attention of law enforcement?

15           THE DEFENDANT:  How they were first brought to the

16   attention of law enforcement, it was approximately a week prior

17   to my initial arrest.  I had spent some time with two young

18   women.  Should not have.  We drove around for quite some time.

19   I returned them to their homes.

20           And I got a call from Officer Brett Naill of the

21   Bismarck Police Department several days later asking me

22   basically what was going on and informed me that they were

23   being issued curfew violation citations and that they had said

24   that no untoward conduct had occurred, and I thought that was

25   that.

14

1          And several days later this whole incident with the

2   vehicle stopping in front of me and the two officers emerging

3   occurred.

4          THE COURT:  And the two young women that you

5   mentioned earlier, how old were they?

6          THE DEFENDANT:  They were 14 and 14.

7          THE COURT:  And there was sexual contact with both of

8   those young girls?

9          THE DEFENDANT:  No, Your Honor.

10         THE COURT:  Sexual contact with one of them?

11         THE DEFENDANT:  Neither, Your Honor.

12         THE COURT:  Okay.

13         THE DEFENDANT:  And they're the persons in Count 1

14  and Count 2.

15         THE COURT:  Those are the individuals --

16         THE DEFENDANT:  Yes, Your Honor.

17         THE COURT:  -- identified in those counts.

18         THE DEFENDANT:  Yes, Your Honor.

19         THE COURT:  Okay.  What about the victims identified

20  in Counts 3 through 21?  There was sexual contact with most, if

21  not all, of those young ladies?

22         THE DEFENDANT:  No, not most, only a few of them,

23  Your Honor.

24         THE COURT:  So, Mr. Delorme, maybe you can shed a

25  little light for my benefit of how this all evolved.

1             MR. DELORME:  Sure, Your Honor.  I think Mr. Rouse is

2    being pretty forthright for -- with you at this point.  The two

3    individuals identified as E.V. and M.G. in Counts 1 and 2, they

4    both lived together in the same residence.  One of them was a

5    foster child of the parent.  The other one was a biological

6    child.  They had been friended by Mr. Rouse in Snapchat.

7    Almost every one of these are going to be Snapchat

8    communications with every victim, but they were friended in

9    Snapchat, Your Honor.

10            With the one, M.G., there was request for images to

11   be sent.  She did send images to Mr. Rouse over a period of

12   time.  Those would've been images depicting her nude and

13   masturbating, Your Honor.  There were some, I guess, not

14   topless, but bra-type pictures of E.V. that were sent.

15            Count 1 is based upon Mr. Rouse requesting that these

16   two individuals sneak out of the home, meet him.  He parked

17   about a block or two away from the residence of where these two

18   young ladies lived.  They did sneak -- snuck out of the house,

19   went to his vehicle.  He drove around for a while, parked by

20   the river.  Count 1 is an attempt because he was attempting to

21   engage in sexual conduct with E.V., trying to grab her by her

22   inner thigh.  She did reject his advances on her, so eventually

23   he did bring them home.

24            And Count 2 was based upon the images and in the

25   interview of M.G. that were recovered from the cell phone that

1   he was talking about.  It was that initial report that came

2   into Officer Naill, Your Honor.  It was forwarded to Detective

3   Rask, who's sitting beside me, and he's -- he's done the lion's

4   share of the work on this particular case.

5           Via interviews with them, he discovered there were

6   additional females that were connected to Mr. Rouse and that

7   these two -- two young ladies also knew about.  And he

8   interviewed -- approached and interviewed several -- several of

9   them, discovered that there was a pattern in place here with

10  communications on Snapchat.

11          And each one of these communications, Your Honor,

12  almost every one that was recovered, you can see that ages were

13  discussed relatively early.  The females would give their age.

14  Mr. Rouse would sometimes give his age.  Sometimes he'd give a

15  much lower age.  Sometimes he would send them an image of a

16  driver's license or ID card that appeared to depict him as

17  younger than what he was.  It looked like it had been somehow

18  doctored digitally for the young ladies.  But based on that

19  pattern is what the search warrant and the arrest warrant was

20  based off of that Mr. Rouse was talking about and the arrest.

21          After that, Your Honor, it was -- once the phone was

22  seized, it was just a matter of -- once they got into the phone

23  and found several of the folders inside of it, they were able

24  to track down each one of these individuals either via those --

25  that information in the phone, or once they would find one

17

1  female, another female would talk about another girl that she
2  was aware of as well.
3          THE COURT:  But the pattern in each -- with each
4  victim was similar?  There were Snapchat communications, then
5  evolved to exchange of nude photos, and then hooking up at some
6  point in time someplace, somewhere in the Bismarck area?
7          MR. DELORME:  Generally or attempt -- attempted to
8  meet up with them, Your Honor.  There was lots of discussion of
9  sexual acts he wanted performed on himself and to perform on
10  the individuals.  Some of these young ladies didn't sneak out
11  of their house, they didn't meet up with him, but he was making
12  specific requests of them, as well as requests for images and
13  videos of them in a nude state.
14          THE COURT:  So how many images, pictures, videos were
15  seized from the cell phone that you mentioned?
16          MR. DELORME:  Total, Your Honor?
17          THE COURT:  Approximately.
18          MR. DELORME:  Probably a couple hundred images and --
19          THE COURT:  Okay.
20          MR. DELORME:  -- maybe a couple dozen videos.
21          THE COURT:  Okay.  Mr. Rouse, is the information that
22  Mr. Delorme just outlined here on the record, is that generally
23  accurate?
24          THE DEFENDANT:  Yes, Your Honor, that is generally
25  accurate.

18

1         THE COURT:  Is there anything that he said that you

2    disagree with, have a different take on?

3         THE DEFENDANT:  The one thing I would like to add,

4    you asked how many had had sexual contact.  It was five to six

5    of the persons on the Indictment.  The remainder there was

6    either no contact in person whatsoever or no sexual contact.

7         THE COURT:  All right.  So let's move on to paragraph

8    7 found on page 10.  Paragraph 7 is inserted into the Plea

9    Agreement to outline what the maximum penalties are for each of

10   these various offenses.  And, Mr. Delorme, the first counts

11   identified in paragraph 7, those are all the same charges,

12   coercion and enticement.

13        MR. DELORME:  Yes, Your Honor, it's either the actual

14   coercion or attempt.

15        THE COURT:  All right.  So in paragraph 7, Counts 1,

16   3, 4, 5, 6, 8, 9, 10, 11, 14, 15, 16, 17, 18 and 20 are all

17   crimes entitled coercion and enticement of a minor to engage in

18   unlawful sexual activity or an attempt?  Is that what you said,

19   Mr. Delorme?

20        MR. DELORME:  Yes, Your Honor.

21        THE COURT:  Okay.  Those are all felony offenses.

22   They all -- in the federal system, felony convictions remain on

23   your record for life.  They're not expunged after a period of

24   time.

25        And all of these particular crimes carry the same

1    maximum penalty, which is a ten-year mandatory minimum
2    sentence, up to a life sentence, which is the maximum.  Each of
3    the counts, each of the crimes carries a maximum fine of
4    $250,000.
5            When it mentions supervised release, that's a status
6    that a person is on after they're released from the custody of
7    the Bureau of Prisons.  That has to be for a minimum of 5 years
8    on each of those counts, up to life.  And there'll be a special
9    assessment that's charged on each of the counts.  It's -- under
10   federal law it's $100 per count, so those first counts that
11   we've just talked about would carry a total special assessment
12   of $1,500, $100 per count.  Any questions about that?
13           THE DEFENDANT:  No, Your Honor.
14           THE COURT:  The mandatory minimums are determined by
15   Congress, not by judges.  And for most sex offenses and most
16   drug offenses, for that matter, there are mandatory minimums in
17   the federal criminal justice system.
18           Counts 2, 7, 12, 13, 19 and 21 are all crimes
19   entitled attempted -- receipt of images depicting the sexual
20   exploitation of a minor or attempted receipt of such images, in
21   other words, receipt or attempted receipt of child pornography.
22   Those are also felony offenses.
23           Each of those crimes carries the same maximum
24   penalty, which is a 5-year mandatory minimum, up to a 20-year
25   statutory maximum, $250,000 fine, placement on federal

1    supervision for a minimum of 5 years, up to a lifetime.  And

2    again, for each of those six counts it's a $100 special

3    assessment, so it would be a total of $600.  Those are the

4    maximum penalties.  Any questions about those?

5          THE DEFENDANT:  No, Your Honor.

6          THE COURT:  Then paragraph 9 talks about assessments

7    and mandatory restitution.  And under federal law with sex

8    offenses such as these, there's possibility of up to a special

9    assessment of $35,000 on the receipt or attempted receipt of

10   images depicting the sexual exploitation of minor, the child

11   pornography offenses.  That carries a potential of up to

12   $35,000 special assessment per count, understood?

13         THE DEFENDANT:  Yes, Your Honor.

14         THE COURT:  Any questions about what the maximum

15   penalties are?

16         THE DEFENDANT:  No, Your Honor.

17         THE COURT:  Then paragraph 9 summarizes what your

18   rights are as a defendant.  The most important right that you

19   have when you're charged with a crime in federal court is a

20   right to a jury trial.  That means you don't have to plead

21   guilty.

22         Every defendant charged with a crime has a right to

23   have the evidence in their case presented to a jury of 12

24   persons selected by both attorneys and to leave it into the

25   hands of those 12 jurors to decide the outcome of the case, to

21

1  decide whether you're guilty or not guilty of these crimes.

2  Have you had a chance to visit with Mr. Hoffmann about the pros

3  and cons of proceeding to a jury trial in a case like this?

4          THE DEFENDANT:  Yes, Your Honor, I have.

5          THE COURT:  In all honesty, these types of cases

6  don't generally play out very well for juries.  I had a similar

7  case involving sex offenses of this nature that we tried just a

8  couple weeks ago in this courtroom.  And I try a number of

9  these cases every year, but they don't turn out very well for

10 defendants.  The fact is I don't ever recall a defendant

11 charged with a child pornography offense or an internet luring

12 offense or a coercion, enticement of a minor offense who's ever

13 been found not guilty by a jury in federal court.  But you've

14 discussed that with Mr. Hoffmann, I trust.

15         THE DEFENDANT:  Yes, Your Honor.

16         THE COURT:  But what this all means is that you don't

17 have to plead guilty.  You are entitled to take this case to

18 trial.  If the case went to trial, Mr. Delorme, as the

19 prosecutor, has the burden of proof in a criminal case.  As a

20 defendant, you don't have to prove or disprove anything.  It's

21 always the government under our Constitution that has the

22 burden of proof.  Mr. Delorme has to call witnesses and present

23 evidence, and he has to convince all 12 jurors that you are

24 guilty of the essential elements of each of these crimes.

25         If we had a trial, Mr. Hoffmann is there to

22

1  cross-examine the government's witnesses and challenge their

2  credibility.

3          If we had a trial, as a defendant you have a right to

4  also call witnesses.  You've got the same right as the

5  government.  You've got a right to present a defense, a right

6  to call witnesses, and a right to testify in a criminal trial,

7  but you can choose to go to trial and not testify as well

8  because you've got a right to remain silent.  In reality, most

9  criminal cases that go to trial, defendants choose not to

10 testify for a number of reasons, but you -- do you understand

11 all of that?

12         THE DEFENDANT:  Yes, Your Honor, I do.

13         THE COURT:  And if we had a trial and you were found

14 guilty by a jury of any of these counts, you always have a

15 right to appeal.  Every defendant can appeal after they've been

16 convicted at a trial.  You've got a right to appeal the jury's

17 decision and a right to appeal the sentence that you'd be

18 ordered to serve if there was a conviction.

19         Those are your fundamental Constitutional rights, the

20 most important of which is your right to a jury trial.  Do you

21 feel that you understand that?

22         THE DEFENDANT:  Yes, Your Honor, I do.

23         THE COURT:  Then let's talk about the sentencing

24 guidelines and how they apply to you in this case.  Have you

25 had a chance to visit with Mr. Hoffman about the federal

23

1 sentencing guidelines?

2          THE DEFENDANT:  Yes, Your Honor, I have.

3          THE COURT:  This manual that I'm holding up is --

4 it's actually the sentencing guideline manual.  It's for 2018.

5 This is the most recent edition.  The Sentencing Commission

6 hasn't published a manual since 2018 because they don't have

7 a -- nobody in Congress -- or nobody in the White House has

8 bothered to appoint members of the Sentencing Commission.  They

9 haven't come out with a manual since 2018.  They're not getting

10 much done in Washington in terms of the sentencing guidelines,

11 but this is the manual that applies today.

12          And we've had the sentencing guidelines in existence

13 in the federal system since 1987.  They were adopted by

14 Congress and the Sentencing Commission 30-plus years ago to try

15 to provide some uniformity and consistency in how defendants

16 were sentenced in federal criminal cases.  And before any

17 defendant is ever sentenced in a federal criminal case

18 nationwide, we are required -- as a judge, I'm required to

19 determine what the sentencing guideline range is.

20          When I first became a judge 20 years ago, the

21 sentencing guidelines were mandatory.  That changed probably

22 13, 14 years ago.  Now the guidelines are considered to be

23 advisory, so judges have more discretion now than we had 13,

24 14, 15 years ago.  When I first became a judge, if the

25 sentencing guideline range was life, then defendants were

1  sentenced to life, and life in the federal system is life.

2  There's no parole, but now we have more discretion.

3       But the sentencing guidelines are all based on two

4  primary factors, your criminal history and the crimes that you

5  plead guilty to.  In terms of criminal histories, there are six

6  separate criminal history categories; one, the lowest; six, the

7  highest.  You'll fall in Criminal History Category I.  You

8  don't have any criminal history whatsoever.

9       Then we have to take a look at each of the crimes

10 that you plead guilty to.  Every crime in the federal system

11 has a certain number that's associated with it.  It's known as

12 the base offense level for that crime.  And in paragraph 14 the

13 parties have agreed that the base offense level for the conduct

14 that you are pleading guilty to is 28.  Do you see that?

15       THE DEFENDANT:  Yes, Your Honor.

16       THE COURT:  All right.  Then in paragraph 15 the

17 parties have agreed that -- to a number of upward adjustments

18 that may apply in this case.  And in child pornography, sex

19 offense cases, there's always a number of upward adjustments

20 that increase that offense level.

21       There's a plus-two upward adjustment in this case for

22 knowing misrepresentation and undue influence; plus-two upward

23 adjustment for use of a computer, a smartphone; plus-two

24 because there was a commission of a sex act; and a plus-21

25 upward adjustment because there were multiple -- multiple

1   victims.

2          According to my math, Mr. Delorme, that's 27 points

3   for upward adjustments and a 28 offense level, which is a 55,

4   not a 57 or 58.  And then a minus-three downward adjustment for

5   acceptance of responsibility on the part of the defendant,

6   which, according to my math, is an overall offense level of 52.

7          MR. DELORME:  Well, your math is probably better than

8   mine, Your Honor.  That's why I married an accountant.

9          THE COURT:  All right.  And, Mr. Hoffmann, you've

10  come up with the same addition?

11         MR. HOFFMAN:  Yes, that's what -- Mr. Rouse and I

12  discussed what's in the -- on page 13.

13         THE COURT:  Okay.  So at least based on the parties'

14  agreement to the guidelines, you're looking at an overall

15  offense level of 52 and a criminal history category of I.  Then

16  we turn to a sentencing table in the back of this manual.  Have

17  you seen that wonderful chart?

18         THE DEFENDANT:  Yes, Your Honor.

19         THE COURT:  And that tells us that straight across

20  the board, no matter what criminal history category that you

21  end up in, it's a life sentence.  Is that what you've been

22  told?

23         THE DEFENDANT:  Yes, Your Honor.

24         THE COURT:  All right.  And as I mentioned, life is

25  life in the federal system.  There's no parole.  People don't

1    get out early for any reasons.  And if you get a life sentence,

2    then you spend your life in prison.

3            Now, in addition to the sentencing guidelines,

4    there's some other sentencing factors that I'm required to

5    consider in this case.  Those sentencing factors are outlined

6    in a federal law.  The citation to the law is 18 United States

7    Code, Section 3553, Subpart (a).  That particular law sets

8    forth about seven or eight other factors that I'm required to

9    consider before I sentence any defendant.

10           And I'm very familiar with all of those factors.

11   I've been required to consider them in every case that I've

12   ever handled, and I've sentenced thousands of defendants over

13   the years.

14           And you can take a look at what that law says if you

15   wish.  Mr. Hoffmann can provide you a copy of that law.  If you

16   want to look it up on the internet and/or in any of the

17   libraries that might exist in the prison facilities that you're

18   in, just type in 18 USC, Section 3553(a), and you can see

19   exactly what it is that I'm required to consider.

20           And then at the sentencing hearing both attorneys

21   have opportunity to outline what they believe is an

22   appropriate, reasonable sentence in this case.  The government,

23   at paragraph 19, says it's going to recommend a sentence within

24   the applicable guideline range or the mandatory minimum,

25   whichever is greater.  And your attorney has a right to

27

1    recommend any sentence at or above the mandatory minimums that

2    may apply.  And you're also given a chance to speak at the

3    sentencing hearing.

4            Any questions about the sentencing guidelines?

5            THE DEFENDANT:  No, Your Honor.

6            THE COURT:  All right.  I took a look a few weeks ago

7    at the Sentencing Commission website, and you can, and

8    Mr. Hoffmann can look at that as well.  But on their website

9    they've got a new subcategory that you can look at to search

10   for the average sentences for similar crimes like this.  They

11   just came out with that website about maybe six months ago.

12           I took a look at it, and it said during the last five

13   fiscal years - that would be 2016 to 2020 - the average

14   sentence for defendants convicted of these types of crimes was

15   313 months.  Twenty-six years was the average sentence

16   nationwide.  And that average sentence was generally imposed

17   for defendants that ended up with an overall offense level of

18   43 and a criminal history category of I.

19           We get those statistics every three months.  I follow

20   the national statistics fairly closely, but do you have any

21   questions at all about the sentencing guidelines?

22           THE DEFENDANT:  No, Your Honor.

23           THE COURT:  All right.

24           THE DEFENDANT:  But thank you for explaining it to

25   me.  I appreciate that.

                                  28

1          THE COURT:  Then if you could turn next to paragraph
2    23, it's entitled Defendant's Waiver of Appeal.  It's an
3    important paragraph in the Plea Agreement.  Waiver of appeal
4    means giving up your right of appeal.  This type of paragraph
5    is found in almost every Plea Agreement that I've ever seen,
6    and I've handled cases in states other than North Dakota.
7          The purpose of waiver of appeal paragraph is to try
8    to put an end to these criminal cases after we've had a
9    sentencing hearing.  We're trying to avoid scenarios where
10   defendants get sentenced, and then they go off to prison and
11   decide to try to reopen their cases for a number of reasons, so
12   it's an important paragraph.
13         The Courts of Appeals - and North Dakota sits in the
14   Eighth Circuit Court of Appeals - have all said that plea
15   agreements are considered to be contracts.  If you sign a Plea
16   Agreement, you've signed a contract with the federal
17   government, just like any other contract that you might sign in
18   life.
19         And the Courts of Appeals have also said that it's
20   entirely appropriate to include a waiver of appeal paragraph in
21   a Plea Agreement, and they enforce these paragraphs against
22   defendants who turn around and try to appeal after they've been
23   sentenced.
24         There's a lot of legalese in paragraph 23, but when
25   you cut through all of that jargon, the most important sentence

1    is the last sentence, and it says as follows, quote, "Defendant

2    reserves the right to appeal a sentence of imprisonment imposed

3    above the upper end of the applicable guidelines range."  Do

4    you see that?

5              THE DEFENDANT:  Yes, Your Honor.

6              THE COURT:  So what that means is that you have

7    agreed that you will accept any sentence that falls within the

8    sentencing guideline range in this case.  You are only

9    reserving the right to appeal a sentence that falls above the

10   sentencing guideline range.  It appears that the sentencing

11   guideline range will likely be life in this case, so this

12   sentence says that you've agreed that you won't appeal any

13   sentence up to a life sentence.  Do you understand that?

14             THE DEFENDANT:  Yes, Your Honor.

15             THE COURT:  Any questions about what that means, to

16   give up your right of appeal?

17             THE DEFENDANT:  No, Your Honor.

18             THE COURT:  As I mentioned, oftentimes defendants,

19   when they've been -- when they've been sentenced, particularly

20   to long sentences, they go off to federal prison, and then

21   within a matter of weeks after they get there, they suddenly

22   become well-educated in sentencing issues.  They become experts

23   on sentencing, because there's a lot of jailhouse lawyers in

24   the federal prisons.

25             And throughout the federal prisons there are an

1   abundance of motions that defendants file after sentencing,

2   motions to withdraw their plea.  They file motions arguing that

3   nobody ever explained the Plea Agreement to them, that their

4   attorney forced the Plea Agreement upon them, that they came to

5   a change of plea hearing and the judge never explained anything

6   to them, never gave them a chance to ask questions.  They argue

7   that they didn't have a clue what they were getting themselves

8   into when they signed the Plea Agreement, and so they claim

9   actual innocence.  They claim the right to a jury trial.  They

10  try to reopen their case.

11          I've never had a defendant that's been successful

12  that's tried to do that when they've signed a Plea Agreement

13  like this and agreed not to appeal, because the Courts of

14  Appeals, as I mentioned to you, say these are contracts.  And

15  they will look at an appeal, and they will simply say to the

16  defendant, "Mr. Defendant, you signed a Plea Agreement.  You

17  agreed that you wouldn't appeal.  The judge sentenced you in

18  accordance with that agreement and in accordance with the

19  sentencing guideline.  You're out of luck.  We're not going to

20  listen to the case."

21          We get decisions like that every month from the

22  Eighth Circuit, and usually they're about a page or two in

23  length.  There's some legalese in them, but basically what

24  they're saying is, "A deal is a deal is a deal, and you said

25  you wouldn't appeal, so we're not going to listen to it."  So

31

1    it's important that you understand what this paragraph means,
2    and do you feel that you do understand what it means to give up
3    your right of appeal?
4            THE DEFENDANT:  Yes, Your Honor.
5            THE COURT:  Okay.  In essence, you've agreed to live
6    with whatever sentence that I order you to serve in this case
7    up to a life sentence, understood?
8            THE DEFENDANT:  Yes, Your Honor.
9            THE COURT:  Then paragraph 25 is entitled Sex
10   Offender Registration, Megan's Law, Adam Walsh Act Notice.
11   Megan's Law and the Adam Walsh Act were laws that were passed
12   probably 15 years ago.  And among other things they require
13   that persons convicted of certain sex offenses under federal
14   law be registered as sex offenders.
15           I don't have any discretion whatsoever to waive that,
16   nor do I have any discretion about determining how long
17   somebody has to register as a sex offender.  That's all
18   determined by the State of North Dakota if that's the state
19   that you choose to live in.
20           There's a committee appointed by the attorney general
21   of North Dakota of persons from all walks of life.  The
22   committee is probably 15 to 20 members in size.  They meet a
23   couple times every month.  They look at every new case that
24   comes out of the state and federal system that involves a sex
25   offense, and that committee then decides whether the defendant

                                  32

1    that they're considering is a low, medium or high-risk sex

2    offender.

3            If they consider that the person is low risk, they

4    have to register for a minimum of 15 years.  Medium risk is

5    25 years, I believe.  High risk is a lifetime of registration.

6    As a federal judge, I'm not involved in that process in any

7    way.  That committee never seeks any input from any judges

8    about how we assess a certain offender, whether they're low,

9    medium or high risk.  And every state handles it differently,

10   but usually federal judges aren't involved at all in that.

11           So living in North Dakota, you would have to register

12   certainly for a minimum of 15 years, but it could be a lifetime

13   of registration.  Do you understand that?

14           THE DEFENDANT:  Yes, Your Honor, I do.

15           THE COURT:  And some states are even more strict than

16   North Dakota is.  And that won't be determined for quite some

17   time, but any questions at all about the need to register as a

18   sex offender as a result of these convictions?

19           THE DEFENDANT:  No, Your Honor.

20           THE COURT:  Okay.  Do you have any questions at all

21   about what this Plea Agreement means for you, Mr. Rouse?

22           THE DEFENDANT:  No, Your Honor.  I believe I fully

23   understand it and the consequences of signing it.

24           THE COURT:  Mr. Delorme, in terms of a factual basis

25   for the plea, is there anything more that you wish to add to

33

1    the record?

2          MR. DELORME:  Yes, Your Honor.  I'd better add a few

3    things just to make sure we have a full and complete record.

4    We've already talked about Counts 1 and 2, so I'm going to just

5    briefly go over the remainder of the counts.

6          Count 3 is a coercion, enticement or an attempt.

7    A.D. is identified as the victim in that case.  A.D. was 13

8    years of age at the time.  In that particular matter Mr. Rouse

9    discussed wanting to meet up with her and engage in sex acts,

10   to include A.D. performing oral sex on Mr. Rouse.

11         Count 4 is a coercion, enticement, victim identified

12   as R.J.  R.J. was 13 years of age at the time.  Rouse

13   communicated with her and wanted to sneak -- her to sneak out

14   so they could meet up and cuddle.  R.J. did sneak out and

15   indicated that Rouse took her to his shop, and that's kind of a

16   common thing we see with most of the these girls, Your Honor.

17   There's discussion of the shop, where according to R.J., Rouse

18   held her down and took off her clothes and engaged in vaginal

19   sex with her.

20         Count 5, another coercion, enticement, A.B. is

21   identified as the victim.  A.B. was 18 -- or 16 years of age at

22   the time.  A.B. was friends with two other girls that were

23   communicating with Mr. Rouse, Your Honor.  One of the two

24   girls -- both of which were minors as well, similar age.  One

25   of the two girls had met with a -- met up with an individual

1   using the app called Tinder, which is kind of a social dating

2   website.

3          THE COURT:  Yeah, I'm familiar with it.

4          MR. DELORME:  With a -- with a individual living in

5   Fargo, North Dakota, they needed to get to Fargo, North Dakota,

6   so that this other individual could meet up with her date.

7   They convinced Mr. Rouse to give them a ride to Fargo.  One of

8   the things that was intended was that A.B. would then do

9   whatever he -- Mr. Rouse wanted once they got a ride to Fargo.

10          Once they got to Fargo, Mr. Rouse dropped off the two

11   friends.  They drove around, found a dark place.  Mr. Rouse

12   then proceeded to attempt to engage in sexual conduct with the

13   -- with A.B.  He did put his hands down per pants and touch her

14   genitals and digitally penetrated her.  However, according to

15   A.B., there was a noise that was loud enough to startle

16   Mr. Rouse, so they ended up driving away and nothing further

17   happened.

18          Count 6, coercion, enticement of a minor again, M.R.

19   is identified as the victim.  She was 15 years of age at the

20   time.  Mr. Rouse arranged to meet up with them out in Driscoll

21   to do stuff.  He picked her up in a gray Jeep, drove to a

22   secluded area, removed M.R.'s clothing.  And according to the

23   interview with M.R., he used his phone to take pictures of her

24   nude and then had sex with M.R.  We did recover from his phone

25   multiple videos of M.R. engaging in sexual -- sexual conduct.

35

1          Count 7 is an attempted receipt.  B.T. is identified

2    as the victim.  B.T. was 14 years of age at the time.  B.T.

3    indicated that two times in early 2018, Mr. Rouse communicated

4    with her and specific -- specifically asked for nude top and

5    bottom pics from her.  There was some images found, not sexual

6    in nature, Your Honor, but he did make the request of her,

7    supporting the attempt.

8          Count 8, coercion, enticement is again identified in

9    this one.  L.W. is the identified victim.  L.W. is 14 years of

10   age at the time.  Mr. Rouse had communicated with her - this is

11   almost all exclusively Snapchat, Your Honor - asking her for

12   nude pictures, to include focus on her genitalia.  L.W. in her

13   interview indicated that on one occasion Mr. Rouse pressed her

14   to sneak out so he could meet up with her so they could have

15   sex together.  She did not actually meet up with him, Your

16   Honor, but he did press her for the -- to arrange to meet with

17   her.

18         Count 9 is coercion and enticement of a minor again.

19   J.T. is identified as the victim.  J.T. is 14 years of age at

20   the time.  J.T. would've met with Mr. Rouse, I think, according

21   to her, 20 to 30 times, Your Honor, had sex with Mr. Rouse four

22   to five times.  We can confirm this from videos and images from

23   Mr. Rouse's phone, that he actually produced images or videos

24   himself with himself engaging in vaginal intercourse with J.T.

25   We also know on one occasion Mr. Rouse drove J.T. to a CVS

1    Pharmacy, provided her a credit card, and had her obtain a Plan

2    B pill to prevent any pregnancy from occurring from any sexual

3    acts.

4            Count 10 is coercion, enticement of a minor.

5    C.I. (sic) is identified as the victim.  C.I. was 13 at the

6    time.  During her chats with Mr. Rouse, Mr. Rouse wanted her to

7    sneak out of her house so he could pick her up, where he would

8    then take her someplace to engage in sexual acts, specifically

9    requested that C.I. perform oral sex on him.  We did recover

10   from his phone one video appearing to depict C -- C.L.

11   masturbating, so she would've sent images as well.

12           And I just -- briefly, Your Honor, the original

13   Indictment was 48 counts -- or the Superseding, so the -- what

14   we're agreeing to here in the Plea Agreement is we came down to

15   21 counts, so there -- there's different conduct that happened

16   with each of these girls, but we came down to one count per

17   victim.

18           Count 11 is coercion, enticement of a minor.  D.B. is

19   identified as the victim.  D.B. was 17 at the time.  Rouse had

20   talked to her via Snapchat and encouraged her to meet up with

21   him, and she agreed.  He picked her up, and the whole idea here

22   was to cuddle.  They drove to a undisclosed place, where B.D.

23   performed oral sex on Mr. Rouse until he ejaculated.  We did

24   also recover a video of D.B. masturbating, recovered from

25   Mr. Rouse's phone.

1     Count 12, attempted receipt, this is a -- G.L. is
2  identified as the victim.  She was 14 years of age at the time.
3  Rouse had provided her some JUULpods.  I don't know if you're
4  aware of those, Your Honor.  Those are those little pods that
5  go inside those vapor smoker devices, so nicotine.  It's like a
6  vape -- vape pen.
7     THE COURT:  I've heard of them, but I don't know what
8  they are.
9     MR. DELORME:  It's like the refillable things.  It's
10  what they -- what you use to actually make the device work.
11     THE COURT:  All right.
12     MR. DELORME:  He provided her some JUULpods and
13  indicated that next time he was going to provide her some, he
14  would want something from her and asked for nude pics, and he
15  did ask for the nude pics.  He -- we did find some images on
16  his phone, Your Honor, but none of them were nude.  There were
17  some images of her in just her bra, and that's supporting the
18  receipt or attempted receipt.
19     Count 13, attempted receipt again, C.S. was
20  identified as the victim.  C.S. was 14 years of age at the
21  time.  Rouse -- Rouse specifically asked her to send nude
22  images of herself.  Videos, images were recovered from
23  Mr. Rouse's phone, which appeared to depict C.S. nude, C.S.'s
24  nude vaginal area.
25     Count 14 is coercion, enticement of a minor.  P.V. is

38

1   identified as the victim.  She was 15 years of age at the time.

2   Rouse asked her for nude images.  She sent him images of her

3   nude breast and vagina and some masturbation videos.  On one

4   occasion Rouse drove to Garrison, North Dakota, convinced her

5   to meet up with him.  When they met, Rouse kissed her hard

6   enough -- or kissed her and then bit her lip hard enough to

7   make her bleed.  Rouse did touch her vaginal and breast area

8   over her clothing and attempted to insert his hand into her

9   pants and under her -- but she declined at that point, and the

10  event ended.

11          Count 15, coercion, enticement of a minor, A.S. is

12  identified as the victim.  A.S. was 14 or 15 years of age at

13  the time.  Mr. Rouse told A.S. that he wanted to have sex with

14  her and requested nude imagery, to include images of her -- her

15  vagina.  Rouse requested to meet up with A.S. on numerous

16  occasions, which A.S. believed to be for sexual purposes.  We

17  did also recover from his phone a video of A.S.'s exposed

18  breast and a video of A.S. in her underwear displaying her

19  buttocks or focus on her buttocks area.

20          Count 16, coercion, enticement again, A.J.M. is

21  identified as the victim.  A.J.M. was 14 years of age at the

22  time.  Rouse requested that he -- or that she send him nude

23  images of herself.  Rouse requested to meet up with A.J.M. to

24  meet to engage in sex acts with her.  A.J.M. recalled Rouse

25  being into rough sex and discussing that with -- with her.  She

1  did not end up meeting with him, but the request was made for

2  sexual purposes.

3          Count 17, coercion, enticement again, R.P. is

4  identified as the victim.  R.P. is 14 years of age at the time.

5  Mr. Rouse requested R.P. send pictures of breasts and buttocks

6  and vagina.  He also requested to meet up with R.P. for sex.

7  She did not actually meet up with him.

8          Count 18, coercion, enticement of a minor, A.J. is

9  identified as the victim.  A.J. was 15 years of age at the

10  time.  Mr. Rouse had request -- requested to meet with A.J. on

11  numerous occasions.  Rouse -- Mr. Rouse did drive to A.J.'s

12  location on one occasion, picked her up from her residence to

13  buy cigarettes, but I don't think that anything sexual occurred

14  on that occasion, Your Honor.  There were images of A.J.'s

15  breast and A.J.'s focus of her underwear area that were also

16  recovered from Mr. Rouse's phone.

17          Count 19 is attempted receipt, victim identified as

18  S.S.  S.S. was 13 years of age at the time.  Again, Mr. Rouse

19  requested she send nude images.  She did send nude images of

20  herself, specifically her genitalia.  And we did recover videos

21  and images depicting S.S.'s vagina and S.S. masturbating.

22          Count 20 is coercion, enticement of a minor.  This is

23  -- E.A. is identified as the victim, Your Honor.  E.A. was 12

24  years of age at the time.  Mr. Rouse asked her for nude images

25  of her breast and of her vaginal area.  And on one occasion he

1   asked E.A. to sneak out and gave E.A. a list of rules, to
2   include rules for masturbating and sending imagery.  And we did
3   recover close-up images of her vagina and breast, Your Honor.
4           Count 21 is receipt of images.  K.B. is identified as
5   the victim.  K.B. was 13 years of age at the time.  Mr. Rouse
6   was communicating with her, asked her for nude images.  And we
7   did find nude images, close-up of her vaginal area and breast
8   on Mr. Rouse's phone.
9           THE COURT:  Anything else about the Plea Agreement,
10  Mr. Delorme?  Specifically, any other provisions that you feel
11  that I need to visit with Mr. Rouse about that have not been
12  covered already?
13          MR. DELORME:  The only other thing, Your Honor, is
14  that there's an agreement in here to -- for the forfeiture of
15  the iPhone XS, which I believe Mr. Hoffmann has reviewed the
16  Preliminary -- Preliminary Order of Forfeiture, so I don't
17  think that has been discussed with Mr. Rouse yet himself.
18          THE COURT:  Mr. Hoffmann, anything that you want to
19  add, clarify or explain concerning the factual basis for the
20  plea or anything else that we've talked about to date?
21          MR. HOFFMAN:  No, Your Honor.
22          THE COURT:  And have you visited with Mr. Rouse about
23  the Preliminary Order of Forfeiture prepared by the government?
24          MR. HOFFMAN:  We -- not that order.  It was presented
25  to me by the government before Mr. Rouse was brought into the

1  courtroom.  I looked it over.  It involves his cell phone that

2  he referred to in his conversation with you, so there is an

3  actual order of forfeiture of --

4          THE COURT:  And what the Preliminary Order of

5  Forfeiture means, Mr. Rouse, is the government is requesting

6  that as a result of any plea of guilty here to these charges,

7  that you agree to forfeit any ownership interest that you have

8  in the iPhone at issue here.  That's all it essentially says.

9          THE DEFENDANT:  Understood.

10          THE COURT:  Okay.  And you don't have any objection

11  to my signing of such an order of forfeiture?

12          THE DEFENDANT:  No, Your Honor, no objection.

13          THE COURT:  All right.  It says the -- dated January

14  here, Mr. Delorme, but I'll --

15          MR. DELORME:  Yeah, Your Honor, we actually reset

16  this hearing a couple times.

17          THE COURT:  Right.

18          MR. DELORME:  Yeah, there was, I think, a snowstorm

19  in December.  Then in January --

20          THE COURT:  Right.

21          MR. DELORME:  -- I think there was difficulty --

22  other difficulties.

23          THE COURT:  But, Mr. Hoffman, are there any other

24  provisions of the Plea Agreement that you feel that I need to

25  address with Mr. Rouse here this morning?

42

1          MR. HOFFMAN:  No, Your Honor.

2          THE COURT:  All right.  Mr. Rouse, any questions

3   about anything that we've discussed so far?

4          THE DEFENDANT:  Just a few factual clarifications.

5          THE COURT:  Sure.

6          THE DEFENDANT:  Mr. Delorme made a comment that the

7   general theme was that these people were being brought to my

8   shop.  There were only two people on the Indictment that were

9   ever brought to the shop.

10          THE COURT:  Okay.

11          THE DEFENDANT:  In addition to that, on Count

12   Number 6, again, for factual clarification, I did not have sex

13   with M.R., and I did not take any photos with my phone or any

14   other device at the time that I did meet up with her.

15          THE COURT:  All right.

16          THE DEFENDANT:  And that is all, Your Honor.

17          THE COURT:  Well, I'm simply going to ask you now,

18   Mr. Rouse, how you intend to plead to these charges.  I can

19   read each and every one of the charges to you if you wish.

20   Some defendants really enjoy having the judge do that.  Most

21   defendants agree to waive the reading of the charge and simply

22   ask how defendants intend to plead, but if you want me to read

23   the charges, I will, but if you're willing to waive that, it'll

24   save some time for everybody.

25          THE DEFENDANT:  Your Honor, I will waive the reading

43

1    of the charges.

2            THE COURT:  But before I ask you how you plead to

3    these charges, do you have any questions or concerns that you

4    wish to raise?

5            THE DEFENDANT:  No, Your Honor.

6            THE COURT:  All right.

7            MR. HOFFMAN:  Your Honor, I do have a couple things.

8            THE COURT:  Yep.

9            MR. HOFFMAN:  When Mr. Rouse and I met before today,

10   he had a concern about Count 19 and Count 21 being entitled

11   with the word -- the use of the word "children."  The statute

12   is "minor."  The actual wording of the charge includes "minor,"

13   but it's just entitled "children."

14           THE COURT:  Sure.

15           MR. HOFFMAN:  And we'd ask that you would amend that,

16   please.

17           MR. DELORME:  I don't have any problem with that,

18   Your Honor.  I indicated to Mr. Hoffmann before the hearing

19   that that was just, you know, probably a typographical error

20   and it should've read "minor."

21           THE COURT:  So I will order the amendment of Count 19

22   and Count 21 to reflect that the word "children" will be struck

23   from the title of both of those crimes and replaced with simply

24   the word "minor."  Anything else?

25           MR. HOFFMAN:  No, Judge.  Thank you.

1    THE COURT:  All right.  So, Mr. Rouse, I need to go

2  through each one of these charges and simply ask how you intend

3  to plead.  So with respect to Count 1 in the Information, the

4  crime of coercion and enticement of a minor to engage in

5  unlawful activity relating to victim identified as E.V., how do

6  you intend to plead to that charge?

7    THE DEFENDANT:  Guilty, Your Honor.

8    THE COURT:  Count 2 is a crime of attempted receipt

9  of images depicting the sexual exploitation of a minor.  It

10  relates to the victim identified as M.G.  To Count 2, how do

11  you intend to plead this morning, sir?

12    THE DEFENDANT:  Guilty, Your Honor.

13    THE COURT:  Count 3 is a crime of coercion and

14  enticement of a minor to engage in unlawful sexual activity

15  pertaining to the victim identified as A.D.  To that charge,

16  how do you intend to plead, sir?

17    THE DEFENDANT:  Guilty, Your Honor.

18    THE COURT:  Count 4 is also a crime of coercion and

19  enticement of a minor to engage in unlawful sexual activity

20  relating to the victim identified as R.J.  To Count 4, sir, how

21  do you intend to plead?

22    THE DEFENDANT:  Guilty, Your Honor.

23    THE COURT:  Count 5, also a coercion and enticement

24  offense relating to the victim identified as A.B., to that

25  Count 5, Mr. Rouse, how do you intend to plead?

45

1          THE DEFENDANT:  Guilty, Your Honor.

2          THE COURT:  Count 6, another coercion and enticement

3   of a minor offense relating to the victim identified as M.R.,

4   to Count 6, Mr. Rouse, how do you intend to plead this morning?

5          THE DEFENDANT:  Guilty, Your Honor.

6          THE COURT:  Count 7 is a crime of attempted receipt

7   of images depicting the sexual exploitation of a minor

8   pertaining to the victim identified as B.T.  To that Count 7

9   offense, sir, how do you intend to plead?

10         THE DEFENDANT:  Guilty, Your Honor.

11         THE COURT:  Count 8 is a coercion and enticement

12  offense of a minor relating to the victim identified as L.W.

13  To Count 8, Mr. Rouse, how do you intend to plead this morning?

14         THE DEFENDANT:  Guilty, Your Honor.

15         THE COURT:  Count 9, another coercion or an

16  enticement of a minor offense relating to victim identified as

17  J.T., to Count 9, Mr. Rouse, how do you intend to plead, guilty

18  or not guilty?

19         THE DEFENDANT:  Guilty, Your Honor.

20         THE COURT:  To Count 10, coercion or enticement of a

21  minor offense relating to victim identified as C.L., to Count

22  10, Mr. Rouse, how do you wish to plead?

23         THE DEFENDANT:  Guilty, Your Honor.

24         THE COURT:  Count 11, another coercion or enticement

25  of a minor offense relating to victim identified as D.B., to

1    Count 11, Mr. Rouse, how do you intend to plead this morning?

2              THE DEFENDANT:  Guilty, Your Honor.

3              THE COURT:  Count 12 is an attempted receipt of

4    images depicting the sexual exploitation of a minor.  This

5    concerns victim identified as G.L.  To Count 12, Mr. Rouse, how

6    do you wish to plead?

7              THE DEFENDANT:  Guilty, Your Honor.

8              THE COURT:  Count 13, another attempted receipt

9    offense relating to the victim identified as C.S., to Count 13,

10   Mr. Rouse, how do you intend to plead?

11             THE DEFENDANT:  Guilty, Your Honor.

12             THE COURT:  Count 14 is a coercion and enticement of

13   a minor offense relating to the victim identified as P.V., as

14   in Victor.  How do you wish to plead to Count 14, sir?

15             THE DEFENDANT:  Guilty, Your Honor.

16             THE COURT:  Count 15, a coercion and enticement of a

17   minor offense relating to the victim identified as A.S., to

18   Count 15, Mr. Rouse, how do you intend to plead this morning?

19             THE DEFENDANT:  Guilty, Your Honor.

20             THE COURT:  Count 16 is another coercion or

21   enticement of a minor offense relating to the victim identified

22   as A.J.M.  To Count 16, Mr. Rouse, how wish to plead this

23   morning?

24             THE DEFENDANT:  Guilty, Your Honor.

25             THE COURT:  Count 17 is a coercion and enticement of

47

1  a minor offense relating to the victim identified as R.P.  To

2  Count 17, Mr. Rouse, how do you wish to plead, sir?

3          THE DEFENDANT:  Guilty, Your Honor.

4          THE COURT:  Count 18 is another coercion or

5  enticement of a minor offense relating to the victim identified

6  as A.J.  To Count 18, sir, how do you wish to plead this

7  morning?

8          THE DEFENDANT:  Guilty, Your Honor.

9          THE COURT:  Count 19 is an attempted receipt of

10 images depicting the sexual exploitation of a minor.  That

11 pertains to victim identified as S.S.  To Count 19, Mr. Rouse,

12 how do you intend to plead?

13         THE DEFENDANT:  Guilty, Your Honor.

14         THE COURT:  Count 20 is a coercion and enticement of

15 a minor offense relating to the victim identified as E.A.  To

16 Count 20, Mr. Rouse, how do you intend to plead?

17         THE DEFENDANT:  Guilty, Your Honor.

18         THE COURT:  And Count 21 is a crime entitled receipt

19 of images depicting the sexual exploitation of a minor.  It

20 relates to the victim identified as K.B.  To Count 21,

21 Mr. Rouse, how do you intend to plead?

22         THE DEFENDANT:  Guilty, Your Honor.

23         THE COURT:  The Court accepts your pleas of guilty,

24 Mr. Rouse, to Counts 1 through 21.  I find that you are a

25 competent young man who understands what the consequences are

1  for pleading guilty and that you understand what your rights

2  are as a defendant.  I find that you've entered a knowing and

3  voluntary plea to each of these counts, with the assistance of

4  your attorney.

5          I further find that there's a sufficient factual

6  basis for each of these 21 counts that support finding you

7  guilty as required under federal law, and in accordance with

8  Rule 11, I accept your plea on all 21 counts.

9          I'm ordering now that the United States Probation

10 Office begin work to prepare a report that's done in every case

11 nationwide.  It's called a Presentence Investigation Report.

12 Carly Dalbey is the young lady up on the video screen.  She's a

13 federal probation officer in Fargo.  She's been assigned the

14 task of preparing this report.  It will probably take several

15 months to prepare it.

16         The presentence investigation report is primarily

17 used for sentencing purposes.  It's a report that both parties

18 will have an opportunity to review before it's finalized.  It's

19 a report that also goes to the Bureau of Prisons following

20 sentencing.

21         The first thing that Ms. Dalbey will need to do is to

22 schedule an interview of you.  That'll probably be by phone,

23 although it might be in person.  She'll schedule that through

24 Mr. Hoffmann because your attorney has a right to be present

25 when you're interviewed.

1        The interview is not some intense police

2   interrogation.  It's just to gather background, factual

3   information from you because these reports contain a lot of

4   detailed information about your background, your family, your

5   education, your work experience, your criminal history.  And it

6   also contains a rather lengthy discussion about the sentencing

7   guidelines.

8        The probation officer will have access to the

9   discovery.  I haven't seen the discovery or the evidence in

10  this case, but the probation officer will.  And then she will

11  also include a rather lengthy discussion about the sentencing

12  guidelines and what she believes are the appropriate sentencing

13  guidelines in this case.

14       The interview will probably take place within the

15  next week, but again, it's going to take a couple months to put

16  these reports together.  It takes that long because these

17  officers have a backlog of other cases on their desk as well.

18       But you and Mr. Hoffmann will have a chance to go

19  through this presentence investigation report before it's ever

20  finalized and long before it comes to me.  Mr. Hoffmann will

21  get you a copy of the report.  Please read it over carefully.

22  If you notice any errors or mistakes in the report, it's

23  important that you let your attorney know about that

24  immediately.

25       And then Mr. Hoffmann will follow up with Ms. Dalbey,

1    and they'll try to get the report revised, if it can be
2    revised, but I don't see these reports until they're finalized.
3                And if you don't understand any part of the report,
4    if you have difficulty -- you won't have difficulty reading it,
5    but the discussion about the sentencing guidelines is a bit
6    foreign to most people, so ask questions.  Mr. Hoffmann has
7    looked at hundreds upon hundreds of these.  He can answer any
8    question that you might have, but you need to speak up and ask
9    questions if you don't understand what something means in the
10   report.  Fair enough?
11               THE DEFENDANT:  Yes, sir.
12               THE COURT:  I would guess that your parents will
13   probably also be contacted by Ms. Dalbey, not for a lengthy
14   interview, but most likely to just back up, corroborate some of
15   the information, background information about you, so don't be
16   surprised if there's calls made by Ms. Dalbey to your parents.
17               And then following all of that we'll have a
18   sentencing hearing.  According to my record, the sentencing
19   hearing has been scheduled for Tuesday, April 5, 2022, at
20   1:30 p.m. in this courtroom.  Is that what counsel have been
21   notified of?
22               MR. DELORME:  I think that might've been set when we
23   had the original --
24               THE COURT:  Oh --
25               MR. DELORME:  -- change of plea hearing.

1           THE COURT:  -- yeah, probably.  I would guess it'll

2    probably be a month or two after that now, but it'll be set at

3    a time that's convenient for both attorneys.

4           And at the sentencing hearing, everybody gets a

5    chance to speak.  Both attorneys can outline their

6    recommendations for a sentence.  You're given a chance to

7    speak.  If you want to call any witnesses, you're entitled to

8    do that.

9           If you want to submit anything in writing for me to

10   consider, you're entitled to do that.  I always encourage

11   defendants to submit letters of support from people that know

12   them well.  You don't have to do that.  If you don't do it, I'm

13   not going to hold it against you, but those kind of letters

14   from family and friends help me better understand the person

15   that I'm about to sentence.

16          And more often than not, those letters provide me

17   with a little more insight about what you've been dealing with

18   throughout your lifetime and provide me with more information

19   than what I'm going to glean from a presentence investigation

20   report, which is pretty much black-and-white, factual

21   information about you.  It doesn't tell me anything about your

22   character or your -- things of that nature, but talk to

23   Mr. Hoffmann.  He can give you some guidance and direction

24   about what judges are interested in hearing from defendants

25   that they're about to sentence.

1        The victims or the victims' parents also have a right

2  to testify.  Have the victims and the victims' parents been

3  notified of this hearing, Mr. Delorme?

4        MR. DELORME:  Yes, Your Honor.

5        THE COURT:  All right.  And do you envision a lengthy

6  sentencing hearing with a number of witnesses or not?

7        MR. DELORME:  I would anticipate some witnesses, Your

8  Honor.  I don't think there'll be somebody from each account --

9  each count speaking, so I would ask that the Court probably set

10  it for two, two-and-a-half hours.

11        THE COURT:  All right.  Do you envision that most of

12  the victims or the parents will be submitting something in

13  writing, victim impact statement, or --

14        MR. DELORME:  I think you'll probably come to realize

15  this through the PSR, Your Honor.  A lot of these individuals

16  are, you know, coming from families that are socioeconomically

17  challenged, so there's probably going to be maybe half or more

18  of them will probably submit something or want to speak.

19        THE COURT:  All right.

20        MR. DELORME:  But I don't think we're going to see

21  every single one of them.

22        THE COURT:  Well, everybody is entitled to speak, and

23  I don't put any restrictions in that regard on anyone.  But,

24  Mr. Delorme and Mr. Hoffmann, do you -- or, Mr. Delorme, first

25  of all, do you expect to be calling any witnesses,

1    investigating officers or anyone else?

2            MR. DELORME:  I may have the case agent, Detective

3    Rask, speak for a little bit at the beginning, Your Honor, just

4    to highlight some of the, you know, facts of the case and what

5    he discovered during the investigation.

6            THE COURT:  Do you envision any calling of witnesses

7    to address sentencing guideline adjustments?

8            MR. DELORME:  No, Your Honor.

9            THE COURT:  All right.  Mr. Hoffmann, it's months

10   away, but what do you envision in terms of number of witnesses

11   that you may call and how long that you would expect to take

12   for any sentencing hearing?

13           MR. HOFFMAN:  Your Honor, I anticipate I'll be

14   calling as a witness Dr. Shannon Weisz, psychologist here in

15   town.  Whether I have any family members testify, I guess that

16   remains to be seen.

17           THE COURT:  All right.

18           MR. HOFFMAN:  But there will be letters.

19           THE COURT:  And Shannon Weisz has issued or will be

20   issuing a written report that I'll have a chance to read

21   beforehand or not?

22           MR. HOFFMAN:  He has done a report, yes, Your Honor.

23           THE COURT:  Okay.  And is that going to be a part of

24   any sentencing memorandum that you submit, so --

25           MR. HOFFMAN:  Yes, Your Honor.

54

1          THE COURT:  -- I would have access and be able to
2     read his report before sentencing?
3          MR. HOFFMAN:  I anticipate that we'd sign a release
4     so that the probation officer could have it.
5          THE COURT:  All right.  So we'll probably set aside a
6     morning or an afternoon.  Do you think that would be
7     sufficient, Mr. Delorme, for a sentencing hearing?
8          MR. DELORME:  I think so, Your Honor.
9          MR. HOFFMAN:  Yes, Your Honor.
10         THE COURT:  All right.  Mr. Rouse, do you have any
11    questions at all about anything that's gone on here today?
12         THE DEFENDANT:  No, Your Honor.
13         THE COURT:  All right.  So I'll remand you back to
14    the custody of the U.S. marshals.  I don't -- I'm not sure
15    where they're going to hold you until the time of the
16    sentencing hearing with COVID and crowded conditions
17    everywhere.  I have to leave it in their hands, and --
18         MR. DELORME:  Your Honor, before we close, I do have
19    a Waiver of Indictment now --
20         THE COURT:  Okay.
21         MR. DELORME:  -- that's been signed by Mr. Rouse and
22    Mr. Hoffmann.  May I approach?
23         THE COURT:  Certainly.  And, Mr. Hoffmann, you've
24    reviewed this Waiver of Indictment form with Mr. Rouse
25    beforehand?

1          MR. HOFFMAN:  Yes, Your Honor.

2          THE COURT:  All right.  So the record should reflect

3    that Mr. Rouse and his attorney have signed a Waiver of

4    Indictment form in open court here today.

5          Anything else, Mr. Delorme?

6          MR. DELORME:  No, Your Honor.

7          THE COURT:  Mr. Hoffmann, anything else we need to

8    take care of?

9          MR. HOFFMAN:  Just one moment, Judge.

10         THE COURT:  Yep.

11         MR. HOFFMAN:  Your Honor, one last thing, the parents

12   of Mr. Rouse asked if they could -- to ask you if they could

13   give Mr. Rouse a hug.  I guess he's been incarcerated for two

14   years, and there's really been no contact.

15         THE COURT:  The U.S. Marshals nationwide frowns on

16   that in any public hearing, so their policy is they don't allow

17   it.  I follow their policies.

18         MR. HOFFMAN:  That's fine, Judge.

19         THE COURT:  Sorry.  I'll remand you back to the

20   custody of the U.S. marshals, Mr. Rouse.

21         We'll stand adjourned.

22         (Proceedings concluded at 9:47 a.m., the same day.)

23                       - - - - - - - - - -

24

25

1      <u>CERTIFICATE OF COURT REPORTER</u>

2          I, Sandra E. Ehrmantraut, a Certified Realtime

3      Reporter,

4          DO HEREBY CERTIFY that I recorded in shorthand the

5      foregoing proceedings had and made of record at the time and

6      place hereinbefore indicated.

7          I DO HEREBY FURTHER CERTIFY that the foregoing

8      typewritten pages contain an accurate transcript of my

9      shorthand notes then and there taken.

10          Dated:  July 21, 2022

11

12                          <u>/s/ Sandra E. Ehrmantraut</u>
                            Certified Realtime Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25