UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA


United States of America,       )
                                )
              Plaintiff,         )
                                )
        vs.                      )        File No. 1:20-cr-107
                                )
Dawson M. Rouse,                 )
                                )
              Defendant.         )


TRANSCRIPT OF SENTENCING


Taken at
United States Courthouse
Bismarck, North Dakota
June 21, 2022


BEFORE THE HONORABLE DANIEL L. HOVLAND
-- UNITED STATES DISTRICT COURT JUDGE --

APPEARANCES

MR. GARY LEE DELORME
U.S. Attorney's Office
220 E. Rosser Ave.
P. O. Box 699
Bismarck, North Dakota 58502-0699

FOR THE UNITED STATES

- - - - - - - - -

MR. MICHAEL R. HOFFMAN
Attorney at Law
120 North Third Street, Suite 100
P. O. Box 1056
Bismarck, North Dakota 58502-1056

FOR THE DEFENDANT

- - - - - - - - -

GOVERNMENT WITNESSES

Page No.

Brandon Rask
    Direct Examination by Mr. Delorme          7
    Cross-Examination by Mr. Hoffman          17

Patrick Jensen
    Direct Examination by Mr. Delorme         19


- - - - - - - - -


DEFENSE WITNESS

Dr. Shannon Weisz
    Direct Examination by Mr. Hoffman         24
    Cross-Examination by Mr. Delorme          36


- - - - - - - - -


Certificate of Court Reporter - Page 79


- - - - - - - - -

1              (The above-entitled matter came before the Court, The
2      Honorable Daniel L. Hovland, United States District Court
3      Judge, presiding, commencing at 1:30 p.m., Tuesday, June 21,
4      2022, in the United States Courthouse, Bismarck, North Dakota.
5      The following proceedings were had and made of record in open
6      court with the defendant present.)
7                      - - - - - - - - - - -
8              THE COURT:  We'll open the record in the case of
9      *United States of America versus Dawson Rouse*.  Here on behalf
10     of the federal government is Assistant U.S. Attorney Gary
11     Delorme.  Representing the defendant is Attorney Mike Hoffmann
12     from Bismarck.  Mr. Rouse, how are you today?
13             THE DEFENDANT:  I'm okay under the circumstances,
14     Your Honor.  How are you doing?
15             THE COURT:  Good.  This is scheduled as a sentencing
16     hearing on 21 separate counts.  Counts 1, 3 through 6, 8
17     through 11, 14 through 18, and Count 20 are all a crime of
18     coercion and enticement of a minor to engage in unlawful sexual
19     activity.  Counts 2, 7, 12, 13 and 19 are offenses of attempted
20     receipt of images depicting the sexual exploitation of a minor.
21     Count 21 is receipt of images depicting the sexual exploitation
22     of a minor.
23             Before today I have reviewed the Presentence
24     Investigation Report very carefully.  I've read it over a
25     couple of times.  I reviewed the Sentencing Memorandum and

4

1   Supplements submitted by both parties.  I've read the

2   defendant's statement, psychological evaluation from

3   Dr. Shannon Weisz.  I've read a number of letters of support.

4   Most are found in Document Number 50 -- 61, I should say,

5   30-some letters of support.  There were other letters that came

6   in after that.  I've read every letter at least twice.

7           I've gone back and reviewed the Second Superseding

8   Indictment, the Plea Agreement, and the Plea Agreement

9   Supplement as well.  And I talked earlier today with the U.S.

10  Probation Office.

11          But, Mr. Delorme, had you filed any other documents

12  in this case?

13          MR. DELORME:  I did not, Your Honor, but I would ask

14  -- there were a couple letters that were filed today, victim

15  impact statements.  I just want to make sure the Court had the

16  opportunity to review those.  They're pretty short, but they

17  came in this morning for us, and we got them filed as soon as

18  we could.

19          THE COURT:  Well, I read -- what documents are they?

20  I can tell you whether they're in my file.

21          MR. DELORME:  They would've both been e-mails to Beth

22  Lang.

23          THE COURT:  I read Docket 66, which is filed on

24  June 21st.  That was an e-mail, picture of a letter, and a

25  few --

5

1          MR. DELORME:  Yep.

2          THE COURT:  -- other e-mails.

3          MR. DELORME:  That's the one, Your Honor.

4          THE COURT:  And then I read Document 64, which was a

5    victim impact statement.  That was filed on the 17th, but is

6    the filing on the 21st the most recent?

7          MR. DELORME:  That is correct, Your Honor.

8          THE COURT:  All right.  Then I think I've read

9    everything.  But did the government have any objections to any

10   of the facts contained in the Presentence Report or the

11   sentencing guideline calculations?

12         MR. DELORME:  No objections, Your Honor.

13         THE COURT:  Mr. Hoffmann, had you filed anything else

14   that I did not mention?

15         MR. HOFFMAN:  No, Your Honor.

16         THE COURT:  And did you have any objections to the

17   facts contained in the Presentence Investigation Report?

18         MR. HOFFMAN:  In my Sentencing Memorandum I did make

19   a list of what Mr. Rouse admitted or denied in terms of the

20   certain counts, and that's on pages 1 to -- page 1 of my

21   Sentencing Memorandum.  But I would just indicate that they're

22   not necessarily objections because they don't affect any

23   sentencing guideline calculation.

24         THE COURT:  Right.  That was my next calculation --

25   or next question, they don't impact the guidelines.

6

1          MR. HOFFMAN:  Correct.

2          THE COURT:  Okay.  And, Mr. Rouse, were you given an

3  opportunity to read the Presentence Investigation Report?

4          THE DEFENDANT:  Yes, Your Honor.

5          THE COURT:  And have you had a chance to visit with

6  your attorney about that report and what it all means for you?

7          THE DEFENDANT:  Yes, Your Honor.

8          THE COURT:  It's my understanding that there are a

9  few witnesses that wish to testify here today.  And,

10 Mr. Delorme, I'll turn to you first.  If there's witnesses you

11 intend to call, you may call them at this time.

12         MR. DELORME:  Your Honor, the United States would

13 call Detective Brandon Rask to the stand.

14         THE COURT:  All right.

15                    BRANDON RASK,

16 having been first duly sworn, was examined and testified as

17 follows:

18                 DIRECT EXAMINATION

19 BY MR. DELORME:

20 Q.   All right.  Detective Rask, could you please state and

21 spell your name for the record?

22 A.   Brandon, B-R-A-N-D-O-N; Rask, R-A-S-K.

23 Q.   And your current occupation is a detective, investigator

24 with the Bismarck Police Department, correct?

25 A.   Correct.

1   Q.   And how long have you been in that position?

2   A.   Roughly nine years.

3   Q.   Okay.  And you are familiar with the matter now before the

4   Court, correct?

5   A.   I am.

6   Q.   How did you become familiar with this particular matter?

7   A.   I was consulted by a patrol officer when he responded to a

8   residence and took a report that at the time was reported as

9   nothing more than a curfew violation that consisted of two, I

10  believe, 13-year-old girls at the time being out past curfew.

11  But in that report it also noted that they were suspected of

12  driving around with a male individual that was 21 years of age,

13  and so I was contacted as a result of those facts.

14  Q.   Okay.  And did you begin an investigation based upon those

15  -- the facts provided to you?

16  A.   I did.  I began with conducting interviews of the two

17  girls that were the subject of that report.

18  Q.   Okay.  And from that you got additional names of other

19  individuals that were communicating with the defendant,

20  correct?

21  A.   That is correct.

22  Q.   As well as they did identify the defendant as the person

23  they had snuck out of the house to be with?

24  A.   That is correct.

25  Q.   Okay.  Just to save a little bit of time, Detective Rask,

1  from there you interviewed -- you had conducted more interviews

2  and received additional names of people that had communicated

3  with Mr. Rouse, correct?

4  A.   Yes.

5  Q.   And ultimately we have identified in our Information that

6  the Court has before today 21 identified victims, correct?

7  A.   Correct.

8  Q.   In your opinion -- as the investigator in this case, you

9  know more than just the standard detective work in this

10  particular matter, correct?

11  A.   That's correct.

12  Q.   You also did a lot of the individual forensics worksheet

13  -- or work yourself, correct?

14  A.   The entirety of them, yes.

15  Q.   Okay.  So you had some additional training to do some

16  forensics?

17  A.   Yes.

18  Q.   And when I talk about "forensics," we're talking about,

19  you had the ability to access and download Mr. Rouse's phone

20  that was seized during a search warrant?

21  A.   Correct.

22  Q.   As well as some other work that you did regarding

23  applications and files on that phone, correct?

24  A.   That's correct.

25  Q.   And one of the ways that you developed more victims in

1   this particular case was involving like a GPS type of

2   application on Mr. Rouse's phone, correct?

3   **A.**   That's correct.

4   **Q.**   So kind of just went back through history of that and went

5   to those locations and -- and started knocking on doors?

6   **A.**   That's correct.

7   **Q.**   Okay.  So again, there's ultimately 21 victims identified

8   by you in this particular matter, correct?

9   **A.**   Yes.

10  **Q.**   In your opinion, with the work you've done, is that all of

11  the victims that could be identified in this particular matter?

12  **A.**   Almost certainly not.

13  **Q.**   Okay.  And why do you say that?

14  **A.**   Upon reviewing data within the Snapchat application, which

15  is primarily where the -- most of the victims were victimized,

16  I found that Mr. Rouse has more than 2,600 friends in Snapchat,

17  and in addition to that, he has more than 700 blocked users in

18  Snapchat.

19          And when I reviewed Mr. Rouse's data, it presented to

20  me a very, very clear pattern of conduct.  He essentially would

21  friend a variety of minor females on Snapchat.  He would coerce

22  them into providing whatever they were willing to provide to

23  the level of their comfort, whether that be digital pictures,

24  videos of nude imagery, then performing sexual acts on

25  themselves, or sometimes and in a few cases they met with Mr.

1    Rouse and engaged in sexual contact with him.

2              It's clear that after Mr. Rouse coerced them to the

3    point that they were willing to go and found no further use for

4    them, he would block them, at which point they would become

5    part of his blocked users on Snapchat.  In fact, in the 21

6    victims in this case, 16 of them were found in his blocked

7    users.  There were only 5 girls out of the 21 victims here

8    today that were in his active communications, and those girls

9    had communicated with him the day we seized his phone, and so

10   it's telling to me that their usefulness had not come to a head

11   yet.

12   Q.   Okay.  And I guess due to resources, you know, and what

13   you had available at the time, you didn't have the ability to

14   go through all 700 blocked users.

15   A.   Correct.

16   Q.   So you think that you would've been able to find more

17   victims had you had that ability to, you know, seek that --

18   that legal process from Snapchat and locate all these other

19   users?

20   A.   Almost certainly.

21             THE COURT:  So what does it mean to block a user on

22   Snapchat?

23             THE WITNESS:  Essentially you're just removing them

24   from your current friends list and, therefore, removing the

25   ability for you to communicate with them and for them to

                                11

1  communicate with you.

2  **Q.**   (MR. DELORME CONTINUING)   Detective Rask, you're talking

3  about your -- the patterns that you were noticing.

4  **A.**   Yes.

5  **Q.**   When Mr. Rouse would contact one of these minor females

6  and start communicating with them, at what point did the topic

7  of age come up?

8  **A.**   Very early in the conversations, most often than not

9  almost immediately.

10 **Q.**   Okay.  So as he's receiving some of these images that he

11 later requests and requests for in-person meetings, he knows

12 how old they are at the time?

13 **A.**   That's correct.

14 **Q.**   And I think we talked a little bit about this previously,

15 but the Snapchat app -- application, when he was using that and

16 he friended, let's say, Victim A, was he able to then access

17 Victim A's friend list to potentially gain access to more

18 individuals to friend?

19 **A.**   Yeah.  Essentially the way social media platforms are

20 designed, they're designed in such a way to expand your friend

21 group.  They're designed so that you're not allowed to just sit

22 idly by and not expand your friend group.

23        Specifically in the instance of Snapchat, let's just

24 use you and I for an example.  If we were friends on Snapchat,

25 Snapchat would recognize that -- say we have ten friends in

1   common.  Then Snapchat assumes that because we have ten friends

2   in common, that we probably have many more friends in common,

3   at which point Snapchat starts suggesting my friends to you as

4   potential friends and your friends to me as potential friends.

5            So in this case, if you were to friend, let's say,

6   numerous 13- to 15-year-old girls whose friends are also likely

7   13- to 15-year-old girls, Snapchat is going to start

8   recommending that age demographic as friends to you.

9   **Q.**   Okay.  And in this particular matter, the primary age

10  range that you were seeing as part of these patterns was 12 to

11  16 years of age?

12  **A.**   Yeah, 12 to 17.  Primarily 13 to 15, I think, were the

13  majority of them.

14  **Q.**   Okay.  Now, the images and videos that were recovered in

15  this particular matter, where were they recovered from?

16  **A.**   A majority of them were found in a password-protected

17  application, Photo Vault application, if you will, that

18  required a password to access it to a user.

19  **Q.**   And that was on Mr. Rouse's phone?

20  **A.**   Correct.

21  **Q.**   Okay.  And how were you able to access it without a

22  password, or did you have a password?

23  **A.**   I did have a password, but ultimately a lot of those --

24  those Photo Vault applications are only surface-protected.  The

25  password only prevents a user of the phone from accessing the

1    application.  It doesn't really protect it in a different part

2    of the file system.  It's accessible to our forensic software.

3    **Q.**   You were going to get into that no matter what with your

4    -- with your software.

5    **A.**   Correct.

6    **Q.**   Okay.  Was there anything you could not get into on Mr.

7    Rouse's phone?

8    **A.**   There was.

9    **Q.**   What was that?

10   **A.**   Within the Snapchat application you have the option to

11   enable a my-eyes-only folder.  Mr. Rouse had that enabled on

12   his phone.  I was never able to access the contents of the --

13   the contents of that.  We were able to extract the files of it,

14   but the files were in an encrypted format, and we were --

15   through multiple attempts, we were never able to decrypt them.

16   **Q.**   Okay.  And you still have not been able to gain access to

17   those -- those folders?

18   **A.**   That's correct.

19   **Q.**   So ostensibly there could be additional victims that

20   could've been identified in that -- in that encrypted folder.

21   **A.**   There's almost certainly victims in there simply because I

22   wasn't able to access the contents of that folder.  There was a

23   screen recording on Mr. Rouse's phone where he accesses the

24   folder and scrolls back through numerous videos and images

25   dating all the way back to 2017.  And when he does that, there

14

1    are multiple images of nude females that can be seen within

2    that folder.

3            The visibility of those images and videos are so

4    brief that you're never able to use them for identification

5    purposes, and they're very small.  They're thumbnail versions,

6    but they're large enough to tell that, without question,

7    there's younger-looking females, there's nudity.  But again,

8    with that how it was, we weren't able to identify additional

9    victims out of that video.

10   Q.   Okay.  And can you just briefly describe for us the images

11   and videos you were able to recover?

12   A.   There -- there was a plethora that ranged from all

13   different stages of dress.  Some of the girls were in bikinis.

14   Some of them were in bras, all the way up to some of the girls

15   being completely nude.  Those consisted of both still images

16   and videos.

17           Out of the 21 victims, there were nine of them that I

18   found videos and still pictures of their vaginal areas, most of

19   which also included digital penetration.  One of those nine was

20   actually a 13-year-old girl who Mr. Rouse filmed himself having

21   sex with.

22   Q.   Okay.  And you know that it was Mr. Rouse because of what?

23   A.   Well, it was on his phone, and in addition to that, there

24   was a unique characteristic on his penis that was later

25   compared to his actual penis that matched.

15

1  **Q.**   Okay.  Just one more question for you, Detective Rask.

2  When you initiated this case in 2020, it was pretty much by

3  chance that that report got to you and you decided to do more

4  with it, correct?

5  **A.**   Yes.

6  **Q.**   Do you -- just going through your investigation and

7  everything you learned about Mr. Rouse, was there any other

8  opportunities that Mr. Rouse could have been caught or that he

9  should have at least taken heed of as a warning maybe not to

10  continue with his conduct?

11  **A.**   There was a couple opportunities that I feel an average

12  person would have diverted from that path.

13  **Q.**   And what was that?

14  **A.**   Back in 2019 there was a report made to the Fargo Police

15  Department regarding an alleged sexual assault involving one of

16  the victims in this case, and that was investigated by a

17  detective in Fargo, who reached out to one of our investigators

18  to attempt to make contact with Rouse regarding the

19  circumstances of that case.

20         Mr. Rouse never returned the call to that

21  investigator.  In fact, went to the school resource officer and

22  instead attempted to pry her for information regarding why he

23  was being contacted.

24  **Q.**   Okay.  Any other conduct?

25  **A.**   There was an additional incident where a 12-year-old

1    neighbor girl was contacted by Rouse on Snapchat, and he

2    essentially began to court her until the girl's mother found

3    out about it and confronted him via text message.  Through

4    begging and pleading over text message, the mother never

5    brought that conduct to the attention of his parents, at his

6    request.

7              Those two instances I felt would have been

8    significant enough for him to thwart his future behavior if he

9    had any ambitions of doing so.

10   Q.   But we are here today because he did not change his

11   conduct, correct?

12   A.   That's correct.

13             MR. DELORME:  No further questions, Your Honor.

14             THE COURT:  Mr. Hoffman, you may inquire if you wish.

15                        CROSS-EXAMINATION

16   BY MR. HOFFMAN:

17   Q.   The incident in Fargo in 2019, can you give me a month

18   when that would have occurred?

19   A.   I don't recall a month, but I believe it was towards the

20   summer or fall of 2019.

21   Q.   And that is one of the complaining witnesses in this

22   particular Information, the charging document against Mr.

23   Rouse.

24   A.   Yes.

25   Q.   And can you give me a year or -- and a month of the last

                                  17

1    incident you talked about, the 12-year-old neighbor?

2    A.    I don't recall that one.  I believe it may have been 2019

3    as well, but I can't say that for certain.

4    Q.    And that particular person is not part of the 21 counts.

5    A.    That is correct.

6          THE COURT:  Could you pull that microphone a little

7    closer to you there, Mr. Hoffmann?  Thank you.

8    Q.    (MR. HOFFMAN CONTINUING)  You would be the primary police

9    officer involved in this case, correct?

10   A.    I worked it cooperatively with Special Agent Helderop with

11   Homeland Security.

12   Q.    All right.  As far as the government's decision to charge

13   21 counts and enter into the Plea Agreement that we have, would

14   you have been a part of that decisionmaking process?

15   A.    No.

16   Q.    There was a point in time when you and I and Mr. Delorme

17   and Mr. Helderop met in this building to go over certain

18   evidence in this case and discuss potentially a resolution of

19   this matter, correct?

20   A.    Yes.

21   Q.    So you were a part of that, right?

22   A.    I was a part of the meeting as far as presenting the

23   evidence, but I have no say in any resolution to the case.

24         MR. HOFFMAN:  I don't have any other questions,

25   Judge.

18

1          THE COURT:  Anything else, Mr. Delorme?

2          MR. DELORME:  No, Your Honor.

3          THE COURT:  All right.  Thank you, sir.  You may step

4    down.

5          MR. DELORME:  One further witness to testify, Your

6    Honor.

7          THE COURT:  Mm-hmm.

8          MR. DELORME:  United States would call Patrick Jensen

9    to the stand.

10                          PATRICK JENSEN,

11   having been first duly sworn, was examined and testified as

12   follows:

13                        DIRECT EXAMINATION

14   BY MR. DELORME:

15   Q.   How you doing, Mr. Jensen?

16   A.   Fine.

17   Q.   Mr. Jensen, you are the father of one of the victims

18   identified in this particular matter, correct?

19   A.   Yes, that's correct.

20   Q.   Okay.  And you reached out to my office and indicated that

21   you wanted to provide a statement to the Court?

22   A.   Yes, that's correct.

23   Q.   Okay.  If you want to, you can go ahead and provide that

24   statement at this time, Mr. Jensen.

25   A.   I'd like to read two if I can.  I wrote this first one

1  pretrial, July 16, 2021.

2          THE COURT:  Could you pull that microphone up a

3  little closer to you as well, please?

4          THE WITNESS:  Sure, I can.  Is that better?

5          THE COURT:  That's good.

6          THE WITNESS:  Today is an important date to advocate

7  for each of the girls that have been affected by the actions of

8  this person.  I don't want to call him a man because a man

9  wouldn't do this to a child.

10         I'm the father of one of the victims.  I'm here today

11 to ask you to detain Dawson Rouse until trial.  The physical

12 and psychological impact this monster has already caused my

13 youngest daughter, who's just 13, can never be taken back or

14 repaid.  We live in a household with three daughters and a son

15 under the age of 16, and because of what he has done, they each

16 worry and ask to be kept aware of what is going on with the

17 trial and where he currently is.

18         His actions, as horrific as they were, continue to

19 affect our young children, our entire family daily.  They fear

20 that he will get out and that he knows where we live.  When he

21 was let out last time, my children were very scared that he

22 would come to our house, and it would be an incredible

23 injustice if he would be released at this time.

24         It's a serious case that involves many underage

25 children.  Given the severity of these charges, the

20

1    overwhelming amount of information against him, the prison time

2    he may face if convicted, and that there is no monetary amount

3    that must be given or forfeited if he would not show up for his

4    trial, I cannot imagine a reason for him to want to show up or

5    stick around if he was released.

6            I'm asking that you will consider keeping Mr. Rouse

7    behind bars until his trial so my daughter can sleep better at

8    night and so that the other victims can feel a little safer and

9    to guarantee that he's at the trial.

10           This is today.  And it seems like an eternity ago,

11   but the impact of Mr. Rouse's crimes still do not fade.  His

12   crimes have changed the lives of many children, families, and

13   even the communities that they are in.

14           He may be sorry for what he's done now.  However, I

15   believe that his pattern of grooming children and taking

16   advantage of these victims shows that he was not going to stop.

17   The information that came out during the legal process is

18   beyond disgusting.  It's devastating to the lives it's

19   affected, and I beg that he will pay through his punishment.

20           My daughter's life changed forever the day that she

21   met Dawson.  She became a different person.  Dawson took

22   advantage of her, exploited her and injured my daughter

23   physically and emotionally.  She struggles with anxiety and

24   depression.  Her confidence has dropped.  She tends to withdraw

25   from activities that she always enjoyed.

1    She's forced to deal with the stigma of what Dawson

2    has also done to her.  Her peers discuss what they have heard

3    or what they have seen in the news.  They make choices about my

4    daughter based on this information.  She's been excluded from

5    things.  She's -- that she used to be invited to.  She's lost

6    friends that she's had, and this has been brought on by

7    Dawson's monstrous actions.  He's taken away something from her

8    that she can never have back.  There is no redo.  I believe we

9    can never know the true impact of what this monster did to our

10   little girl.

11   When this started, my two oldest sons were grown and

12   living on their own, and it's not often that I see such

13   emotions from my older boys, but they have gone through

14   everything from anger to agony, frustration for what Dawson did

15   to their little sister.

16   My oldest son has taken it particularly hard, and

17   it's difficult for me to explain the emotions of my grown son

18   coming to me sobbing.  It breaks my heart.  He's in anguish at

19   my youngest daughter's loss of innocence and his feeling of

20   frustration at failing her as a protector and a big brother,

21   and those are his words.  It impacts the thoughts daily, and

22   there is not a day that goes by where he does not feel

23   tormented, as if he has failed his sister.

24   The impacts are seen by our children still living at

25   home as well.  We deal with it weekly, hearing something about

22

1    it through peers talking, friends bringing it up, or just being

2    there to support when one of them is dealing with a

3    particularly bad thought about the event.

4         Their daily actions require thinking about what has

5    happened and being extra careful about safety when considering

6    basic daily activities, where others just quickly are able to

7    make decisions or choices.  They each must live with the

8    knowledge of the evil that this person has caused our daughter,

9    our sister, and all the other child victims.

10        For myself and my wife, there isn't a day that goes

11   by that we do not struggle with feelings of anger and even rage

12   towards Dawson, sorrow for his family, and frustration towards

13   the choices that he made, and the knowledge that we cannot just

14   take away what has happened.  We get no do-overs either.

15        Now, multiply what has happened to my daughter by

16   every other little girl that is impacted by his admitted

17   crimes, not only to children, but their siblings and their

18   families, all impacted and all changed.  They'll never be the

19   same.  He took away something from every one of them.  He took

20   away something from every person in this room.  And I hope that

21   I was able to voice not only for my little girl, but for the

22   children and their families that weren't able to be heard

23   today, victims we don't even know about.

24        I ask, again, that Dawson Rouse may never be given

25   the freedom to do again what he's already done, and I hope it

23

1    is his time to pay.  I hope that you will consider the full

2    punishment allowed.

3    Q.    (MR. DELORME CONTINUING)   Mr. Jensen, has your daughter

4    been through any counseling or any kind of, you know,

5    assistance in that -- in that manner?

6    A.    Yes, sir, she's been through counseling, and she continues

7    to go to counseling when she needs it.

8                   MR. DELORME:  Okay.  That's all I have, Your Honor.

9                   THE COURT:  Mr. Hoffmann, any questions?

10                  MR. HOFFMAN:  No, Your Honor.

11                  THE COURT:  All right.  Thank you, sir.  Thank you

12   for being here.

13                  Any other witnesses, Mr. Delorme?

14                  MR. DELORME:  No, Your Honor.

15                  THE COURT:  Mr. Hoffmann, do you have any witnesses

16   you wish to call today?

17                  MR. HOFFMAN:  Yes, Your Honor, Dr. Weisz.

18                  THE COURT:  Okay.

19                           DR. SHANNON WEISZ,

20   having been first duly sworn, was examined and testified as

21   follows:

22                       DIRECT EXAMINATION

23   BY MR. HOFFMAN:

24   Q.    You are Dr. Shannon Weisz?

25   A.    That is correct.

1   **Q.**   Doctor, what's your occupation?

2   **A.**   I am a psychologist at Missouri River Health.

3   **Q.**   Is that -- Missouri River Health, is that a clinic that

4   you run?

5   **A.**   That is correct.

6   **Q.**   And how long have you been in that position?

7   **A.**   We've been open -- Missouri River Health has been open

8   since January 2021.

9   **Q.**   What do you do as a clinical psychologist?

10  **A.**   I have several different roles.  One of my primary roles

11  is providing therapy for folks that might be struggling with

12  depression, anxiety, other mental health issues, personality

13  disorders, that type of work.  I also do forensic evaluations

14  that are focused on issues like psychosexual evaluations,

15  criminal responsibility, competency matters.  I'd say those are

16  my two biggest roles which I do on a daily basis.

17  **Q.**   What is your education that leads you to this profession?

18  **A.**   So I received my undergraduate degree from North Dakota

19  State, a double major in psychology and sociology.  I got my

20  Master's in counseling psychology from University of North

21  Dakota.  And then I received my doctorate in clinical

22  psychology from Minnesota School of Professional Psychology.

23          As part of that training I was required to

24  participate in numerous practicum, internships that specialized

25  -- trained me in areas like forensic evaluation, completing

25

1   therapy service and so on.  I think when all was said and done,

2   it was right around 5,000 hours supervised experience.

3   **Q.**   What is your work history prior to Missouri River Health?

4   **A.**   So I was employed as a psychologist and addiction

5   counselor at Chambers and Blohm Psychological Services, which

6   is an agency here in town.  They essentially do the same thing

7   that we do at Missouri River Health.  I was there for, I

8   believe, about ten years.

9   **Q.**   Were you asked to do any type of evaluation in regards to

10  Dawson Rouse?

11  **A.**   Yes, that's how I came to be involved in this case.  I was

12  asked to complete what we call a psychosexual evaluation, which

13  essentially is a psychological evaluation that looks at issues,

14  not only diagnostic issues that might be present and need

15  addressing, but also looking at recidivism rates and also

16  interventions necessary to remedy issues that might be

17  identified as part of that evaluation process.

18  **Q.**   And who asked you to do that evaluation?

19  **A.**   You did.

20  **Q.**   And in the course of doing that evaluation, did you -- and

21  I'm looking at your report, which has been provided to the

22  Court and to the government, for your information.  It

23  indicates that you started in this case on what date?

24  **A.**   The initial day that I met with Mr. Rouse was October 7,

25  2020.

1  **Q.**    And that involved a clinical interview and also

2  psychological testing.

3  **A.**    Correct.

4  **Q.**    And how many times did you end up meeting with Mr. Rouse?

5  **A.**    There were three additional times over the next

6  approximately six months where I met with him; another time,

7  November 5, 2020; January 26, 2021; and then February 7th --

8  17, 2021.

9  **Q.**    And how many -- I'm sorry.  How many total minutes did you

10  meet in clinical interview with Mr. Rouse?

11  **A.**    I'm going to need to calculate, so --

12  **Q.**    I see the time spent there on the top of your --

13  **A.**    Oh, right there it is, yeah.  I mean, roughly 360 minutes.

14  **Q.**    So six hours.

15  **A.**    Correct.

16  **Q.**    And psychological testing, how much time did you spend on

17  that?

18  **A.**    180 minutes.

19  **Q.**    Okay.  That would be three hours.

20  **A.**    Correct.

21  **Q.**    And it appears you've spent about four hours reviewing

22  records?

23  **A.**    That would be correct.  Probably that's an underestimate

24  considering the amount of discovery that was included for this

25  particular case.

1    Q.    Your report indicates information sources, so I provided

2    to you the charging documents in this case, discovery in this

3    case, including affidavits by Detective Rask?

4    A.    Correct.

5    Q.    All right.  And you were present today when Detective Rask

6    testified?

7    A.    That's correct.

8    Q.    The psychological testing that you performed, would that

9    involve the -- what you described in your report as being the

10   instruments that you used?

11   A.    Yes, that's correct.

12   Q.    So you wrote this report sometime prior to June of 2021,

13   correct?

14   A.    That is correct.

15   Q.    Now, in June of 2021 we also received what's called a

16   Presentence Investigation Report in this matter.  I provided

17   that to you, correct?

18   A.    That is correct.

19   Q.    And there is a number of paragraphs in there, paragraphs 8

20   through 35, which address each of the 21 counts and the

21   government's specific allegations of acts by Mr. Rouse against

22   these 21 identified victims, correct?

23   A.    That's correct.

24   Q.    And I also provided you the government's Sentencing

25   Memorandum, correct?

28

1   **A.**   Correct.

2   **Q.**   After reviewing the Presentence Investigation Report, did

3   you adjust your thought process in terms of your initial report

4   in this matter?

5   **A.**   Yeah, I think that when I had that additional information,

6   the amount of victims, the degree of actions that were alleged

7   and -- it certainly added context to some of the allegations

8   against Mr. Rouse.  And so with the additional evaluation at

9   that time diagnostically, the primary issues seen were an

10  anxiety condition, along with just the role of completing a

11  mental health evaluation for sexual abuse.

12       But after that additional information to me, it seems

13  appropriate that additional diagnoses would be made in the area

14  of impulse control disorder, as well as paraphilic -- specific

15  paraphilic disorder, what we would refer to as like hebephilia.

16  **Q.**   Would you describe for Judge Hovland the impulse control

17  disorder, what that means?

18  **A.**   Sure.  So essentially when we talk about sexual health

19  issues or our compulsive behaviors regarding sexuality, there

20  is no specific diagnosis in the Diagnostic Statistical Manual,

21  Fifth Edition, that specifies sexual addiction.

22       And so when we're talking about sexual health issues

23  and difficulty controlling behavior, we don't have like -- like

24  a gambling disorder would be a good example of a diagnosis that

25  has evolved through the DSM and now has a set criteria that

29

1   establishes that particular condition.  Right now, as it stands
2   with the DSM-5, we do not have a sexual addiction diagnosis,
3   and so we often will characterize that as an impulse control
4   disorder in that particular area.
5           So essentially when we look at addictive behavior,
6   whether we're talking a substance-use issue or sexual behavior
7   or gambling behavior, the criteria are generally consistent
8   between those.  But as it stands now, there would be no
9   diagnosis, for example, for sexual addiction, and so we'll
10  categorize that with an impulse control disorder.
11  Q.   You have described this -- an issue for Mr. Rouse,
12  however, as having a sexual addiction.
13  A.   Right.  So what I would say is that for him, how I have
14  conceptualized this particular case is he has essentially
15  become compulsed in this particular way, where I believe the
16  behavior started when he was actually a teenager yet and kind
17  of continued to manifest into his early adulthood.  And so that
18  behavior has been compulsive and then became well established,
19  where I believe it was difficult, if not impossible, for him to
20  stop until there was a point of intervention, which I believe
21  is what Detective Rask was referring to.
22  Q.   Is a sexual addiction something that's still evolving
23  within your profession?
24  A.   It is.  I mean, there -- again, back to how diagnoses in
25  the DSM become a diagnosis is through literature review,

1   research studies, and -- and so we continue to have specific

2   issues that we know cause functional impairment that lead to

3   new diagnoses, and so this is an area that we continue to see

4   more and more issues in -- particularly in legal matters.  We

5   see it a lot with like child pornography cases, for example, or

6   other -- other manifestations with regard to sexual behavior

7   generally.

8   Q.   In terms of Dawson Rouse and sexual addiction, and you

9   talked about this developing in his teenage years, those would

10  have been years when he was still considered to be either a

11  minor or a juvenile, correct?

12  A.   That would be correct.

13  Q.   And in some definitions, a child himself, correct?

14  A.   Correct.

15  Q.   Do you have any insight as to the reasons this developed

16  in Mr. Rouse?

17  A.   It can manifest because of many different reasons.  It can

18  be one's own trauma.  It can be, you know -- I mean, it's

19  really difficult to say.  I mean, typical causes would often be

20  trauma.  It could be abuse.  It could be past experiences.  It

21  could be exposure to certain stimuli.  I mean, it can be a lot

22  of things.

23         It can be a coping methodology that we often see,

24  just like other addictive behavior.  I would suspect that

25  that's a piece of what is -- drove this behavior for Mr. Rouse,

31

1    would be -- is a coping method, an unhealthy one, but a coping
2    method nonetheless.
3    **Q.**   And coping mechanism in regard to what?
4    **A.**   It could be dealing with trauma again.  It could be
5    dealing with untreated mental health issues.  It could be
6    family-of-origin issues.  It could be all sorts of things.
7    **Q.**   I'd like to ask you a couple questions about males ages 18
8    to 25 and cognitive development.  Is there a growing
9    understanding within your profession as to that age group and
10   cognitive development of the brain?
11   **A.**   Well, I don't know that I would say it's evolving.  I
12   think it's pretty well established that adult males tend -- or
13   cognitively we develop into middle twenties.  Twenty-five is
14   the -- often the number that's thrown out for when that process
15   is completed, but -- and I think -- I mean, I think one thing
16   we can point to might even be insurance companies and how that
17   might be an age where premiums begin to decrease because of
18   things like poor judgment.
19           You know, when we look at cognitive development, our
20   pre -- our frontal lobe is often one of the last parts that
21   begins -- that fully develops, and that's an area where
22   judgment and insight and personality and all these pretty
23   critical pieces are still very much evolving.
24   **Q.**   So far as Dawson Rouse is concerned and his cognitive
25   development and then developing the sexual addiction, these are

32

1   all -- this is all occurring before he's even at the age that

2   he sits here now two years later, after he's been charged and

3   -- arrested and charged in this matter, correct?

4   A.   Right.   Correct.

5   Q.   How -- how important is it, do you believe, the federal

6   sentencing and -- supervised release to Mr. Rouse, I guess

7   generally and to Mr. Rouse particularly?

8   A.   I think literature is pretty clear in this department that

9   the longer a person has supervised release, the lower

10  recidivism rates tend to be.   And so a person that, for

11  example, is on extended probation, the risk of repeating

12  similar offenses goes down.   And, likewise, I think the longer

13  people are involved in treatment programming, that also works

14  as a protective factor to minimize risk.   But a primary issue

15  in -- in dealing with folks that have engaged in sexually

16  harming behavior is usually long-term supervision.

17  Q.   Is Mr. Rouse in need of treatment?

18  A.   I believe so, yes.

19  Q.   And sexual addiction treatment?

20  A.   That's correct, or I specifically would say like sex

21  offender specific treatment, which is a particular -- that

22  focuses on, you know, cycles and understanding all the nuances

23  to issues that lead people to committing crimes, such as we're

24  talking about today.

25  Q.   And treatment, if it was effective in this case, would

33

1  also diminish the risk of recidivism.

2  **A.**    Right.  That is a factor that actually does contribute to

3  lowering that -- successful completion I would -- I would say.

4  And also other variables over time that contribute to lower

5  recidivism rates would be age.  I mean, so a person that -- as

6  we grow older, there will be less and less risk over time if

7  the person has gotten adequate treatment and is compliant with

8  the things that are helping support them be successful.

9  **Q.**    I take it from reading your report and listening to your

10  testimony today, that you do not believe that Mr. Rouse is

11  antisocial or a sociopath?

12  **A.**    No, there was no evidence to suggest that that would be an

13  appropriate diagnosis.  There was no indicators of that.

14  **Q.**    And I need to ask you about another term you used in your

15  -- previously in your testimony, the hebephilia.  Could you

16  please describe that for us?

17  **A.**    So what that is is that's more of a language we use in the

18  treatment of conditions like we're talking about here today.

19  It's a person that's interested in people that are

20  post-pubescent.

21         So when we use the word "pedophilia," for example,

22  which is a diagnosis in the DSM, it's often misused.  What that

23  represents is people under the age of 12.  Hebephilia, on the

24  other hand, tends to be a sexual attraction to 13-, 15-year-

25  olds, but under the age of 18, but I think the typical age

34

1   would be 13 to 15.

2   **Q.**   And that would be important for purposes of treatment.

3   **A.**   Right.  I mean, because, again, there's not a diagnosis

4   for that specific issue, we would categorize it under a

5   specified paraphilic disorder because we can specifically name

6   that as a sexual interest.

7   **Q.**   And the last question I guess I have for you, if you can

8   answer it, is Mr. Rouse amenable to treatment?

9   **A.**   I mean, by all -- all accounts I would say most people are

10  amenable to treatment.  I guess it comes down to, one, a

11  person's accepting of responsibility.  And being in a program

12  with skilled clinicians, I think that can get people that even

13  aren't necessarily motivated to change, to identify reasons why

14  change would be helpful.  And so I haven't seen many instances

15  of people that aren't amenable to change.

16        I think the biggest thing I would be looking for

17  there would be something like you mentioned a bit ago, would be

18  something like antisocial personality or psychopathy, where

19  treatment in those particular individuals only tends to make

20  them more sophisticated at what they do, and so it often can

21  actually work in the opposite way rather than being helpful.

22        MR. HOFFMAN:  I don't have any other questions, Your

23  Honor.

24        THE COURT:  Mr. Delorme, do you have any questions?

25        MR. DELORME:  Yes, Your Honor.

35

1                          CROSS-EXAMINATION

2   BY MR. DELORME:

3   Q.   Dr. Weisz, we'll just pick up where Mr. Hoffman left off,

4   talking about amenable to treatment.  For somebody to be

5   amenable to treatment, they have to commit to it and be honest

6   and fair with the -- with the providers, correct?

7   A.   That's correct.

8   Q.   Okay.  Now, you've had access to all the documents in this

9   case.  You've had access to the PSR.  You were here when

10  Detective Rask testified?

11  A.   That is correct.

12  Q.   In your report you note some of the self-reported

13  information that Mr. Rouse provided you.  And specifically

14  pointing to paragraph 3, first paragraph, he indicates to you

15  about three-quarters of the way through the paragraph that he

16  denied knowing some of the ages until after receiving images or

17  engaging in sexual acts.

18  A.   Um --

19  Q.   Let me -- let me finish real quick.  You heard the

20  testimony of the detective?

21  A.   Right.

22  Q.   You saw the PSR report.  That directly contradicts that

23  statement to you, correct?

24  A.   Right, and so that was -- this was done before that time.

25  You bet.

                                  36

1   **Q.**   Sure, but it does contradict what you now know.

2   **A.**   Right.  That's correct.

3   **Q.**   Okay.  Also, when you go to page -- page 5, last,

4   basically, sentence of the first paragraph, he denied having

5   fantasies of nonconsensual sexual activities, fetishes or

6   sexual paraphilias.

7   **A.**   Yes.

8   **Q.**   Again, you've had access to the PSR, correct?

9   **A.**   I have.

10  **Q.**   Okay.  In paragraph 38 of the PSR -- or 36, I believe.

11  Yep, 36.  There's indication of a woman - I believe it was an

12  adult, so refer to her as a woman - that Mr. Rouse was

13  communicating with in South Dakota where Mr. Rouse discussed

14  picking the female up in a van, raping every hole, beating her

15  up, treating her like a human toilet, and treating her like a

16  slave.  Now, that contradicts what he self-reported to you in

17  your -- your assessment, correct?

18  **A.**   That's correct.

19  **Q.**   Okay.  As far as hebephilia, just so we're more specific

20  on this, that's a sexual interest in pubescent but minor --

21  **A.**   Correct.

22  **Q.**   -- individuals, correct?

23  **A.**   Right.

24  **Q.**   Okay.  Do you have a diagnosis in the DSM for somebody who

25  is interested in BDSM or rough sexual activity or hurting

37

1  somebody during sexual acts?

2  **A.**   There is no specific diagnosis for that that I'm -- that

3  I'm aware of.  I mean, no, I don't believe that there's a

4  specific diagnosis.  Now, there is interest in BDSM and things

5  like that, but nothing specific.

6  **Q.**   Is that something that would be identified and treated by

7  a -- by a clinician?

8  **A.**   Not necessarily simply because some people, that's

9  their -- their preference when it comes to sexual activity,

10 provided that it's, you know, between mutually consenting

11 individuals.

12 **Q.**   Okay.  Now, I note that Mr. Hoffmann provided a copy of

13 your evaluation and then a brief follow-up communication you

14 had with him more recently.  I think in that more recent

15 follow-up, which was June 14th, you indicate that particularly

16 you believe that his conduct can be based upon -- tied to his

17 family of origin.

18 **A.**   I think that can be one possible scenario.  That seems to

19 me -- based on the totality of the situation, seems to be a

20 primary issue for him, yes.

21 **Q.**   Okay.  And overall you did assess Mr. Rouse as being

22 above-average risk for future sexual harming behavior, correct?

23 **A.**   That's correct.

24 **Q.**   And even with the additional information provided to you

25 in the PSR, that did not change your assessment or evaluation.

38

1  **A.**   No, because that number would stay the same based on the

2  Risk Matrix 2000, so regardless, those numbers would remain the

3  same.

4  **Q.**   Okay.  And as part of the United States' recommendation in

5  court, I'm going to be asking for 25 years of supervised

6  release to follow.  According to your testimony with

7  Mr. Hoffmann, that would probably be really good for Mr. Rouse

8  as far as having that supervision over him as he's trying to

9  transition back into the community and be treated, correct?

10  **A.**   I would -- I would agree with that.

11          MR. DELORME:  Okay.  Thank you.  No further

12  questions.

13          THE COURT:  Thank you, sir.  You may step down.

14          MR. HOFFMAN:  Judge, I have no other witnesses.

15          THE COURT:  All right.  So, Mr. Rouse, I'm going to

16  first give the attorneys an opportunity to outline what they're

17  recommending for a sentence.  When the attorneys are done, I'll

18  turn to you and give you a chance to speak.  You have the same

19  opportunity to speak as anyone else in this hearing, but we'll

20  hear first from Mr. Delorme on behalf of the federal

21  government.

22          MR. DELORME:  Thank you, Your Honor.  I want to start

23  off real briefly by acknowledging just the chance that this

24  particular matter fell into the hands of Detective Rask and his

25  investigation to follow up on that.  It could so easily have

1   just been written off as a curfew issue.  Nothing would have
2   happened in this particular matter.

3           But for his investigation, while it does not take
4   away the hurt and the harm for the 21 individuals that we've
5   identified, it most certainly did decrease the possibility that
6   others were victimized thereafter, so I just want to take that
7   point -- make that point for the Court.

8           As per my United States' sentencing recommendation,
9   Your Honor, as I indicated in my memorandum, I'm asking for
10  480 months and 200 -- 25 years of supervised release.  And the
11  breakout for that is I'm asking for 480 months concurrent on
12  Counts 1, 3, 4, 5, and 6, 8, 9, 10 and 11, 14, 15, 16, 17 and
13  18 and 20, to run concurrent with one another.  And I'm asking
14  for 240 months on Counts 2, 7, 12, 13, 19 and 21, to run
15  concurrent with one another and concurrent with the counts I've
16  just discussed.

17          I'm also asking for restitution in this particular
18  matter, Your Honor.  There was one request for restitution for
19  $1,250.  We could provide the name of those individuals to the
20  Court thereafter.  But I believe in looking at 18 USC 2259, a
21  request for restitution in this particular matter, even though
22  it was 1,250, I believe the mandatory minimum the Court can
23  order is $3,000 per separate -- pursuant to that section of
24  law, Your Honor.  So in a sense, in essence, I'm asking for
25  $3,000 of restitution for that -- those individuals, and that's

1    for counseling costs that they incurred for their daughter.

2           Your Honor, quickly, you've indicated that you've

3    looked at the PSR.  You've read it multiple times, and it

4    appears on the surface -- you've read all the letters of

5    support that Mr. Rouse received and has provided to the Court.

6    On the surface Mr. Rouse is an upstanding adult male, appears

7    to come from a good family, seems to do right by others, is

8    very helpful.  He follows his religious beliefs, and all those

9    folks, they identified that in their letters.

10           What they don't know is that Mr. Ross (sic) and --

11    Mr. Rouse had another side.  He had a dark side, and the dark

12    side is why we are here today.  And however that manifested in

13    him and started, it continued all the way through his arrest.

14    And, in fact, as the detective indicated, to understand, he was

15    communicating with victims on the very date that he was

16    arrested in this particular matter.

17           That very dark side led him to do some very dark

18    things with these individuals.  It started off asking for

19    images, videos, asking them to perform sexual acts on

20    themselves and provide those to him.  But then he started

21    meeting with these individuals, and again, they were ages 12

22    through primarily 15.  There was, I believe, a 16- and

23    17-year-old as well.

24           Mr. Rouse was extremely interested in BDSM.

25    Pointblank, it's all over the information in the -- in the

41

1    investigation.  He had looked it up.  He had contracts that he
2    found online that he brought to the -- to his interactions with
3    some of the females.  In fact, one of the females ultimately
4    signed one of these BDSM contracts with Mr. Rouse.  That
5    individual, Your Honor, was also the one that there were
6    several videos of Mr. Rouse meeting with her, having sexual
7    acts.  He was taking pictures of her and videotaping her.
8            He also provided her an excessive amount of alcohol,
9    directed her to drink it in one -- pretty much in one session,
10   to which she did.  Again, videos and images depicted her in a
11   state of extreme inebriation, lying on the ground with spittle
12   and other fluids on her face.
13           That same young lady -- and I say that, and I
14   shouldn't be saying that, Your Honor.  These are very young
15   girls.  They're girls, and I tend to try to use these terms and
16   make some meaning of them, but they're all girls.  That same
17   girl he brought to CVS at some point, provided her a credit
18   card, sent her inside with the instruction to get the day-after
19   pill, which she did.
20           Every one of the families that provided you with a
21   statement here, Your Honor, are indicating to you that they're
22   all suffering from some sort of aftereffect of what Mr. Rouse
23   did.  They've got daughters now that were A and B students that
24   are now C and D students.  You know, they were not only failing
25   in school, they're failing socially.  They're making wrong

42

1  decisions.  They're associating with people they probably

2  shouldn't be associated with and probably wouldn't have but for

3  the exposure that they have had with Mr. Rouse.

4        I believe a 40-year sentence, Your Honor, takes into

5  account the seriousness of the defendant's conduct.  It will

6  act as a significant deterrent for others considering doing the

7  same thing.  It provides adequate justice for the victims, yet

8  still allows Mr. Rouse some opportunity for release at some

9  point in his life.  And hopefully if that were to occur and

10 he's on supervised release, he would integrate, Your Honor, and

11 seek that treatment and become a producing citizen again.

12        Your Honor, I'm asking that the Court issue -- or as

13 part of the order, issue a no-contact with the victims or the

14 families in the order, as well as the supervised release

15 conditions.

16        And I've indicated to the Court before that's because

17 what we're seeing now is people are starting to use some of

18 these means of communications from BOP systems to communicate

19 with people that they victimized.  And BOP has a hard time

20 dealing with -- with that if it's not in the order itself,

21 because they look at the terms of supervised release as not

22 taking effect until after they get out of -- out of the BOP

23 system, so I'd ask the Court to take that into account.

24        THE COURT:  Are you saying they have access to social

25 media in the --

1           MR. DELORME:  They have access --

2           THE COURT:  -- prison environment?

3           MR. DELORME:  -- to phones, Your Honor, and they can

4    write letters, and such, so they, you know --

5           THE COURT:  Oh, I understand they can write letters.

6           MR. DELORME:  Yep.

7           THE COURT:  But utilizing Snapchat and other --

8           MR. DELORME:  But not that kind of -- no, Your Honor.

9    Phones, written letters, and such, that's -- that's been an

10   issue.

11          THE COURT:  All right.

12          MR. DELORME:  I'd also ask the Court to dismiss the

13   48 original counts of the Indictment, and I'd ask the Court to

14   issue the order of -- Final Order of Forfeiture that's been

15   provided prior to the hearing on the matter.  Thank you, Your

16   Honor.

17          THE COURT:  Thank you.  Mr. Hoffmann.

18          MR. HOFFMAN:  Judge, when I -- when I think of

19   40 years, I have to put that in some type of context or

20   framework that I can understand.  And as I prepared for coming

21   here today, I kept thinking -- my thoughts keep going back, I

22   should say, to the fact that this year is my 42nd year of being

23   a lawyer.  I graduated law school in 1980.

24          So when I think of Dawson Rouse being sentenced to

25   40 years, let's say that that started in 1980.  That would be

                                  44

1   basically a sentence that would take us up to about 2 years

2   ago.

3          And when I place him in that context of that

4   40 years, the main thing that comes to my mind is if I was at

5   40 years and I would be thinking about Dawson Rouse having been

6   sentenced when I became a lawyer, I would say to myself, Dawson

7   Rouse should've been out of the federal penitentiary a long

8   time ago and should've been on supervised release for a long

9   time with treatment.

10         And who knows, maybe he would've progressed to the

11  extent where the pretrial services -- or the supervised release

12  people would say he no longer has to be on this program, and

13  the Court would agree with that.  And I'm not just saying that

14  as a simple concept for me to think about it.  I think about it

15  in terms also of Mr. Rouse and why that 40-year sentence is

16  inappropriate.

17         It's inappropriate because of his age when he was

18  sentenced and his age when he would've committed these offenses

19  and Dr. Weisz's testimony, who told the Court that this sexual

20  addiction developed when he, himself, was still under some

21  definitions a child, or if you want to call him a juvenile, or

22  if you want to call him a minor.  Either way it developed when

23  he was a young person, before his male brain had actually fully

24  developed and had the cognitive development to make proper

25  decisions.

                                45

1          I used the word in questioning Dr. Weisz, the word
2     "evolved," and he says, "Well, no, it's been established for
3     some time," that that's the truth about male brains.  I think
4     my idea of the evolution and the development of this is that
5     people in the field of the penitentiaries are starting to
6     realize that we need to treat these young people differently.
7     We need to talk about their punishments in term of restorative
8     justice and rehabilitation.

9          So again, putting me back in that 40-year concept of,
10    he's sentenced in 1980, and he should've been out a long time
11    ago, should've been on supervised treatment for a long time, I
12    have to keep falling back to the point of the fact of how old
13    he was when this sexual addiction began and his age when these
14    offenses were committed.

15         I don't think at any point in time in the papers that
16    we've given you or any statements that we've made that we've
17    downplayed this conduct.  It is deplorable, but I think I'm
18    asking you -- I'm asking you to do a sentence based upon some
19    logic and some cognitive thinking about what is appropriate in
20    this case.

21         Just a couple responses to the government, I could be
22    wrong.  You can look at the PSR and tell me if I'm wrong, but I
23    think there were only two counts that mention BDSM.

24         And it's been two years that he's been in county
25    jails, and there's been no conduct by him of any attempts to

46

1    contact people, write letters beyond social media, anything
2    like that.
3              He's told you that he has had no write-ups in any of
4    the jails that he's been in.  I'm aware of none.  I believe
5    that he's been a model prisoner in all of the facilities that
6    he's been in, so I don't think that you're going to be dealing
7    in the future with any conduct on his part that's going to be
8    of a negative nature in regards to the events of this case and
9    the people involved in this case.
10             And I don't want to say this, and I -- I do this with
11   some hesitancy, but the government talked about, you know,
12   people in this case needing counseling and all of that.  Well,
13   we are still a court of law, and we don't make decisions based
14   upon speculation or innuendo.
15             If there were counseling services of a magnitude of
16   which the government contends, then we would have records of
17   those counseling services.  We would have medical bills of
18   those counseling services.  That's what makes us a court of
19   law, dealing with evidence and not just argument and
20   speculation.  The total restitution the government is asking
21   for in this case is $3,000, and I don't object to that.
22             Judge, I try very hard to do a Sentencing Memorandum
23   that is logical and concise, and I believe I've done the best I
24   can in that regard for your consideration today.  I believe
25   that Mr. Rouse's letters that were written in support of him

47

1    were all good letters.  I've told him that.  I've told his
2    family that.  Father Ehli, I think his name is, wrote a letter
3    after the government's Sentencing Memorandum, hit the local
4    news, and he asked for leniency in the face of what he knew the
5    government was asking for.
6         I think Mr. Rouse's letter to the Court, that's all
7    his handwriting, all his.  I didn't edit anything.  I didn't
8    tell him what to write.  Good or bad, there it is for your
9    consideration.
10        I put it in my Sentencing Memorandum, Your Honor,
11   that we're asking you to consider a sentencing range for a
12   total offense level of 34, which would be 151 to 188 months.  I
13   believe that that would be sufficient to meet punishment and
14   deterrence, but not excessive of what's necessary in this case.
15        I do believe that supervised release is an important
16   factor in this case, and I'm not going to disagree with the
17   longest term of supervised release if that's what the Court
18   decides.  Dr. Weisz seemed to indicate that that was
19   appropriate.  If you did a sentence -- if you did a sentence of
20   15 years and 25 years of supervised release, that's 40 years
21   right there.  Dawson Rouse, at his age right now, will be an
22   old man when that's over.
23        His conduct of when he was yet not of his age and, I
24   submit to you, not fully developed as a -- as an adult has
25   impacted his life also, his entire life.  When he reaches that

48

1   age, his life is not far from being over, and he will always

2   have this conduct and these repercussions to deal with.

3          North Dakota is a small state.  Bismarck is a small

4   community, and a person who puts themselves in this position by

5   their conduct, they suffer from the fact as soon as this case

6   becomes public, and he has done that.  His family has done

7   that.  That's no excuse, but I'm just saying that this is --

8   this is a matter that he has lived with and will continue to

9   live with his entire life.

10          But I believe the sentence that I'm asking for is

11   appropriate for punishment, deterrence, and then ultimately the

12   protection of society and him as far as treatment and

13   rehabilitation is concerned, and that's what I would ask you to

14   do.  Thank you.

15          THE COURT:  All right.  Thank you.  So, Mr. Delorme,

16   the government is requesting a downward variance in this case,

17   correct?

18          MR. DELORME:  Yes, Your Honor.  I think the 480

19   months is fair and appropriate in this particular matter, and

20   that he does have, you know, some slight ability then to obtain

21   some release in the future.

22          THE COURT:  All right.  So, Mr. Rouse, I am required

23   to give you the same opportunity to speak as the attorneys have

24   had.  If you wish to say anything, sir, you're free to speak.

25   If you've got questions, you're free to ask.

49

1           THE DEFENDANT:  Okay, Your Honor.  I'd like to start

2   off by thanking you for your -- you know, the time to address

3   you and the court today.  You know, I'd like to -- it's my

4   actions and my actions alone are the reason I'm here today.

5   Nobody else put me here.  It's my own fault.  I'm the reason

6   why I'm here today, and I freely chose to make these terrible

7   actions.  That's the reason why I was arrested, why I'm

8   incarcerated now, why I'm facing all these years.  With a

9   humble heart, I'm sorry.

10          I'd like to also address the victims of my crimes and

11  their families and apologize to them.  I know nothing I could

12  ever say can ever take this away, and I put them through all

13  manner of pain and suffering, and absolutely nothing I can do

14  can ever undo that.  I can apologize a million times, but it's

15  not enough.

16          One government's witness, you know, did say, yeah, my

17  behavior, my actions, they truly were monstrous.  You know, I

18  would just like to ask for -- you know, hopefully some day the

19  victims of my crimes and their families, to find it in their

20  heart to forgive me, and I'm hoping that this today is the

21  first step in healing the wounds that I caused.

22          After two years of going through this, I do truly

23  understand how serious this offense is, and I understand that

24  it does warrant a decently lengthy prison sentence.  You know,

25  I -- I'll be able to have the opportunity to go to treatment

1   within the BOP.  And I freely admit, I agree with Dr. Weisz
2   that, you know, I do need treatment for this.  I will freely
3   admit to and agree with that.  You know, I want to do better.
4   I need to do better.  I want to change for the better.
5          And, you know, something I put in that letter to
6   you -- and this is something I do mention kind of hesitantly
7   just because I know it's not always a good idea to bring God
8   into the courtroom, but in that letter I mentioned when I was
9   sitting in the -- under the bright lights of a booking cell in
10  Burleigh County back in April of 2020, when this all first
11  started, I kind of -- I made a covenant with God that, you
12  know, okay, I'm not going to sleep with anyone else, no
13  behavior, no action like that until marriage.
14         And, you know what, if marriage isn't in the cards
15  for me, celibacy it is.  I made it two years.  I can make it
16  the rest of my life if that's the case.  It's entirely okay
17  with me.
18         I also -- I do intend on attending and completing any
19  treatment that's available to me within the BOP, especially the
20  sex-offender-specific treatment that's offered at some of the
21  SOMP yards.  I'd also like to continue aftercare after being
22  released from BOP custody.  You know, the whole goal with this
23  is to kind of try and lessen any risk of recidivism, and as
24  Dr. Weisz said today, a lengthy term of supervised release
25  helps to ensure that.

1          You know, I want to turn my life around.  I believe
2    I've already started to, but I just -- I don't want to ever
3    have to come back to this courtroom or any other court of law
4    on this side.  You know, I've got the motivation.  I've got the
5    drive to change.  I've got the support system to help me
6    change.  I want to change.  I want to do better.
7          You know, this was -- my behavior in these actions,
8    it was not only just a dishonor to me and my family, the
9    community I grew up in, the schools I went to, the people I
10   hung around, the value systems that were supposed to have been
11   instilled in me throughout my growing up, you know, I just -- I
12   disregarded a large portion of that when I did this, and it's
13   terrible.  I never should've done that.
14         You know, I -- I hurt people in -- through these
15   actions, I hurt people, and that's something I have to live
16   with for the rest of my life, and it's not an easy thing to --
17   it's not very easy to find peace at night, trying to fall
18   asleep realizing all of the bad, terrible things that you've
19   done over the course of your life.
20         You know, as was mentioned, you know, my family has
21   suffered as a part of this too and along with the victims, but
22   even though I've suffered, my family has suffered, I recognize
23   that I'm not the victim here.  I really truly recognize that.
24   I know that the victims and their families have to suffer a
25   great deal, a great -- more pain and agony than I have, and for

1  that I'm truly sorry.

2          I screwed up.  I was young.  I lacked good judgment,

3  and this is -- was testified to.  You know, I've made a grave

4  -- grave series of mistakes, and I have to own up to this.

5  That's -- at this point there's nothing left to do.  I broke

6  the law.  I made a conscious choice to break it.  I shouldn't

7  have.  It was wrong both legally, ethically and morally, and I

8  have to own up to the consequences.  There's no other option.

9          I not only ruined my lives (sic), but, as has been

10  testified, I've damaged and ruined lives of many others with my

11  conduct today.  I've caused so much pain and suffering, so much

12  hurt and sorrow for so many people.  Absolutely nothing I can

13  say is going to be able to take this away.  Nothing I can say,

14  nothing I can really do is -- you know, like the one gentleman

15  said, there are no do-overs for any of this for any of us.  You

16  know, I acknowledge that no matter what I do, it can't be

17  undone.

18          Finally, I want to apologize once more to the victims

19  of my crimes for putting them through this.  I'm truly sorry

20  for what I did to them.  I'd like to apologize to their

21  families as well for having to watch their daughters and

22  sisters go through this.

23          I'd like to apologize to my family for disappointing

24  them, putting them through all this, and just, you know, once

25  more I'd like to -- I'd like to apologize to the Court and just

1  once more to the people who suffered as a part of this.  My
2  actions have caused suffering for everyone involved on every
3  side.  Like the one gentleman said, it's caused -- it's
4  affected the lives of everyone sitting in this courtroom today.
5       Your Honor, I'd like to humbly and respectfully ask
6  for mercy and leniency in your sentencing of me today.  I'd
7  still like to be able to live a productive and law-abiding life
8  after sentencing, after my term of incarceration.  I'm truly
9  sorry for what I've done.  Nothing I can do can reverse the
10 actions that I took.
11      I -- it kills me daily just reflecting on what I did.
12 It truly does.  No one should put a mom or a dad or a brother
13 or an acquaintance or anybody through this, and nobody should
14 put another human being through what I did, period, end of
15 story, and I'm sorry for that.  I truly am, and I just -- I ask
16 for leniency and mercy on your behalf today.  Thank you for
17 your time, Your Honor.
18      THE COURT:  All right.  Thank you.
19      MR. DELORME:  Your Honor, I know it's not customary,
20 but could I have 90 seconds just to briefly respond to
21 Mr. Hoffmann's indication or his assessment of BDSM and how it
22 plays in this particular matter?
23      THE COURT:  I'll give you 90 seconds.
24      MR. DELORME:  That's all I need, Your Honor.  I
25 looked at the PSR real quick, and BDSM is bondage, dominance,

54

1    sadomasochistic conduct.  The victim in Count 4 reported pulled
2    hair, bit lip; Count 5, pulled hair, strangulation; Count 6,
3    pulled hair, scratched deeply, strangulation; Count 9, pulled
4    hair, strangulation; Count 11, victim -- had victim do a BDSM
5    online test; Count 14, had the victim take a BDSM test and
6    slapped and bit her during their physical interactivity;
7    Count 21, deep scratching.  At least three of the victims
8    reported the sexual events as forcible rape, Your Honor.
9             Thank you.  I think that's less than 90 seconds.
10            THE COURT:  All right.  And, Mr. Rouse, I did read
11   the letter that you sent to me.  I just got that this morning,
12   and I thought it was a thoughtful letter that you put together.
13            I've been a federal judge for 20 years, and I've
14   dealt with hundreds and hundreds of sex offenders, child
15   pornography offenders, child sex abusers, sex traffickers of
16   adults and minors and far too many deviant, perverted sexual
17   predator-type behavior.  I've seen some of the most absolute
18   worst sexual misconduct that one can ever imagine as a federal
19   judge and end up in a federal court prosecution just like this.
20            And it's beyond troubling for me to see intelligent
21   adults like yourself sexually abuse minors.  I see it all the
22   time.  I've got a couple more sentencings tomorrow of
23   individuals, one of whom went to trial, that the conduct
24   directed to infants was unimaginable, and I'm -- look at those
25   cases, and I look at this case, and I'm never sure when and how

1    and why the wires got crossed with such individuals.

2         I do know from my experience sitting on the Bench

3    that cell phones and the internet and social media applications

4    like Snapchat have opened the door for society's worst to prey

5    on the most vulnerable.  I see it every day, and I'm not sure

6    how we close that door, but the internet has opened the door

7    for the worst that one can imagine.

8         What occurred in this case is and was horrendous.

9    Snapchat seems to be the social media tool of those that lure

10   on young teens.  I'm not sure why it evolved into that, but it

11   certainly has from what I've seen.  But using Snapchat to lure

12   young teenage girls, Snapchat conversations quickly turn to

13   very sexually explicit topics.

14        I haven't read all of the discovery in this case and

15   all the Snapchat entries, nor have I looked at but a few

16   videos, but it seemed to -- you seem to follow the same pattern

17   on Snapchat, making contact, requesting nude images, videos

18   from those that you were communicating with.

19        Most of the victims were 12 to 17 years of age,

20   seemed to be focusing on 13-, 14-, 15-year-olds, young teenage

21   girls that I consider to be oftentimes naive and rather

22   vulnerable, as most of these victims were.  Had sexual contact

23   with at least seven of them that I was able to count, sexual

24   intercourse with at least three or more - who knows how many?

25   - and 700 blocked contacts on Snapchat, which doesn't speak

1  well for you.

2         Each and every one of those instances is statutory

3  rape, intercourse with somebody under the age of adulthood is.

4  And at least it was obvious to me that in reading through the

5  discovery in the Presentence Report, that you knew what you

6  were doing was wrong and you knew what you were doing was

7  illegal, correct?

8         THE DEFENDANT:  Yes, Your Honor.

9         THE COURT:  I know that there were multiple victims

10  where you had -- at least it's outlined in the Presentence

11  Report and was not objected to, that you told them not to say

12  anything about what happened.  One victim in particular, you

13  said, and I quote, "I mean, if we get caught, I will go to

14  jail," end of quote, so don't say anything.

15         And several victims also reported that they were

16  raped.  That's found in the Presentence Report at paragraphs

17  11, 13, 19 and 20, and that was not disputed.

18         Originally there were 48 counts.  Ended up with 21

19  counts.  It's probably the tip of the iceberg.  In my

20  experience as a federal judge, whether I'm dealing with drug

21  traffickers, persons that engage in sexual predator-type

22  conduct, almost every offender that I've ever dealt with over

23  the last 20 years tends to minimize their misconduct.  That

24  kind of goes with the territory.

25         So I tend to agree with Mr. Rask that -- Detective

1   Rask that there's probably far more victims in this case than
2   what was ever charged out, but I'm not factoring that into any
3   sentence in this case.  And it wasn't just young teenage girls
4   in the Bismarck area.  There were travels to Fargo and Mandan,
5   Tioga, Garrison, Center, Driscoll, Minot.
6          And one of the videos that I did see was you
7   interacting with a victim and having her sign a sexual consent
8   contract.  Where'd you ever get that from.
9          THE DEFENDANT:  I don't recall exactly.  It was
10  somewhere on the internet, Your Honor.
11         THE COURT:  And that signing of that sexual consent
12  contract was all captured and preserved on video as Government
13  Exhibit A.  And you had that same victim initial on the
14  contract certain types of sexual contact that they would be
15  willing to consent to.  And this was a 14-year-old girl, I
16  think, that was the victim depicted in that video.  And I can
17  tell you, sitting on the Bench for the last 20 years, I have
18  never seen that before, never heard of it before, and I've --
19  but I learn something new every day.
20         And I saw the video.  I saw the victim, J.T., signing
21  the contract and you then turning to the camera and saying that
22  you also consented to the behavior identified in the contract.
23  I just found that so bizarre.  You can't have a minor sign a
24  contract.  It's meaningless.
25         And then there were a few victims' identities that I

1  can't recall, but they were identified in the Presentence

2  Investigation Report in which you had them purchase a Plan B

3  after-sex pill after unprotected sex and provided them with a

4  credit card for them to purchase that pill.  And I've never

5  seen that before from any defendant that I've ever dealt with.

6          But the really sad -- sadness in this case, I guess,

7  is the harm that was caused to the victims and their families.

8  And we've had one of the parents testify here today.  There

9  were many other letters that I received from victims.  I'm not

10  going to read all of them, but they're similar in nature to the

11  testimony from Mr. Jensen.

12          One of the victims who wrote to me said that, and I

13  quote -- this is from Docket Number 63.  "From the day I

14  realized that what this man was doing was wrong, I've been a

15  different person.  Before this event happened, I wanted to be

16  in the National Honor Society, student council, and so many

17  other things.  I had big goals set for myself, and I probably

18  could've achieved them if I tried.  I started going to

19  counseling very shortly after everything came out, and I have

20  gone almost weekly since then."

21          And that same victim's mother wrote to me on

22  June 15th and said the actions of you had "a lasting impact on

23  myself and my family.  It's left us with hurt, fear, anger,

24  loss of trust, sadness and depression.  It's created a ripple

25  effect within our family, left us struggling with making a

1    normal family life again.  We lost the trust that our daughter
2    can go out on her own and be safe, not allowing her access to
3    social media in fear that other predators are there waiting to
4    harm her.  We've had many sleepless nights over the last two
5    years."

6            "This has affected my daughter's grades in school,
7    friendships and her self-worth.  She was once an A, B student,
8    now struggling to pass.  She's been seeing a counselor for the
9    last two years to work on anxiety and depression she has
10   suffered.  We've spent thousands of dollars on our counselor
11   and will continue to do so so she can hopefully be able to live
12   a happy and healthy life."

13           Another parent wrote me and said that they sent their
14   daughter to a therapist because she can't trust people anymore.
15   She pushes people away so she doesn't get hurt and exploited by
16   other guys.  At one point she was cutting herself to try and
17   heal from what you had done to her.

18           And another mother wrote to me on June 17th, mother
19   of a victim, and said as follows, quote, "My daughter has lost
20   so much over the past few years.  She was and is a very bright,
21   funny, personable girl who loved to spend time with family and
22   friends.  She knew what she wanted to do in her future, as well
23   as on track to meet her goals."

24           "Following this event she began withdrawing from
25   everyone, rarely spends time with family anymore.  She's come

60

1    to despise herself.  She's spontaneously shaved her head.  She

2    had incredibly long and beautiful hair.  She began cutting and

3    talking about suicide."

4           "I've taken to her -- to her -- her to a counselor,

5    had her put on antidepressants, and she will tell me that none

6    of it matters and she refuses to work with the counselor.  She

7    is yet to tell any of them about what happened.  She talks

8    about how stupid she was in doing what she was asked to do.

9    She was 12 at the time."

10          "She trusts no one, including herself.  She was

11   looking forward to high school and all the things she was going

12   to be do and be involved in.  This is far from the case.  This

13   past year here grades in school have dropped dramatically from

14   straight A's to struggling D's and C's.  She quit volleyball

15   and cheer.  She stopped speaking with her best friends."

16          And the mother wrote to me and said, "I've struggled

17   in trying to figure out how to help my child.  I struggle with

18   phone calls from work, from school that worry about whether she

19   will impulsively take her own life, what choices she will make

20   and will they be good ones.  I worry about her getting involved

21   with the wrong group of friends and where that will take her."

22          And the letters go on and on.  I don't think any of

23   us can really understand what impact that this misconduct had

24   on those victims.  You took away their innocence and caused

25   really lifelong psychological trauma.  And I'm not sure if any

1   of us, particularly yourself, will ever fully understand and

2   comprehend the trauma that you have inflicted on these young

3   girls.  We can talk about it.  We can read about it, but I

4   don't think any of us really know, and it's something they'll

5   experience for the rest of their lives.

6          Congress and the federal Sentencing Commission have

7   looked at these particular offenses that you've pled guilty to,

8   and they have said that all of these offenses deserve a life

9   sentence.  When I first became a federal judge in 2002, the

10  sentencing guidelines were mandatory, so had you appeared in

11  front of me 15 years ago, you would have received a life

12  sentence for these convictions.  Judges had no discretion

13  whatsoever.

14         I'm not saying that that's always right, and I'm not

15  saying that a life sentence in many instances is a appropriate

16  sentence, but that was the reality 15 years ago.  And life is

17  life in the federal prison.  We don't have parole in the

18  federal prison system.  So obviously Congress and the

19  Sentencing Commission have -- believe, and rightfully so, that

20  these are serious sexual crimes that deserve serious

21  punishment.

22         I've read all of the letters.  There's some letters

23  that I received -- and they were all very nice letters from

24  family members, but there were some that begged for leniency

25  and begged for probation, and this -- we all know this is a

1    case that carries a ten-year mandatory minimum.

2           Mandatory minimums are not determined by judges.

3    They're determined by Congress.  So there isn't any competent,

4    experienced federal judge in the country that would ever look

5    at this case and wouldn't even be allowed to impose a

6    probationary sentence.  No federal judge could ever impose a

7    sentence less than ten years.

8           And I think I told you about this at the change of

9    plea hearing, but the average sentence for these types of

10   crimes, as determined by the Sentencing Commission by

11   tabulating every judgment of conviction that's been handed down

12   over the last 5 years, the average sentence is 313 months.

13   That's a little better than 26 years for these very same

14   crimes.

15          And I keep up on the federal sentencing statistics.

16   We receive that statistical data every three months.  I read it

17   carefully.  I know what's going on around the country in terms

18   of sentencing in these types of cases.  And I do not take these

19   cases lightly.  Believe me.

20          And I can tell you that the average case that's been

21   reported to the Sentencing Commission for convictions of this

22   type are not cases that involved multiple victims.  They're not

23   cases in which a defendant pled guilty to 21 counts, originally

24   48 counts, and then received a sentence of 26-plus years.  This

25   is a far different kind of case than the average case that's

1    reported in the Sentencing Commission data.

2           And I can tell you, in all honesty, that anyone who
3    read the Presentence Investigation Report like I did a couple
4    of times and who really knew what happened in this case would
5    reach the conclusion that this series of events was
6    unconscionable.  It was horrendous.  This is not a situation
7    where it was just a few bad days or a few bad weeks for a young
8    college-aged kid.  This was a fairly calculated scheme to prey
9    on young, vulnerable women, primarily in the 13 to 15 age
10   range, so I believe it warrants a lengthy sentence.

11          The federal sentencing guidelines in this case have
12   established an overall offense level of 43 and a criminal
13   history category of I.  When you look at the sentencing table
14   in the federal sentencing guideline manual, it doesn't matter
15   what your criminal history is, whether it ranges from a one to
16   a six, the Sentencing Commission and Congress have said a life
17   sentence is warranted.

18          There have been no requests in this case from either
19   attorney about any departures from the sentencing guideline
20   range, so I need not even address that.

21          There has been a request actually by both counsel for
22   the government and the defendant for a downward variance from
23   the sentencing guidelines.  And a downward variance requires
24   careful consideration of sentencing factors that are all
25   outlined in a federal statute.  The citation to the statute is

64

1   18 United States Code, Section 3553(a).

2         From what I've read in the file -- all of the

3   attorneys here are very seasoned, experienced lawyers.  They

4   know about the 3553(a) factors.  And Mr. Rouse, in his

5   interview with the United States probation officer that drafted

6   the Presentence Investigation Report, revealed his awareness of

7   the 3553(a) factors.  I know those factors and have -- required

8   to consider them in every case.  I've sentenced 5,000-plus

9   defendants over the years, and I've been required to consider

10  those factors in every case.

11        And the Eighth Circuit Court of Appeals that handles

12  appeals from the district court here in North Dakota, they have

13  repeatedly said that sentencing judges in this district, when

14  they're considering the 3553(a) factors, are entitled to rely

15  upon undisputed facts contained in a sentencing memorandum,

16  factual information contained in presentence investigative

17  reports, arguments of counsel, letters of support from family

18  members and friends, letters from the defendant, and I've

19  relied upon all of that information, and it all addresses the

20  3553(a) factors.

21        In the broad exercise of my discretion, I will impose

22  a variance in this case, as both counsel have requested it, but

23  I'm not going to vary downward to that 15-year range that

24  Mr. Hoffmann had suggested, nor am I going to impose a sentence

25  of 40 years, as requested by the government.  I don't think

1    that either one of those recommendations is completely
2    unreasonable.

3         But, Mr. Rouse, it'll be my judgment in this case
4    that you shall be committed to the custody of the Bureau of
5    Prisons to be imprisoned for a period of 360 months.  So the
6    record is clear, that's 360 months on Counts 1, 3 through 6, 14
7    through 18, and 20.  And I'm imposing a sentence of 240 months
8    on Counts 2, 7, 12, 13, 19 and 21, those sentences to run
9    concurrent with one another; 360 months, 30 years.

10        And I'm placing you on supervised release after your
11   release from the custody of the Bureau of Prisons for a period
12   of 30 years, 30 years on Counts 1, 3 through 6, 14 through 18,
13   and 20; and 5 years, which is the statutory max, on Counts 2,
14   7, 12, 13, 19 and 21, all to run concurrent.

15        I believe that's a sentence that's sufficient but not
16   greater than necessary.  There will be those that will -- no
17   matter what side of the fence that they're on, that will
18   disagree, but I have to take into consideration a wide range of
19   factors.  And as I mentioned, I do not take these cases
20   lightly.  I think these are extremely troublesome cases,
21   horrendous cases that warrant a long sentence.

22        I'm ordering as a part of the sentence, Mr. Rouse,
23   that you pay a special assessment of $2,100.  That's a
24   mandatory fee payable to the District of North Dakota.  It's
25   $100 per count that you've been convicted of.  I'm ordering

66

1    restitution in the amount of $3,000 because that has not been
2    disputed.  I'm not imposing any fine in this case.
3            I'll dismiss all of the remaining counts of the
4    Indictment and Superseding Indictment.
5            In terms of the conditions of supervised release that
6    I'm ordering, and these are conditions you're required to
7    follow after you're released from the custody of the Bureau of
8    Prisons, you'll be required to comply with the standard
9    conditions of supervision that are ordered for every defendant
10   in this country sentenced in a federal criminal case.  The
11   standard conditions essentially require that you live a sober,
12   law-abiding lifestyle.
13           Then I'm ordering some special conditions.  You are
14   required to comply with those just as you are required to
15   comply with the standard conditions.  And I can tell you that
16   none of these special conditions of supervision that I'm
17   ordering are out of the ordinary.  You are not being singled
18   out in any way by any of these conditions.
19           And I read every decision that comes down from the
20   Eighth Circuit Court of Appeals when defendants challenge their
21   conditions of supervised release, and to the best of my
22   knowledge, none of these conditions that I am ordering to date
23   have ever been found to be unreasonable or inappropriate or
24   unwarranted for persons convicted of sex offenses.
25           Special conditions are as follows:  One, you must not

1   have any direct or indirect contact with any of the victims in

2   this case identified in the Information, in the Presentence

3   Investigation Report, as well as the discovery, unless you have

4   the written permission from your probation officer to do so.

5           You must not have any direct contact with any child

6   you know or reasonably should know to be under the age of 18

7   unless you've got the permission of your probation officer.

8           You must not access the internet except for reasons

9   approved in advance by the United States Probation Office.

10          Upon your release you'll be required to provide to

11  the United States Probation Office the opportunity to install

12  any computer-monitoring software and to take any steps needed

13  to ensure compliance with any computer-monitoring conditions

14  imposed by the United States Probation Office.  And they also

15  have a right to search any computer or computer devices.

16          You'll be required to submit to periodic polygraph

17  testing, at the discretion of your supervising probation

18  officer, to ensure compliance with all post-trial conditions.

19          You must participate in any form of sex offender

20  treatment and programming that's identified in any assessment.

21  You must participate in sex offender treatment programming and

22  follow the rules and regulations and recommendations for

23  treatment of those specialists involved in that assessment and

24  programming.

25          You are prohibited from viewing any adult or child

1    pornography.  The specific condition is going to state that you

2    must not view or possess any visual depiction, including

3    photographs, films, videos, pictures, computers or

4    computer-generated images or pictures of, quote, sexually

5    explicit conduct, as that term is defined under federal law.

6         You must also participate in any other form of

7    programming, counseling, classes of any sort recommended by the

8    United States Probation Office, including mental health

9    treatment and counseling.

10        You'll be required to register as a sex offender

11   under both North Dakota and federal law.  The federal law is

12   known as the Sex Offender Registration and Notification Act,

13   commonly referred to as SORNA, S-O-R-N-A.  That law requires

14   that you register, as well as update your registration at the

15   local county law enforcement agency that handles those types of

16   registrations, within three business days of changing your

17   occupation, changing your residence, or changing any place that

18   you may be going to school.

19        There's both a federal and a state requirement to

20   register as a sex offender.  In North Dakota, this state

21   follows the federal registration requirements.

22        How long you have to register is not determined by

23   me.  That is determined by a separate state committee appointed

24   by the state attorney general.  That committee is comprised of

25   15 or more persons from all walks of life.  They meet a couple

69

1  times every month, and they take a look at new judgments of

2  convictions that come down.  They take a look at the

3  Presentence Investigation Reports, among other things, and they

4  then classify offenders as being a low, medium or high-risk sex

5  offender.

6          If you are considered to be a low-risk sex offender,

7  the registration is a minimum of 15 years.  Medium risk is

8  25 years.  High risk is a lifetime of registration.  Federal

9  judges are not involved in that registration process in any

10  means, nor are we contacted and asked to provide any

11  information as to how we would evaluate somebody that's a sex

12  offender.  That's entirely a state function.

13          If you move out of state, the burden rests on your

14  shoulders to comply with that particular state's sex offender

15  registration requirement, and it varies from state to state

16  around the country.

17          I'm also ordering as a special condition that you can

18  be placed in a halfway house at any time after you've been

19  released from the custody of the Bureau of Prisons.  You'll be

20  required to follow the rules and regulations of that facility.

21          And last of all, you will be subject to being

22  searched, as is every defendant in the federal criminal justice

23  system nationwide who's on any form of supervision or

24  probation.  Search clauses simply provide that you can be

25  searched at any time, any place by a federal probation officer.

1          They have a right to search you and your personal
2    belongings.  They have a right to search any residence that you
3    are living at or visiting at, any place that you're working.
4    They have a right to search bank accounts, financial
5    information, computers, computer devices, cell phones, smart
6    phones or whatever devices are being used in the years ahead.
7          And you will be required as a part of the search
8    clause to provide to any federal probation officer passwords,
9    user names or any other information needed to gain access to
10   computer or computer devices of any sort.
11         Search clauses are ordered for everyone nowadays in
12   the federal system.  Thousands of defendants have challenged
13   search clauses over the years as being a violation of their
14   privacy rights.  The defendants are batting zero nationwide
15   because the United States Supreme Court has said that persons
16   on any form of federal supervision or probation can be searched
17   without a search warrant, without a Court order.  I've never
18   had a defendant that's been successful challenging a search
19   clause.
20         But again, none of these conditions are out of the
21   ordinary.  Do you have any questions about them?
22         THE DEFENDANT:  No, Your Honor.
23         THE COURT:  Have you and your attorney, Mr. Hoffmann,
24   talked at all about whether you want me to recommend to the
25   Bureau of Prisons placement at a specific federal prison

71

1  facility?  The Bureau of Prisons encourages federal judges to
2  make those recommendations in our judgment.  The Bureau of
3  Prisons tells every federal judge that they try to follow the
4  recommendations for placement that we make, but there's no
5  guarantee that that's going to happen, but I'm certainly
6  willing to make a recommendation in my judgment.
7          THE DEFENDANT:  As I kind of discussed in the letter
8  to you, I'd like a recommendation for a location that has the
9  sex-offender-specific treatment and, if possible, a protective
10 custody style environment, someplace like, you know, FCI
11 Englewood.
12         THE COURT:  Well, the safest environment for sex
13 offenders in the federal prison system is getting into a
14 federal prison that has -- that's considered a SOMP, S-O-M-P,
15 facility.  That acronym stands for Sex Offender Management
16 Program.  There's probably a half a dozen or more SOMP
17 facilities within the BOP.  I'm not entirely sure in this
18 region of the country where the closest SOMP facility is.
19 Maybe you know, Mr. Delorme.
20         MR. DELORME:  I believe it's Colorado, is the
21 closest.
22         THE COURT:  All right.  But I'll get in touch with
23 the U.S. Probation Office and find out where the closest SOMP
24 facility is within the BOP in this region.
25         Under the First Step Act passed by Congress a couple

72

1    years ago, the BOP is supposed to place you within 500 miles of

2    your home if there is a facility that has space available and

3    programs available that they believe that you need.  But I

4    think getting into a BOP prison facility with a SOMP program is

5    the best possibility for you.

6            When you go to a federal prison, it is kind of out of

7    my control.  Once I sentence you, then you fall within the

8    jurisdiction of the Bureau of Prisons.  With all of the COVID

9    concerns that have plagued our country over the last two years,

10   it's a bit unknown how fast BOP will move.

11           But they have a designation team, is what they call

12   them, in Oklahoma and a regional team in the Twin Cities.  They

13   will decide where you will be placed.  That could all happen

14   within a couple of weeks.  It could be a couple of months.

15           But the time that you've been in custody and the time

16   that you will remain in custody until you go to a federal

17   prison is time that the Bureau of Prisons will calculate and

18   give you credit for.  I do not have that responsibility as a

19   part of my judgment and signing a judgment of conviction in

20   this case.  Any questions about any of that?

21           THE DEFENDANT:  No, Your Honor.

22           THE COURT:  I also need to inform you that you do

23   have a right to appeal.  Every defendant can appeal after

24   they've been sentenced if they feel they haven't been treated

25   fairly.

73

1          You did sign a Plea Agreement in this case that we
2     reviewed in some detail months ago, and in that Plea Agreement,
3     like most plea agreements that defendants sign, there was a
4     specific paragraph in which you expressly agreed that you would
5     not appeal any sentence that fell within the sentencing
6     guidelines.  Do you recall that?
7          THE DEFENDANT:  Yes, Your Honor.
8          THE COURT:  So in your Plea Agreement you agreed in
9     the contract not to appeal any sentence up to a life sentence
10    in this case.  I believe you've clearly given up your right of
11    appeal in the Plea Agreement, but, nevertheless, I'm required
12    to inform every defendant of their right to appeal.
13         And in the federal system, defendants only have a
14    short period of time to appeal.  That is simply 14 days.  It
15    doesn't matter what state you're in or what judge you're in
16    front of.  The 14 days will start to run today, possibly
17    tomorrow.  I've got another hearing after this, so I don't know
18    when I'll get to sign that judgment and when it will be
19    docketed, but probably tomorrow morning.
20         If you wish to appeal, all that you need to do is
21    talk to Mr. Hoffmann and tell him you want to appeal.  I don't
22    hold that against any defendant.  But Mr. Hoffmann then would
23    simply need to file a one-page document called a notice of
24    appeal, one page, one paragraph.  As long as that's filed
25    within 14 days from the date I sign the judgment, then your

1    appeal rights are protected.  If it doesn't get filed within 14

2    days, then you've lost your right to appeal anything that I've

3    ordered here today.  Do you understand that?

4              THE DEFENDANT:  Yes, Your Honor.

5              THE COURT:  Okay.  In terms of the Final Order of

6    Forfeiture, Mr. Hoffmann, have you visited with Mr. Rouse about

7    that, and if so, do you have any objections to my signing that

8    order of forfeiture?  All that he's giving up is an ownership

9    interest in one cell phone.

10             MR. HOFFMAN:  Well, we've discussed that a long time

11   ago, not today, but we have, based upon our previous

12   discussions, no objection.

13             THE COURT:  All right.  Mr. Delorme, do you have any

14   objections you wish to voice on the record to the sentence

15   that's been imposed here?

16             MR. DELORME:  I have no objection, Your Honor.  I'd

17   just ask the Court to include the no-contact language within

18   the judgment as well just so BOP has it covered if that becomes

19   an issue.

20             THE COURT:  No contact with the victims in the

21   judgment?

22             MR. DELORME:  That's correct, Your Honor.

23             THE COURT:  I'll do that.

24             MR. DELORME:  As far as the facilities, Your Honor, I

25   just looked it up.  You have FMC Carlswell, which is --

75

1          THE COURT:  Say that again, and slow down.

2          MR. DELORME:  FMC Carswell, which is in Texas, I

3    believe.

4          THE COURT:  It's a federal medical center.

5          MR. DELORME:  FMC Devens, which is in Massachusetts;

6    FCI Elkton in Ohio; FCI Englewood, which is in Littleton,

7    Colorado; FCI Marianna, which is in Florida; USP Marion in

8    Illinois; FCI Petersburg, which is a medium facility in

9    Florida; FCI Seagoville in Texas; and USP Tucson in Arizona,

10   those are the locations.

11         THE COURT:  Those are all SOMP --

12         MR. DELORME:  Those are all SOMP --

13         THE COURT:  -- BOP facilities?

14         MR. DELORME:  -- the current SOMP locations, yes.

15         THE COURT:  All right.  Well, you and Mr. Hoffmann

16   can visit about that and -- I mean, I'll simply recommend to

17   the BOP, unless you tell me otherwise, that they place you in

18   the closest BOP facility that has a Sex Offender Management

19   Program in this region.  Is that acceptable?

20         THE DEFENDANT:  Yes, Your Honor.

21         THE COURT:  All right.  To the victims and their

22   parents that may be here today, and particularly Mr. Jensen,

23   who testified, I want to thank you for being here.  It's not

24   easy to come into federal court and testify at a hearing like

25   this.  It's not easy to have your family get involved in a

1  nightmare like this.  But I want to thank you for having the
2  courage to be here, as well as the other victims that are here
3  and their family members.

4          Those that may have written me letters, as well as
5  those that didn't, please, through the U.S. Attorney's Office,
6  seek help and counseling assistance that will be made available
7  to you.  Please reach out to professionals that can be of some
8  assistance to try to help you get your feet back on the ground.

9          I also want to thank Detective Rask and Special Agent
10 Randy Helderop for their exhaustive work in this case.  What
11 started out as a simple phone call about a possible runaway
12 turned out to be a major federal case, but I'm sure that both
13 of those gentlemen could have spent the rest of their lives
14 investigating this case.  And I want to thank them for being
15 here and for their work in trying to get a handle on this
16 problem that never seems to end.

17         And, Mr. Rouse, I hope that you get the help that you
18 need in federal prison.  They do have some excellent programs
19 for sex offenders, persons that are suffering from all kinds of
20 sexual disorders.  But in the federal prison system, it's all
21 voluntary, and from what I know, unless individuals are in
22 SOMP-type BOP facilities, nobody raises their hand to get
23 involved in treatment.

24         In a SOMP facility at least there are others of
25 similar background and similar convictions, and so people

1    readily get involved in treatment, but if you're not in a SOMP

2    BOP facility, most people don't seem to volunteer to get

3    involved in treatment, for whatever reasons they may have, but

4    I hope that you can get the help that you need.

5              So anything else we need to take care of here,

6    Mr. Delorme, that I may have overlooked?

7              MR. DELORME:  No, Your Honor.

8              THE COURT:  Mr. Hoffmann?

9              MR. HOFFMAN:  No, Judge.

10             THE COURT:  Mr. Rouse, any questions at all before we

11   close the record here?

12             THE DEFENDANT:  No, Your Honor.

13             THE COURT:  All right.  Then we'll -- I'll remand you

14   back to the custody of the U.S. marshals.

15             We'll stand adjourned.  We'll start the next hearing

16   in five minutes.

17             (Proceedings concluded at 3:33 p.m., the same day.)

18                      - - - - - - - - - -

19

20

21

22

23

24

25

1        <u>CERTIFICATE OF COURT REPORTER</u>

2            I, Sandra E. Ehrmantraut, a Certified Realtime

3    Reporter,

4            DO HEREBY CERTIFY that I recorded in shorthand the

5    foregoing proceedings had and made of record at the time and

6    place hereinbefore indicated.

7            I DO HEREBY FURTHER CERTIFY that the foregoing

8    typewritten pages contain an accurate transcript of my

9    shorthand notes then and there taken.

10           Dated:  July 21, 2022

11

12                         <u>/s/ Sandra E. Ehrmantraut</u>
                           Certified Realtime Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25